*** Filed ***
09:47 AM, 16 Jan, 2026
U.S.D.C., Eastern District of New York

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

—————————————————————x

**JADENAE TRABACCHI,**

$\qquad\qquad\qquad$ Plaintiff

$\qquad\qquad\qquad\qquad$ **Docket No: 24-cv-06123(TAM)(RPK)**

against-

**THE DEPARTMENT OF EDUCATION OF**
**THE CITY OF NEW YORK, DAVID BANKS,**
 **Chancellor, and KATHERINE RODI, Director**
 **of Employee Relations,**

$\qquad\qquad\qquad$ Defendants

—————————————————————x

# PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

Jadenae Trabbachi
8420 20th Avenue
Apt. c1
Brooklyn, N.Y. 11214
631-484-1127
jadenaetrabacchi@gmail.com

1

## <u>PRELIMINARY STATEMENT</u>

Plaintiff Jadenae Trabacchi ("Plaintiff") submits below her opposition to the Defendants' Motion To Dismiss her Amended Complaint. She alleges that Defendants, acting under color of law, applied the COVID Vaccine Mandate (CVM) to her in such a way as to deprive her of a reasonable accommodation, weaponized the accommodation procedure by attaching a disciplinary code – the "Problem Code" to her personnel file, and deprived her of her Constitutional fundamental right to a due process 3020-a hearing before she was terminated from her salary and employment because she requested an accommodation for her medical conditions. She was given no post-deprivation remedy.

The Problem Code in her file permanently altered her employment – current and future – without Just Cause or any due process. See **EXHIBIT C**, Amended Complaint. The Defendants answered with absolute denial of such claims with a bad faith response that death or permanent physical/mental impairment was the employee's choice, not the NYC DOE's burden or liability. These actions taken by Defendants were intentional, discriminatory, and put into place to retaliate against Plaintiff and all NYC public workers who dared to exercise their Constitutional rights by challenging the CVM and remaining unvaccinated. Retaliation and bad faith drove these efforts of Defendants to remove good, hard-working people from their jobs and health insurance for no reason and without Just Cause. Knowing that they could never win at any arbitration hearing on the unjust deprivation of a Constitutional right given by the tenure law, Defendants prohibited anyone from scheduling a 3020-a after a disciplinary code and a charge of misconduct was put into each unvaccinated employee's personnel file. This was done without notice to anyone.

2

Most shocking of all was the agreement of this Court to the scam promoted by Defendants in favor of 'Big Pharma' and the business of law in New York City. The NYC Law Department, the Corporation Counsel, sees accommodations with pay for medical leaves or religious beliefs as bad business. The Motion submitted and opposed here must be denied in its' entirety and this Court should move this case to discovery and settlement.

The Exhibits already submitted to this Court in support of Plaintiff's causes of action are: **EXHIBITS A(1)-(5)--I.** Attached to this Opposition are **EXHIBITS J-P.** Plaintiff requests that each and every argument, cause of action, background facts and Exhibits in her Complaint be incorporated in full into the arguments made here by reference.

### STANDARD OF REVIEW

On a Rule 12(b)(6) motion, the court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff. *Lynch v. City of New York*, 952 F.3d 67, 74 (2d Cir. 2020); *Littlejohn v. City of New York*, 795 F.3d 297, 306 (2d Cir. 2015). To survive, a complaint need only "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This standard "does not require 'detailed factual allegations,'" but demands "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The assessment 'does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal' conduct. *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955; *see Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937." *Lynch,* 952 F.3d at 75. A complaint should not be dismissed simply because it appears recovery is remote or unlikely. *Twombly*, 550 U.S. at 556.

3

## STATEMENT OF RELEVANT FACTS

Plaintiff filed her Complaint in this Court on 8/30/24. The Defendants – The NYC Department of Education ("NYC DOE"), David Banks (replaced by Melissa Aviles-Ramos after the Complaint was filed) and Katherine Rodi ("Rodi"), Director of Employee Relations, all named in their official capacities – were served on 9/24/24 by a professional process server. (Gotham Process Inc., see Docket for #7, 8, 9.).

On 10/9/24 Plaintiff rejected the Magistrate Judge as presiding over her case. On 10/10/24 the Court was informed that a district judge was to preside, On 10/11/24 Judge Rachel P. Kovner and Magistrate Judge Taryn A. Merkl were assigned.

On 11/15/24 Defendants filed a Motion To Dismiss Plaintiff's Complaint.

On 12/20/24 Plaintiff filed her Opposition to the Defendants' Motion To Dismiss.

On January 3, 2025 Defendants filed a Reply to Plaintiff's Opposition.

On February 26, 2025 Judge Kovner requested a Report and Recommendation on Defendants' Motion To Dismiss.

On July 31, 2025 Magistrate Merkl submitted her R&R which recommended that Plaintiff's Complaint be dismissed, but on 10/25/25 Merkl ordered that Plaintiff be given the opportunity to file an Amended Complaint, due to the original R&R being sent to the wrong address, and the mistake Merkl made in believing the shocking lie of Defendants that David Banks and Katherine Rodi were never served in this case.

On November 19, 2025 Plaintiff filed a letter to Magistrate Judge Merkl giving proof that the Defendants were properly served. (Docket #26)

4

Also on November 19, 2025, Plaintiff filed an Affidavit from Betsy Combier who explained the history behind the lie of the Defendants when they stated in their Motion that Rodi and Banks were never served, despite acceptance of their Summonses and Affirmations of Service by the process server at 100 Church Street. **EXHIBIT J** Affidavit of Betsy Combier.

On 11/21/2025 Magistrate Judge Merkl Ordered that due to the Mayor offering a reinstatement to their former positions to all fired City Workers, if they applied by December 5, 2025, all parties must confer on a possible settlement. By 12/8/2025 the parties are directed to file a status report apprising the Court of any settlement discussions, including whether the case could benefit from a referral to mediation or settlement. The Defendants were not interested.

On December 12, 2025 Defendants filed a Motion To Dismiss Plaintiff's Amended Complaint and on January 16, 2026 Plaintiff filed this Opposition To Defendants' Motion To Dismiss Plaintiff's Amended Complaint.

After the COVID-19 pandemic panic became a topic of concern in the fall of 2019, the City of New York started a process that was based upon an autocratic presumption of police power with widespread discrimination in implementing its COVID Vaccine Mandates. There were many of them, from 2021-2023. In February 2023 the City made compliance voluntary.

However, the single consistent clause, that "Nothing in this Order shall be construed to prohibit any reasonable accommodation otherwise required by law" made all the DOH Orders not generally applicable. Defendants chose to ignore this clause and created a procedure that falsely claimed to review all accommodation requests. None were reviewed or heard. Defendants ignored due process rights and adopted an as-applied discriminatory and meaningless medical accommodation procedure. Defendants also conditioned approvals for accommodating municipal

5

workers on blind support for an Emergency Use Authorization (EUA) vaccine that was temporary yet created permanent harm for Plaintiff. See Chokshi Order, September 15, 2021, **EXHIBIT D,** AC.

While hundreds of municipal workers were given approved remote positions for their religious beliefs and/or medical condition pursuant to invalid, lawless and unknown reasons never explained, Plaintiff was denied approval. The DOE made up that her continued employment as an unvaccinated employee created an undue burden. Certainly this "undue burden" had no value, and was never explained.

Indeed, what is now known is that the City created the scenario that made asking for an accommodation – medical or religious - into "misconduct", a new disciplinary charge that the City punished by termination. See **EXHIBIT C**, AC.

On August 12, 2021 Harry Nespoli, Chairperson of the Municipal Labor Committee, wrote a letter to Renee Campion, Commissioner of the New York City Office of Labor Relations ("OLR") wherein Nespoli wrote about MLC's officers meeting with the City to negotiate working conditions for municipal employees who could not get the vaccine due to religious, medical, or other reasons. He also mentioned:

> "Make no mistake, despite calling this a vaccination policy, the City's proposal creates a new criterion and process for discipline that would allow agencies to suspend workers without pay and without the typical forms of due process provided for under the collective bargaining agreements and law….no policy should be implemented before it is negotiated."

In Health Freedom Def. Fund, Inc., v. Carvalho, No. 22-55908, 2024 WL 2873372 (9th Cir. June 7, 2024), the Ninth Circuit reinstated constitutional challenges to the Los Angeles Unified School District's Covid-19 vaccine mandate. The Ninth Circuit overruled the district court's determination that there is a legitimate government interest in mandating a vaccine that cannot

6

stop the spread of disease. The district court relied heavily on Jacobson to hold that the mandate was rational—even "compelling"—as a matter of law thereby concluding that Plaintiffs' challenged claims failed. But the Ninth Circuit concluded that the police powers invoked in Jacobson do not apply to personal medical choices, which the government is not at liberty to infringe without strict scrutiny. 2024 WL 2873372 at *8.

The district court here must not resolve factual disputes on a motion to dismiss. At this stage, this Court should accept as true Plaintiffs' allegations that the vaccine does not prevent the spread of COVID-19. To the extent there is dispute about whether unvaccinated employees are more likely to spread Covid-19, or if so, whether the City was unable to mitigate the risk without undue hardship, Plaintiff prevails at this stage.

**THE COVID VACCINE MANDATE AS APPLIED TO PLAINTIFF DEPRIVED HER OF 14TH AMENDMENT DUE PROCESS RIGHTS TO A MEDICAL ACCOMMODATION AND/OR A 3020-A ARBITRATION HEARING ON THE DENIAL/FAILURE TO ACCOMMODATE**

As a tenured employee of the NYC DOE, Plaintiff has a fundamental right to due process before being terminated. The question is, what process is due? Education Law §§3020 and 3020-a clearly spell out the procedure, which ends up with a decision by a neutral arbitrator who bases his/her decision on whether there was Just Cause. See **EXHIBIT K,** Rights of Tenured Teachers

The "Seven Steps to Just Cause" are a set of widely accepted tests used in labor arbitration to determine if an employer had a fair reason to discipline or terminate an employee.

These steps, developed by arbitrator Carroll Daugherty, pose a series of questions. If the answer to any of these questions is "no," it typically indicates that the employer did not have "just cause" for the disciplinary action:

7

- **Notice**: Did the employee have clear warning of potential consequences for their conduct?

- **Reasonable Rule or Order**: Was the employer's rule or order relevant to the efficient and safe operation of the business?

- **Investigation**: Did the employer investigate before disciplining the employee?

- **Fair Investigation**: Was the investigation fair and objective, allowing the employee to present their side?

- **Proof**: Did the employer find sufficient evidence of the employee's guilt during the investigation?

- **Equal Treatment**: Were rules, orders, and penalties applied consistently to all employees in similar situations?

- **Penalty**: Was the discipline appropriate considering the offense and the employee's history?

- These principles are commonly used in unionized settings and are often included in collective bargaining agreements to protect employees from unfair discipline.

As applied here, none of the seven steps were put into place. Plaintiff was deprived of her fundamental right to due process under the 14th Amendment and Section 1983. Additionally, Plaintiff was punished with being wrongfully disciplined for her alleged "insubordination" in not getting vaccinated with the COVID vaccine  without any §3020-a  or §2568 hearing and no accommodation offers or review by the Defendants.

Education Law Section §3020 , Chapter 16, Title 4, Article 61 states as follows:

"Discipline of teachers.

No person enjoying the benefits of tenure shall be disciplined or removed during a term of employment except for just cause and in accordance with the procedures specified in section three thousand twenty-a of this article;
No person enjoying the benefits of tenure shall be suspended for a fixed time without pay or dismissed due to a violation of article thirteen-E of the public health law….. (iii) the provisions of subdivisions one and two of this section shall not apply to agreements negotiated pursuant to this subdivision…"

Plaintiff did not, at any time, waive her rights to a §3020-a hearing on her medical exemption

8

requests. She wanted her due process rights to be honored. Instead, she was declared insubordinate by the Department, her personnel file was flagged and her fingerprints tagged with a "Problem Code" designating misconduct and put into the same database used by the FBI.

The United States Supreme Court has defined waiver as "an intentional relinquishment or abandonment of a known right or privilege. Johnson v. Zerbst, 304 U. S. 458, 464 (1938). Courts should "indulge every reasonable presumption against waiver, Aetna Ins. Co. v. Kennedy, 301U. S. 389, 393 (1937), and they should "not presume acquiescence 526*526 in the loss of fundamental rights," Ohio Bell Tel. Co. v. Public Utilities Comm'n,301 U. S. 292, 307 (1937). In Carnley v. Cochran, 369 U. S. 506 (1962), the Court held:

"Presuming waiver from a silent record is impermissible. The record must show, or this must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandably rejected the offer. Anything less is not waiver." Id., at 516.

Additionally, a waiver of a teacher's tenure rights must be knowingly and freely given (Matter of Gould v. Bd. of Educ. of the Sewanhaka CHSD, et al., 81 NY2d 446; Matter of Abramovich v. Bd. of Educ. of the Three Villages CSD No. 1, 46 NY2d 450).

Tenured teachers have a property and liberty right to their jobs. Cleveland v Loudermill (470 US 532 (1985)) was a landmark 1985 U.S. Supreme Court case that established that public employees with a property interest in their jobs are entitled to a "pre-termination" hearing, which requires notice of the charges and an opportunity to respond. The Court held that this minimal hearing, coupled with subsequent post-termination procedures, satisfies the due process requirements of the Fourteenth Amendment. This ruling prevents public employees from being fired summarily without a chance to defend themselves, even if the hearing is not a full-blown trial. Plaintiff's accommodation requests should have been given strict scrutiny, and she should not have been punished by Defendants placing a "Problem Code" on her fingerprints marking

9

them as guilty of misconduct for requesting these accommodations. The actions of the Defendants were malicious and made in retaliation for Plaintiff requesting the accommodation and not getting the vaccine.

The due process given to tenured teachers was further detailed with Education Law 3020-a. The process then due pre-termination was a full and fair hearing before a neutral arbitrator. Plaintiff was never given *any* hearing, and not a §3020-a as required by Ed. Law §3020-a. These 3020-a proceedings are public policy in New York State and have been a custom and practice since 1897. Therefore when there is any penalty that reduces the benefits of these rights, there must be Just Cause. Judge Desmond Green in the Richmond County Supreme Court ruled in the case of Rosalie Cardinale that:

"New York State created the public school tenure system guaranteeing continued employment to tenured teachers by statute and therefore created a property right in a tenured teacher's continued employment. (See Education Law§§§ 3012, 3012- a, 3020, Holt v. Board of Educ. Of Webutuck Cent. School Dist., 52 NY2d 625 [1981], Matter of Abromovich v. Board of Educ. of Cent. School Dist. No. I of Towns of Brookhaven & Smithtown, 46 NY2d 450 [1979]). Where a property right in continued employment exists, such as New York's tenure system, the recipient of such a right may not be deprived without due process. See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538 [1985].

New York State guarantees a tenured teacher's due process rights to continued employment by statute requiring that "no [tenured teacher] ... shall be disciplined or removed during a term of employment except for just cause and in accordance with the procedures specified in section three thousand twenty-a of this article or in accordance with alternate disciplinary procedures contained in a collective bargaining agreement ... " Education Law § 3020."

See Kambouris v NYC DOE, Index no. 518863/2022, Decision dated January 5, 2023.

Defendant DOE did not appeal. See also the Scheinman Award dated June 27, 2022 where Arbitrator Martin Scheinman apologized for denying all DOE employees a full and fair hearing when their denials from the DOE of accommodation requests were presented. See **EXHIBIT L**, Scheinman June 27, 2022 Award.  In 2021, everyone got 15 minutes as an appeals hearing, and

10

were denied any accommodation, intentionally.

Plaintiff does not merely allege that she requested an accommodation and it was denied. She alleges that Defendants: (1) placed her on leave without pay (LWOP) without Probable Cause; (3) later terminated her employment; and (4) flagged her personnel file with a Problem Code which operated as a misconduct designation, barred future DOE employment, and carried stigmatic consequences affecting liberty and reputation interests. The U.S, Supreme Court has ruled that suspension without pay for any length of time is retaliatory discrimination (Burlington Northern and Santa Fe Railway Company v Theresa White, 548 US 53 (2006)). The goal of EDL §3020-a is to protect a teacher/educator from being removed, suspended without pay, or terminated, without Just or probable cause.

 Tenure remains public policy and a Constitutional and property right in New York State and NYC, and is also a human right not only in state Law, but also in employment contracts statewide. Plaintiff was never given a hearing on her request for accommodation. See the case of Kambouris v NYC Dep't of Education, Index No. 518863; Abramovich v. Board of Ed. of Central School Dist. No.1 of Town of Brookhaven and Smithtown  62 A.D.2d 252 [2d Dept. 1978] (holding that the public policy expressed in the tenure statutes is designed to protect individual teachers, as public servants, from being dismissed without a hearing once their competency has been demonstrated); McElroy v. Board of Educ. of Bellmore-Merrick Cent. High School Dist,  5 Misc.3d 321 [Sup Ct. Nassau County, 2004] (acknowledging purpose of statute is to protect tenured teachers from arbitrary discipline); Cardinale v NYC Department of Education, Index No. 85165/2017.

In order for a tenured educator to be taken off of his/her salary, there must be a probable cause hearing where the NYC DOE has the burden of proof. EDL §3020-a "provides the exclusive

11

method of disciplining a tenured teacher in New York State.  Teborado v. Cold Spring Harbor Cent. School Dist., 126 A.D.2d 542, [2d Dept. 1987]. DOE's attempt to characterize its accusations against Plaintiff here as anything other than misconduct or wrongdoing flies in the face of the facts. And even then, its claim cannot be sustained as a matter of law see Mannix v Bd. of Ed. of City of New York, 21 NY2d 455 [1968] (holding that the employing board improperly terminated tenured teacher accused of not fulfilling a condition of employment by not providing the teacher with due process under EDL §3020-a ); Matter of Glass v. Board of Education, 21 A.D.2d 891 [1964] (finding tenured teacher entitled to EDL §3020-a hearing where board claimed teacher failed to meet a condition of employment); Lynch v Nyquist, 41 AD2d 363, 365 [3d Dept. 1973] (stating that certification requirements cannot be used as means to erode the protection afforded to tenured teachers and that the regardless of the strength of the board's proof that the teacher was not actually certified it had to proceed pursuant to EDL §3020-a).

 The deprivation of constitutional rights is per se irreparable harm see Ferreyra v. Decker, 456 F.Supp, 549 [S.D.N.Y. 2020], Mitchell v. Cuomo, 748 F.2d 804, 806 [2d Cir. 1984]. The tenure statutes reflect the intent and purpose of the Legislature to protect educators who have successfully completed a probationary period from being disciplined summarily without the safeguards of Education Law § 3020-a. Holt v. Board of Educ. of Webutuck Cent. School Dist., 52 N.Y.2d 625 (1981).

Defendants have not submitted any proof of their specious, deceptive and false claims that Plaintiff did not establish a prima facie case for medical discrimination and employment retaliation. Defendants' argument that she suffered an adverse employment action for "failing to comply with the conflicting employment requirement" is also false. The conflict, if any, was with

12

the unlawful due process designed by the Defendants out of thin air. There was no employment requirement to get vaccinated with the COVID vaccine or be fired. Defendants made that up, and then used it as their standard to dismiss Plaintiff's case.

Plaintiff did not have standing to protest the Scheinman Award issued to all teachers in September 2021, so she was forced to submit to the procedure that subsequently led to her wrongful termination without due process. Clearly, Scheinman made up the LWOP by changing the commonly known AWOP ("Absence Without Pay") which is disciplinary to a forced leave without pay in order to throw out senior, tenured teachers such as Plaintiff without a due process hearing. See **EXHIBIT E**, AC

Based on the foregoing, the NYCDOE failed to provide a reasonable accommodation and as a result, discriminated against the Plaintiff on the basis of her medical condition, unlawfully discriminating against the Plaintiff in the terms and conditions of her employment on the basis of her medical condition, in violation of Education Law §3020, §3020-a (Tenure Law); 42 U.S.C. § 1983; N.Y. Executive Law§ 296 (New York State Human Rights Law); and N.Y.C. Human Rights Law.

Clearly, Defendants deprived Plaintiff of her fundamental Constitutional right to a due process that included a 3020-a hearing in front of a neutral arbitrator, due to her being charged with misconduct with the application of the problem code on her file without any notice to her that this was done..

### PLAINTIFF'S NYSHRL AND NYCHRL CLAIMS ARE NOT TIME-BARRED

NYC Human Rights Law (NYCHRL)  and NY State Human Rights Law (NYSHRL) strongly address medical accommodations, requiring employers to provide "reasonable accommodations" ensuring equal access to jobs unless it's an "undue hardship" for the employer, with a key focus

13

on a good-faith "cooperative dialogue" process. Employers must discuss requests with employees in good faith to find a suitable accommodation, not just deny them outright.

Defendants cannot argue that Plaintiff's claim to NYSHRL and NYCHRL jurisdiction was time-barred. First, there were no changes made to Plaintiff's conditions of employment, even to allow a vaccine in the contract – which did not happen. Secondly, a Problem Code for misconduct was secretly placed on her personnel file, and the damages are continuing. Until today Plaintiff is a charged employee, guilty of misconduct, although she was given no notice and no pre-deprivation or post-deprivation due process hearing. Her requests for accommodation to remain working remotely were denied outright or never responded to. The violation of NYSHRL and NYCHRL were continuous and never-ending.

On June 18, 2020, the Appellate Division of the First Department in Hosking v. Memorial Sloan Kettering Medical Center, 186 AD3d 64 (l st Dep' 2020) held that a reasonable accommodation requires a "good faith interactive process," clarifying the individual needs of the employee and the business, and the appropriate accommodation. The New York State Human Rights law requires "at least some deliberation between the parties about the viability of an accommodation, while the New York City Human Rights law, places the burden on the employer to show the unavailability of any safe and reasonable accommodation and to show that any proposed accommodation would place an undue hardship on its business. See, Jacobsen v. New York City Health and Hospitals Corp., 22 NY3d 824 (2014).

The New York City Human Rights Law ("NYCHRL") requires a more rigorous process than the State Human Rights Law. Courts must construe the "NYCRL" broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possibly." Albino v.

14

City of New York, 16 NY3d 473 (2011). Unlike the NYSRHL, the NYCHRL places the burden on the employer to show the unavailability of any safe and reasonable accommodation and to show that any proposed accommodation would place an undue hardship on its business. Jacobsen v. New York City Health and Hospitals Corporation, 22 NYS3d 824 (2014).

The record clearly indicates that here, Defendants' administration of the accommodation requests proceeded without any "cooperative dialogue."

Cooperative dialogue presumes an interactive process/engagement wherein information is exchanged by the parties in a manner where each party is afforded the opportunity to be heard by the other. Such interaction need not be face to face and may be in written form as long as the needs of the person requesting the accommodation understands and knows of the potential accommodations.

This deprivation of a lawful procedure was intentional, acted on under color of law, and pursued in bad faith. Defendants omitted information of their long-term policy in accommodating employees according to law. This matter shows that Defendants not only did not engage in a dialogue about the accommodations already given to them, but punished Plaintiff as guilty of misconduct for applying for exemption/accommodation.

In Wilson v. Garcia, the Supreme Court, in addressing the borrowing provision of the civil rights statute, determined that choosing "a simple broad characterization of all Section 1983 claims" better suited the purpose of the statute rather than choosing the most analogous state statute for a particular claim. (Id. at p. 272, 105 S. Ct. at p. 1944) If the choice of the statute of limitations were to depend upon the particular facts or the precise legal theory of each claim… different

15

statutes of limitations would be applied to the various Section 1983 claims arising in the same State, and multiple periods of limitations would often apply to the same case. Wilson v. Garcia, supra, 471 U.S. at pp. 273-74, 105 S.Ct. at pp. 1945-46). The Court concluded that in light of "the federal interests in uniformity and certainty, section 1983 was meant to be given a broad and simple interpretation, and the Courts were directed "to select in each State, the one most appropriate statute of limitations for all section 1983 claims." (Id. at p. 275, 105 S.Ct. at p. 1948).

The statute of limitations issue was further refined in a Supreme Court decision determining where two or more statutes of limitations exist within a state for certain enumerated torts, as in New York, the appropriate statute to apply is the residual or general personal injury statute. Meiselman v. Richardson, 743 F. Supp. 143 (EDNY 1990), citing Owens v. Okure, 488 U.S. 235, 109 S. Ct. 573, 102 L.Ed. 594 (1989). Specifically, the Court in Owens concluded that the three-year personal injury statute, CPLR 214(5), was better suited to govern section 1983 actions than the one-year statute of limitations for certain intentional torts specified by CPLR 214(3). The Court indicated that it was fulfilling the goals set forth in Wilson to "end this 'conflict, confusion, and uncertainty." (Owens v. Okure, 109 S. Ct. at p. 576, quoting Wilson v. Garcia, 471 U.S. at p. 266, 105 S.Ct. at p. 1941), by applying "the one most analogous state statute of limitations" to all section 1983 claims. Meiselman v. Richardson, 743 F. Supp. 143, 146 (EDNY 1990). In Owens, as in Wilson, the Court rejected determining the statute of limitations based on the type of theory of action before the court and its similarity to a particular state claim. Id.

In Wilson v. Garcia, the Supreme Court, in addressing the borrowing provision of the civil rights statute, determined that choosing "a simple broad characterization of all Section 1983 claims" better suited the purpose of the statute rather than choosing the most analogous state statute for a

16

particular claim.  (Id. at p. 272, 105 S. Ct. at p. 1944) If the choice of the statute of limitations were to depend upon the particular facts or the precise legal theory of each claim,… different statutes of limitations would be applied to the various Section 1983 claims arising in the same State, and multiple periods of limitations would often apply to the same case.  Wilson v. Garcia, supra, 471 U.S. at pp. 273-74, 105 S.Ct. at pp. 1945-46).

The Court concluded that in light of "the federal interests in uniformity and certainty, section 1983 was meant to be given a broad and simple interpretation, and the Courts were directed "to select in each State, the one most appropriate statute of limitations for all section 1983 claims." (Id. at p. 275, 105 S.Ct. at p. 1948). Owens concluded that the three-year personal injury statute, CPLR 214(5), was better suited to govern section 1983 actions than the one-year statute of limitations for certain intentional torts specified by CPLR 214(3).   The Court indicated that it was fulfilling the goals set forth in Wilson to "end this 'conflict, confusion, and uncertainty." (Owens v. Okure, 109 S. Ct. at p. 576, quoting Wilson v. Garcia, 471 U.S. at p. 266, 105 S.Ct. at p. 1941), by applying "the one most analogous state statute of limitations" to all section 1983 claims.  Meiselman v. Richardson, 743 F. Supp. 143, 146 (EDNY 1990).  In Owens, as in Wilson, the Court rejected determining the statute of limitations based on the type of theory of action before the court and its similarity to a particular state claim.  Id.

Here, the federal law is applicable because of the Supremacy Clause; the three-year statute of limitations should apply. See Purcell v. New York Institute of Technology, 931 F.3d 59 (2nd Cir. 2019), where the Second Circuit reversed the District Court because the lower court mistakenly held that a Title VI race claim against a school had to be commenced via an Article 78 proceeding and thus the four-month statute of limitations applied.  The Second Circuit held that federal law preempts state law and the three-year statute of limitations applied.

17

As a direct and proximate result of Defendants' failure to accommodate, Plaintiff suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages in an amount to be determined at trial. Based on the foregoing, Defendants failed to provide a reasonable accommodation and as a result, discriminated against the Plaintiff on the basis of her medical condition, and unlawfully discriminated against her in violation of the Equal Protection of the Law contained within the 14th Amendment; 42 U.S.C. § 1983; N.Y. Executive Law§ 296 (New York State Human Rights Law); and N.Y.C. Human Rights Law.

The City and Defendants named in this case acting under color of law created the CVM in order to terminate as many municipal workers and DOE employees as possible in a lawless manner and punish anyone who challenged their presumed total power. The goal was to fire municipal workers who had employment protections such as Civil Service titles or tenure, which are soundly despised by the leaders of City politics.

In order to remove the highest number of DOE employees as possible, Defendants created many excuses for their unilateral terminations yet not a single valid reason was given. In order to prove a fundamental right  and allege a procedural due process violation, Plaintiff must plead facts plausibly showing that [s]he possessed a protected liberty or property interest and that [s]he was deprived of that interest without constitutionally sufficient process. *See O'Connor v. Pierson*, 426 F.3d 187, 195–96 (2d Cir. 2005). That is exactly what Plaintiff alleges occurred in her set of facts presented here.

Generally, procedures provide constitutional due process where a plaintiff is given "a pre-termination opportunity to respond, coupled with post-termination administrative procedures

18

as provided by [state] statute." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 547–48 (1985); *see also Locurto v.Safir*, 264 F.3d 154, 171 (2d Cir. 2001) ("When [a tenured] public employee is terminated, procedural due process is satisfied if the government provides notice and a limited opportunity to be heard prior to termination, so long as a full adversarial hearing is provided afterwards.").

Shocking new information recently filed in this Court reveals that (1) all requests for religious and medical accommodations/exemptions requested by NYC DOE employees in the fall of 2021 were denied *without review* in the first step of applying for medical/religious relief from getting vaccinated; (2) the DOE and Department of Citywide Services (DCAS) will not reveal any particulars on who or why an employee was given an accommodation and push the burden of proof on the Plaintiffs/victims of the deprivation of those rights; and (3) Defendants have submitted false information to this Court.

The fact is that the NYC DOE keeps public information secret. The process for putting a problem code on an employee's personnel file as well as why a problem code is placed there at all, are secrets that the City will not reveal. What is *not* a secret is who has a problem code. This is easy to find by administrators, vendors, UFT personnel and anyone who knows computer codes. See EXHIBITS C,H,I, in AC. See attached **EXHIBIT M**. Katherine G. Rodi Deposition in Masciarelli v NYC DOE, 22-cv-07553-CBA-VMS. (Docket #76, 5/14/25; pp. 23, 73); and **EXHIBIT N**, Letter from the City Law Department to this Court in Masciarelli dated November 18, 2025.

Defendant Katherine Rodi's testimony on March 25, 2025 is particularly disturbing, especially the part where she testified about how she was part of a secret NYC DOE "General Committee" and she denied every DOE employee's accommodation appeal *without reviewing any of them*:

19

"With further questioning, Rodi explains that the general committee members were under pressure to reopen in-person schooling and couldn't do so without replacing at least some of the DOE employees who were barred from entering school buildings. Rodi describes the flood of requests for accommodations the DOE received during the fall of 2021:

*We received it from teachers, from custodians, from school food workers, from principals, from assistant principals, from, you know, name the person, name the job. And the fact is that we needed to run a school system . . .*

She describes denying accommodation requests in order to "resign" employees so that they could be replaced:

*[T]he only option was [sic] had was to resign them from the system without any bias so that we could hire other teachers. Because, again, we had a school to run.*

Later [Attorney Austin] Graff questions Rodi about the details of what happened to each individual's request for an accommodation:

*Q. Okay. So when you received an application for religious exemption, what did you review to make a determination whether to grant or deny?*

*A. We made sure that the person had appropriately applied in the right area. A number of people would check religious exemption, but they were really looking for a medical exemption.*

*We also made sure that they actually submitted something with their application, because some people included blank sheets of paper. And, then, if it was a medical—if it was in the wrong place, we—we immediately advised them so that they could reapply or reapply in the right place.*

*If it was a blank piece of paper, we immediately advised them so that they could submit appropriate documentation.*

20

*And then, other than that, we then—we reviewed to make sure they had submitted something to support, you know, that it was religious in nature. We didn't judge what it was. And even if it was just a piece of paper that they wrote out. And then we denied their request."*

The "right place" for medical accommodation review was a grievance that went to arbitration. It was not HR at the DOE, as no one ever responded to anyone. No terminated employee of the DOE was given this information, as Defendants did not want to schedule any hearings for the unvaccinated asking for medical accommodation. It was a losing proposition for Defendants. These actions by Defendants are deliberate, misleading and made in bad faith. No hearing was ever held where Plaintiff could be heard on her reasons for not getting vaccinated against COVID. She has been denied her procedural and substantive due process. See **EXHIBIT J,** Rights of Tenured Teachers.

## THE CVM AND DOH NEVER CHANGED THE TERMS AND CONDITIONS OF PLAINTIFF'S EMPLOYMENT

In their Motion To Dismiss Plaintiff's Amended Complaint (p. 3), Defendants wrote:

"Critical to this case is that the Vaccine Mandate created a condition of employment for DOE employees, including Plaintiff, to be vaccinated. On this point, the law is clear. The Second Circuit has unequivocally held that the Vaccine Mandate was a valid, lawful "condition of employment" for DOE employees."

We know now that the COVID Mandate for DOE employees never changed their terms or conditions of employment. That was a lie told by the Defendants to pursue the hoax of police power and assist Big Pharma gain a wide market share in medical insurance. See Judge Porzio In Garvey c City of NY (Index No. 85163/2022),

"Petitioners – all but one – applied for [religious] exemptions from the mandate. They received generalized and vague denials. During that time their exemptions were being processed, they remained unvaccinated. There was no reason that they could not continue to submit to testing and continue to fulfill their duties as public employees. There was no reason why the City of New York could not continue with a vaccine or test policy, like the Mayor's Executive Order that was issued in August 2021……"

21

and,

"Though vaccination should be encouraged, public employees should not have been terminated for their non-compliance….The Health Commissioner cannot create a new condition of employment for City employees. The Mayor cannot exempt certain employees from these orders. Executive Order 62 renders all of these vaccine mandates arbitrary and capricious….prohibit an employee from reporting to work."

See also:
**Former NY Governor Andrew Cuomo And Dr. Jay Varma Admit That No Authority Existed For The COVID Mandate Terminations**
https://advocatz.com/2024/09/20/former-ny-governor-andrew-cuomo-admits-that-no-authority-existed-for-covid-mandate-terminations/


Indeed, the inconvenient truths are that (1) the vaccine did not protect anyone from getting the vaccine and (2) the CVM did not stop transmission of the COVID virus to other people. In August 2021, Wolf Blitzer interviewed CDC Director Rochelle Walensky, who acknowledged on national television that the vaccines could not stop transmission of COVID.

https://www.cnn.com/2021/08/05/health/us-coronavirus-thursday/index.html

That's not all that went wrong in 2021-2022. Not a single union in the City agreed with, or ratified, a change of the terms and conditions in their contracts that agreed with the City's mandate to coerce their members into getting vaccinated or lose their jobs. Yet the City imposed the CVM and argued that the mandates changed union workers' terms of employment. The City used this false information and their power over the City budget and salaries as collateral, destroying the lives of thousands of honest, good workers and their families.

**PLAINTIFF EXHAUSTED HER ADMINISTRATIVE REMEDIES**

In her Report and Recommendation, Magistrate Judge Merkl wrote, "Over the course of her complaint, Plaintiff claims that her termination by the DOE, pursuant to the Mandate, was due to discrimination on the basis of her religion, medical condition, and disability. (Compl., ECF No.

1, ¶¶ 45, 54.) Plaintiff does not allege any discrimination on the basis of religion in her Complaint, and certainly not in ¶¶45,54.

On p. 1 of her R&R Magistrate Judge Merkl writes,

"Plaintiff fails to plead any particularized facts indicating that she apprised the DOE of a medical condition that would restrict her ability to receive the COVID-19 vaccine, nor has she plausibly alleged that she ever requested an accommodation for her religious views."

Perhaps Magistrate Judge Merkl overlooked EXHIBIT A(1)-(5) in the Amended Complaint.

Certainly Magistrate Judge Merkl is incorrect here, as are Defendants in their Motion, claiming that Plaintiff failed to exhaust her administrative remedies.

Plaintiff sent in her doctors' notes to the NYC DOE Human Resources, gained a temporary accommodation for remote work, and then was denied an extension and was placed on the problem code and terminated for misconduct for not, supposedly, complying with a new condition of employment – getting the COVID vaccine (only there was no new condition of employment in Plaintiff's contract). None of the claims against Plaintiff in the Defendants' Motion To Dismiss are true.

Thus the argument that Plaintiff failed to exhaust her internal appeals processes is false and without merit. Exhaustion is excused "when an agency's action is challenged as either unconstitutional or wholly beyond its grant of power, or when resort to an administrative remedy would be futile or when its pursuit would cause irreparable injury." Town of Oyster Bay v. Kirkland, 19 N.Y.3d 1035, 1038 (2012).

The Second Circuit in Kane already determined that the procedure used by the DOE and Martin Scheinman in 2021 were unconstitutional, creating precisely the type of circumstance where exhaustion would be excused. Even if complete exhaustion were required (which it is not),

23

Plaintiff submitted her doctors notes to the DOE as requested and was denied. Thus, she met the requirement. She pursued every available avenue for review,,and cannot be barred from pursuing her claims because Defendants failed to complete a review process they themselves promised. As the Second Circuit recognized in New Yorkers for Religious Liberty, Inc. v. City of New York, 121 F.4th 448, 464 (2d Cir. 2024), an employee who "never even had an opportunity to appeal the denial of her religious exemption or to have her exemption considered by the Citywide Panel" has a valid claim because "without the opportunity to submit to the Citywide Panel for fresh review, [her] religious exemption request can only have been considered under the same framework that we held was likely unconstitutional in Kane." The law does not permit Defendants to create procedural barriers, fail to provide promised reviews, and then claim that Plaintiff failed to exhaust administrative remedies. To hold otherwise would reward Defendants for their own obstructive conduct and contravene the remedial purposes of anti-discrimination laws.

Moreover, exhaustion is excused "when an agency's action is challenged as either unconstitutional or wholly beyond its grant of power, or when resort to an administrative remedy would be futile or when its pursuit would cause irreparable injury." Town of Oyster Bay v. Kirkland, 19 N.Y.3d 1035, 1038 (2012). See **EXHIBIT O**, Court of Appeals Order – Kane case.

Even if complete exhaustion were required (which it is not), Plaintiff would meet this requirement. She pursued every available avenue to obtain an accommodation to work remotely, all in vain. She cannot be barred from pursuing her claims because Defendants failed to complete a review process they themselves promised.

Finally, under the doctrine of preemption, based on the Supremacy Clause, federal law preempts state law, even when the laws conflict.  (Article VI, U.S. Constitution).  Plaintiff's Federal Law

24

claims preempt state law, and thus, Plaintiff can maintain a federal plenary action challenging her dismissal due to the violation of her 14th Amendment due process rights, the denial of a 3020-a hearing or any hearing, so she could be heard on the subject of her objection to the vaccine, and the secrecy of the problem code leading to a continuous wrong.

The damages are a never-ending story.

### PLAINTIFF'S SECTION 1983 CLAIM MUST NOT BE DISMISSED

Additionally, Magistrate Merkl seems to have found valid the claim of the City Law Department that Katherine Rodi was never served, yet on the Docket at #7 is the proper notarized and filed Affidavit of Service on Katherine Rodi in September 2024 *a year earlier than the R&R.*

On November 19, 2025 Plaintiff wrote and filed two letters to Magistrate Judge Merkl, one asking why service on Ms. Rodi was properly made at 100 Church in several other cases, why not this case? (See Docket #26), and a second letter wherein an Affidavit signed by Betsy Combier described the history behind the service on Katherine Rodi at 100 Church Street. See Attached**, EXHIBIT J**, and Docket #27. Plaintiff successfully showed that Katherine Rodi was served properly, and Magistrate Judge Merkl Ordered settlement discussions and gave permission for Plaintiff to file an Amended Complaint. The DOE did not want to settle.

### Former NY Governor Andrew Cuomo And Dr. Jay Varma Admit That No Authority Existed For The COVID Mandate Terminations
https://advocatz.com/2024/09/20/former-ny-governor-andrew-cuomo-admits-that-no-authority-existed-for-covid-mandate-terminations/

The COVID Mandate never usurped Plaintiff's constitutional right to her employment and due process as defined in the Education Law §§3020 and 3020-a, and more generally in the 14th Amendment. Plaintiff never waived her rights to these statutes which are in full force and effect

25

in New York City and State. In other words, the City chose to ignore the challenged constitutional due process arguments and continued to terminate every one. Other points made by Defendants are equally irrational, namely that the COVID Vaccine Mandate changed Plaintiff's terms of employment (there was no change); that the LWOP was *not* disciplinary (suspension without pay is discriminatory retaliation, and the "Problem code" placed on her fingerprints in her personnel file was a disciplinary action).

Indeed, the City, acting in concert with its agencies, engaged in widespread discrimination in implementing its vaccine mandates which caught their victims randomly and arbitrarily. The COVID Vaccine Mandate was not neutral. Rather than accommodate Plaintiff, as the Collective Bargaining Agreement (CBA) of the UFT guaranteed, the City adopted a facially discriminatory accommodation policy that conditioned an exemption on very limited, unsupported criteria that were, for the most part, kept secret. There was no criteria to grant or deny anyone's claim or request for exemption/accommodation.

The NYC DOE's "police power" was nothing more than a big hoax, a public relations scam paid for by Big Pharma and it's investors, who got kickbacks to assist the City in cleaning house of City payrolls. The mass layoff of municipal workers 2021-22 was the result. The Defendants were successful, until they weren't.

Under "Protected Bases Defined" in the Department of Citywide Administrative Services' Reasonable Accommodation Procedural Guidelines, "Disability" is :

"A disability is any "physical, medical, mental or psychological impairment, or a history or record of such impairment."1 Both temporary or short-term injuries, as well as chronic conditions, may qualify as disabilities, even if the impairments, when treated, permit the individual to perform physical activities without limitation, and/or the conditions do not substantially limit the individual's major life activities."

26

City workers cannot be terminated without a hearing (Civil Service Law 75-b and Education Law 3020-a.)

 Plaintiff, a tenured teacher for 10 years with the NYC Department of Education ("NYC DOE"), has protected rights under the Tenure Law, 14th Amendments, Civil Service Law 75-b and Human Rights Laws that were never honored by the Defendant. Defendant wants this court to believe that an experimental, temporary, City-ordered Emergency Usage COVID vaccine could trample Plaintiff's Constitutional rights to her pre-deprivation due process hearing pursuant to the 14th Amendment and Education Law §§3020 and 3020-a. As Defendants deliberately and intentionally deprived Plaintiff of her pre-termination due process, Plaintiff's case cannot be considered given any due process post-deprivation, either. Defendants at all times acted under color of law. Plaintiff has validated a Section 1983 claim.

## KATHERINE RODI IS A VALID DEFENDANT IN THIS CASE

Katherine Rodi was served properly at 100 Church Street in Manhattan. See Docket #7. She has given testimony that she is the Director of Employee Relations at the NYC DOE and as such she is the official at the DOE who places a problem code on employees' personnel files. She has been doing this since 2012. See **EXHIBIT P**. Testimony from PERB Case U-32479 November 2015. See also Sacay v. The Research Foundation of the City University of New York, 44 F. Supp.2d 505 (E.D.N.Y. 1999) (noting that inference that a supervisor played a role in the allegedly discriminatory decision to discharge an employee provided a minimally sufficient basis for individual liability under the HRL. Additionally, Rodi testified in March 2025 that she was the Director of a secret "General Committee" that denied all accommodation requests by DOE employees without review.

27

**CONCLUSION**

Plaintiff has proven that her right to a pre-deprivation and post-deprivation hearing on her medical accommodation request was never given to her due to the malfeasance of the Defendants cited in this case. Plaintiff respectfully requests that the Defendants' Motion To Dismiss the Amended Complaint be denied in it's entirety, and this case proceed immediately to a settlement or judgment against Defendants.

Dated: January 15, 2026

/s/Jadenae Trabacchi

# EXHIBIT J

UNITED STATES DISTRICT COURT EASTERN
DISTRICT OF NEW YORK

_____X

JADENAE TRABACCHI,

               Plaintiff      **DOCKET NO. 24-CV-6123 (RPK) (TAM)**

        -against –

THE DEPARTMENT OF EDUCATION
OF THE CITY OF NEW YORK, DAVID
BANKS, Chancellor; and KATHERINE RODI,
Director of Employee Relations,

               Defendants

_____X

STATE OF NEW YORK)
              SS.:
COUNTY OF NEW YORK

## AFFIDAVIT OF BETSY COMBIER

    I, BETSY COMBIER, affirm under the penalties of perjury under the laws of the State of New York that the following is true and may be filed in a court of law:

1.    My name is Betsy Combier, and I am the President and lead paralegal/workplace investigator of Advocatz, a consulting business for people who need a partner as they go through the Courts, grievances, or life problems.

2.    Since 2004 I have been working on exposing how the "Problem Code" is placed onto the

1

personnel files of NYC DOE employees without just or probable cause, depriving the employee of Constitutional due process.

3. My research into the Problem Code and the secret manipulation and deprivation of rights by the New York City Department of Education has led me to conclude that the process of employees being problem coded has no justification under any law, rule or regulation.

4. The Plaintiff in the case cited above asked for my assistance after New York City Law Department Attorneys Kathleen Linnane (who has since left the Corporation Counsel and now works for Paduano & Weintraub located at 1251 Avenue of the Americas, N.Y., N.Y. 10020) and Attorney Brigid Lynn filed a Motion To Dismiss in the Court on 11/15/24 in which they argued that Defendant Katherine Rodi must be dismissed from the case because she was *never served*. Yet the Docket of the case on PACER.gov (#7) clearly shows the notarized, stamped and filed Summons served on Kathleen Rodi on 9/24/24 at 100 Church Street in Manhattan. This is the correct place to serve Ms. Rodi since at least 2018.

5. Ms. Linnane and Ms. Lynn wrote in their Motion To Dismiss that Ms. Rodi cannot be served at the City Law Department at 100 Church Street. This was a lie, and both Attorneys were well aware of making this up due to their inability to justify Defendant Rodi's actions, namely placing every unvaccinated DOE employee on the Problem Code on October 4, 2021. However, Magistrate Judge Taryn A. Merkl bought the bait in her Report and Recommendation and questioned the service. This Affidavit addresses these actions and supports the Plaintiff's Complaint and service as lawful and correct.

6. The Problem Code is visible to anyone who nominates any DOE employee for a job,

2

who is a payroll secretary or manages salaries for a school or vendor, and anyone else who knows where to look in the codes available in the DOE database. The DOE will fight to say this is not true, because the way that the Problem Code is placed on all employees who get a letter to file (which cannot be grieved) is a violation of the 14th Amendment and its' promise of due process.

7. The DOE has never been able to come up with a good, lawful reason to permanently scar a person's career without a hearing (assuming this person was not convicted in any criminal proceeding). I cannot find one either.

8. I am an Expert Witness on the Problem Code, Education Law §3020-a arbitration, and Section 913 evaluations, and respectfully submit this AFFIDAVIT in support of the Plaintiff's Amended Complaint submitted to the Court holding Jurisdiction over this case in the Eastern District of New York.

9. I know the facts stated herein to be true based upon my personal knowledge and upon my review of the files of hundreds of my clients whom I have represented in proceedings with the New York City Department of Education ("DOE"), except for statements which are made on information and belief and, as to those, I verily believe them.

10. I uncovered what became known as the "Problem Code" when I filed a Freedom of Information request with the DOE for names of employees and reasons for them being listed in the Monitoring Unit database in 2004. I was denied access because all the employees were listed only by their social security numbers, which I was forbidden to see. See my articles on Parentadvocates.org:

3

**The New York City Department of Education's "Problem Code" is an Unlawful Flag On Employee's Fingerprints**
https://www.parentadvocates.org/index.cfm?fuseaction=article&articleID=8884

**In NYC the Absent Teacher Reserve and The Rubber Room Are Both Strategies For Unlawful Denial of Tenure Job Protections (2021)**
https://www.parentadvocates.org/index.cfm?fuseaction=article&articleID=8958

and on my website Advocatz.com:

**The New York City Department of Education, UFT, Problem Code, and Perpetual Fog Machine Continue To Prevent Unvaxxed Employees From Working**

https://advocatz.com/2023/02/12/the-new-york-city-department-of-education-problem-code-continues-to-prevent-unvaxxed-employees-from-working/

11. I worked as a union Special Representative under UFT Presidents Randi Weingarten and Michael Mulgrew from 2007-2010 and told members about the problem code as well as whether they were coded or not. The Problem Code of members was easily available to us, and I became the person who was called about it. I answered every call, but left the UFT when it became obvious to me that my help on this issue, as well as others, was not highly regarded by the people at the top level of the UFT.

12. As an Expert witness on the Problem Code, I have made myself available to assist DOE employees as they pursue clearing their name and overturning a wrongful termination.

13. Since February 8, 2022 I have been writing and publishing stories on Advocatz.com about the unlawful termination of unvaccinated municipal workers in New York City, and about the DOE placing unvaccinated employees onto the "Problem Code" database on October 4, 2021 after they dared to challenge the experimental COVID Vaccine Mandate (CVM).

4

14. On April 22, 2022 I received an email from a teacher who was unvaccinated and this email had truly shocking information. The email was sent to her by DOE employee Eric Amato. In his email, Mr. Amato wrote:

> "PR = Problem code – Problem code was added to all employees who were placed on 2VM vaccine mandate leave. It was placed there the day you went on the leave. Our central offices placed this code on all employees who went on the leave. It will be removed once you are eligible to return to work.
>
> Thanks,
> Eric"
>
> See my Declaration:  **Betsy Combier declaration** in my articles above and here:
>
> 2022-6-3-doc-168-1-declaration-of-black-in-supp-exhb-1

My Declaration was filed in the cases of Kane v De Blasio et al., (21-CV-7863) and Keil v City of New York et al. (21-CV-8773), on June 3, 2022 (Docket 168-1).

15. Mr. Amato left his employment with the DOE soon after he sent the email.

16. After the Problem Code was exposed, the planned hoax by the DOE and Unions in New York City to fire as many permanent/tenured employees as possible started unraveling. The goal of a mass layoff of permanent or tenured municipal workers and educators fell apart. There was never a just cause for the thousands of people who lost everything, but here is where the following slogans come in handy: "Knowledge is power", and "You can fool some of the people all of the time, and all of the people some of the time, but you cannot fool all of the people all of the time". Most people contribute the second slogan to President Abraham Lincoln.

**UPDATE: Educators Accused of Submitting Fake Vaccination Cards Win Jobs Back and Backpay**

5

https://advocatz.com/2023/02/17/update-educators-accused-of-submitting-fake-vaccination-cards-win-jobs-back-and-backpay/

**NYC is Forcing Unionized Public Employees Into At-Will Terms of Employment**
https://advocatz.com/2024/09/23/nyc-is-forcing-unionized-public-employees-into-at-will-terms-of-employment/

17. Suddenly, in October 2021, all employees of the DOE in all titles, tenured or untenured, who could not, did not, or would not - for religious or medical reasons - get vaccinated by the COVID vaccine were permanently coded and subsequently labelled as guilty of misconduct and blocked from getting unemployment or any employment as a teacher for the DOE or any vendor without any due process hearing of any kind. The DOE refused to hold any grievance or Education Law §3020-a arbitrations, so the UFT paused any and all filings of grievances in October and November 2021.

18. All this must be seen as a conspiracy of harm, as the COVID vaccine did not protect anyone from getting the COVID virus or transmitting it to someone else, and both the UFT and the DOE were aware of this information. Both chose to ignore the science, some say to get kickbacks from the drug companies for every vaccine given.

**Former NY Governor Andrew Cuomo And Dr. Jay Varma Admit That No Authority Existed For The COVID Mandate Terminations**
https://advocatz.com/2024/09/20/former-ny-governor-andrew-cuomo-admits-that-no-authority-existed-for-covid-mandate-terminations/

19. Additionally, the City of New York marketed the COVID Vaccine Mandate ("CVM") as a new term of employment for the municipal workers in New York City, but this was always false for non-healthcare employees. No union changed the terms in their contract to make the vaccine mandatory.

6

20.    In June 2022 while I was representing a teacher in a PERB Case (Public Employment Relations Board), Administrative Law Judge (ALJ) Mary Thomas Scott informed me that the 10-year litigation on the Problem Code had reached an end, and did I want the final decision? Bless her. I said yes. The PERB Problem Code case was filed by the UFT against the DOE to force the DOE to make a Problem Code on a member's file more transparent by answering such questions as: when was this Code placed on the member's file? Why? The ALJ found that the "flagging" impacted terms and conditions of employment, and that the District had violated the Act by instituting the flagging system. Thus the DOE lost the case, but has never complied with the Judgment.

21.    The person who has been avoiding scrutiny yet has permanently scarred DOE employees without due process is the DOE Executive Director of Employee Relations, Ms. Katherine Rodi. She has been in that position since 2012. (Testimony. Nov. 5, 2015, PERB). Rodi also has the responsibility of overseeing the NYCDOE's Office of Safety and Health, and the Office of Personnel Investigation ("OPI") where she decides who among the NYCDOE's employees are placed on a "Problem Code". She monitors the disciplinary information in the personnel file that is highlighted by the Problem Code for principals who may want to hire a former or current employee.

22.    In her testimony given under oath at PERB in November 2015 Ms. Rodi testified that "no Respondent ever sees their flag/problem code", and if a principal or some other potential employer wanted to hire someone who was coded, they could hire the person. None of these statements are true.

23.    While working at the UFT, when I received a call from a DOE employee/UFT member

7

asking if he/she was on the Problem Code, I told them "one minute, I will let you know". I walked quickly the 5 steps into the office next door, and would ask Amy Arundell, another Special Representative, whether or not the caller was coded by file number. Ms. Arundell looked at her computer and told me yes or no. I gave this information to the person on the phone. This was 2008-2009. So, when Amy Arundell testified in November 2015 at PERB that she had never heard of the Problem Code until 2012, in order to get the UFT's PERB Improper Practice Charge case heard under the statute of limitations of 4 months, she was not telling the truth either, just like Ms. Rodi.

24.     The DOE has continuously tried to keep the Problem Code hidden because there is no law, rule or regulation that can legally support the manner in which the Code serves to directly harm an employee by getting the employee terminated and unable to work ever again as an educator in New York City.

25.     It is a well-known fact that Ms. Rodi has been sued many times in this Court, and service was and is accepted at 100 Church Street, New York City: Plaintiff Jadenae Trabacchi served Katherine Rodi on 9/24/24 at 100 Church Street (Docket #7); EDNY Pro se Plaintiff Mushtaq Ahmad (18-CV-3494(WFK)(LB) used the United States Marshals Service to serve Ms. Rodi. The Marshal was turned away from 65 Court Street, and told to serve Ms. Rodi at 100 Church Street, NY NY 10007, where Betty Mazyck accepted service.(Docket # 22 Filed 09/24/18); Petitioner Miles Grossman (NYS Supreme Court No. 155034/2023) served Katherine Rodi at 100 Church Street, accepted by Ariton Marke, Deputy Unit Chief; Parrino v NYC DOE (24-CV-08892 served Rodi 2/25/25); Rothschild v NYCDOE et al., (25-CV-01684), served Rodi October 7, 2025; Trudo v

8

NYC DOE et al.,(25-CV-01345) served Rodi 5/6/2025; Matyas v NYC DOE et al., (25-CV-01861) served Rodi on 5/6/2025. None of these cases had a problem with service at 100 Church Street, Manhattan.

26. The reason why the lie of Attorneys Linnane and Lynn that Ms. Rodi was never served (but Docket #7 says that she was served on 9/24/24) in this case was so absurd comes from the failure of another lie made by the NYC Law Department in 2024. Around the same time that this case was filed, another pro se case with Katherine Rodi as a Defendant was also served on the City Law Department at 100 Church Street. When the professional process server presented the Complaints at the service window, he was told that Ms. Rodi could not be served because she *"no longer worked at the Department of Education"*. The Plaintiff called me and told me that the process server was turned away, what could she do? I immediately contacted "my old friend" from 2004, Dr. Peter Ianniello, who is Executive Director of Human Resources for the DOE. He replied in 5 minutes that this information was false, and that Kathy Rodi continues to work for the DOE. I then called the Unit Chief in charge of Operations at the City Law Department, and I told him what happened. He told me, "Well, we do not accept service for every employee at the DOE…." I told him that Ms. Rodi was a VIP, in charge of Employee Relations and OPI. The Unit Director said, "Oh, Betsy, I get it! I will immediately write a Notice to all who work at the service window that any and all lawsuits filed with Katherine Rodi in the caption must be accepted by us. Please tell the service provider who was turned away to come back!" I did just that, and on Dec.19, 2024 Rodi was successfully served in that case. I thought this was the end to the lies of the Corporation

9

Counsel. I was wrong. On November 15, 2024, the New York City Law Department Attorneys in the matter cited in the caption above, Ms. Kathleen M. Linnane and Brigid Lynn, wrote into their Motion To Dismiss that Katherine Rodi was never served, and thus the Court had no jurisdiction over her and she must be dismissed from the case. In my opinion, lying in a federal court motion is extremely serious business.

27. Plaintiff and I had a great solution. When Ms. Lynn sent Plaintiff a request for an extension of time to oppose the Amended Complaint, Plaintiff wrote back that she would grant any amount of time, as long as Ms. Lynn withdrew her claim that Rodi was never served, and that this was a mistake. Lynn refused, saying "I am not in a position to agree that service on Katherine Rodi at 100 Church Street was proper service" (Oct. 28, 2025).

28. That same day, Attorney Lynn wrote to the Magistrate Judge Merkl:

"I write to respectfully request an extension of time to December 4, 2025, for the DOE to respond to the amended complaint. This is the DOE's first request for an extension of time to respond to the amended complaint and the requested extension does not affect any scheduled dates. Although not entirely clear, it appears that pro se Plaintiff is only willing to consent to an extension if Defendant agrees that individual defendant Katherine Rodi was properly served at 100 Church Street and informs the Court that it was mistaken in claiming otherwise in its Motion to Dismiss the Complaint. Defendant, however, does not agree that service on Rodi was proper. Thus, it appears that Plaintiff opposes the requested extension.
….. Plaintiff is required to file proof of service on individual defendants Rodi and Melissa Aviles-Ramos…."

29. In sum, Plaintiff has plausibly pleaded that she was potentially subjected to an unconstitutional government action resulting in an injury for which she has yet to receive recompense. Due to the inability to defend the actions of DOE Defendant Katherine Rodi in placing Plaintiff Trabacchi on the stigmatizing Problem Code on or about October 4, 2021, Corporation Counsel Attorneys Linnane and Lynn deliberately filed false

10

information about an alleged "lack of/improper service" on Katherine Rodi while a filed and notarized Summons served on Ms. Rodi at 100 Church Street on 9/24/24 is clearly seen on the Docket at #7.

I swear on this 18th day of November, 2025, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

_____
Elizabeth Combier ("Betsy")

Notary Public

State of _New York_ County of _New York_
Subscribed and sworn to (or affirmed) before me
on this _18_ day of ___Nov___ ,20 _25_
by _Elizabeth Irene Combier_ ,
proved to me on the basis of satisfactory evidence to
be the person(s) who appeared before me.

_____
Notary Public Signature

Nicholas Cruz
Notary Public, State of New York
Reg. No. 01CR0031988
Qualified in Bronx County
Commission Expires December 16, 2028

11

# EXHIBIT K



**The University of the State of New York**
The State Education Department
Teacher Tenure Hearing Unit
89 Washington Ave., Room 987 EBA
Albany, New York 12234

Ph:     (518) 473-2829
Fax:    (518) 402-5940

(09/21)

## Rights of Tenured Employees
*(This document only applies to cases where charges were filed on or after July 1, 2015.)*

This document, while not intended to be exhaustive, describes certain rights of tenured employees in Education Law §3020-a and §3020-b* proceedings. The information contained in this document should not act as a substitute for the applicable statutes or regulations. Individuals are advised to consult with an attorney as significant adverse consequences may result from these proceedings.

> **Special Notice to Tenured Employees of the New York City Department of Education**
>
> Many of the provisions in Education Law §3020-a and/or §3020-b, including those described in this document, have been substantially modified by the collective bargaining agreement and subsequent amendments and/or revisions between the United Federation of Teachers ("UFT") and the New York City Department of Education ("NYCDOE"). Education Law §3020(3) permits the NYCDOE to modify the provisions of Education Law §3020-a through the collective bargaining process. If you are a tenured employee of the NYCDOE, you are advised to review your collective bargaining agreement and any amendments and/or revisions thereto to determine whether your rights may deviate from the provisions described below. If you have any questions, you should consult with the UFT and/ or an attorney.

Tenured individuals cannot be disciplined or removed from employment except for "just cause" pursuant to Education Law §3020. The procedures for such discipline or removal are set forth in Education Law §3020-a, Education Law §3020-b, and the Commissioner's Regulations 8 NYCRR Ch. II, Sub. C, Part 82-3.

### Charges

1. The employing board of education ("board") must determine, by a majority vote, that probable cause exists to bring a disciplinary proceeding against the tenured employee ("employee").
2. If the board finds probable cause, the tenured employee must be provided with a written statement specifying: a.) the charges in detail; b.) the maximum penalty the board will seek if the employee is found guilty of the charges or that will be imposed if the employee does not request a hearing; and c.) a copy of this form outlining the employee's rights. The charges must be sent by certified or registered mail, return receipt requested or by personal delivery.
3. Charges cannot be brought more than three years after the alleged incompetency or misconduct, except when the charge is of misconduct constituting a crime when committed.

### Suspension Pending Hearing

The employee may be suspended pending a hearing on the charges and the final determination thereof. An employee may be suspended without pay if: a.) the employee has pleaded guilty to or has been convicted of certain felony drug crimes or a felony crime involving the physical abuse of a minor or student; or b.) the employee is charged with misconduct constituting physical or sexual abuse of a student. Employees suspended without pay due to charges constituting physical or sexual abuse of a student, are entitled to an expedited probable cause hearing.

### Termination Without Hearing

The employee shall be terminated without a hearing upon conviction of a sex offense as defined by Education Law §305(7-a)(b)(2). Employees acting as school administrators or supervisors shall be terminated without a hearing upon conviction of defrauding the government as defined by Education Law §305(7-b)(b)(2).

### Hearing Request/Failure to Request

1. Within 10 days of receiving charges, the employee must provide a written request to the clerk or the secretary of the employing board if the employee desires a hearing on the charges.
2. In the written request for hearing, the employee should indicate the name and contact information for the attorney who will represent the employee, if any. Such attorney shall be authorized to receive all correspondence related to the proceeding on the employee's behalf.

**Rights of Tenured Employees** *(cont.)*

3. If the employee does not request a hearing within 10 days of receipt of the charges, the employee shall be deemed to have waived the right to a hearing if there is an unexcused failure to request a hearing.
4. If the employee waives his right to a hearing, the board shall proceed, within fifteen days, by a majority vote to determine the case and fix the penalty, if any, to be imposed.

### Hearing Officer Selection Process

1. Within 3 business days of receipt of the written hearing request, the clerk or secretary of the board shall notify the commissioner of the need for a hearing.
2. Upon receipt of such notification, the commissioner shall request that the American Arbitration Association provide a list of names of individuals to potentially serve as hearing officers along with relevant biographical information concerning the individual. The commissioner shall forthwith send such list to both parties.
3. For charges brought pursuant to §3020-a, the employee and the board must notify the commissioner of their agreed upon hearing officer selection within 15 days of receiving the list of potential hearing officers. If the parties fail to agree or fail to notify the commissioner of their selection within 15 days, the commissioner shall appoint a hearing officer from the list.
4. For charges brought pursuant to §3020-b, where an employee has received two consecutive ineffective ratings, the employee and the board must notify the commissioner of their agreed upon hearing officer selection within 7 days of receiving the list of potential hearing officers. If the parties fail to agree or fail to notify the commissioner of their selection within 7 days, the commissioner shall appoint a hearing officer from the list.
5. For charges brought pursuant to §3020-b, where an employee has received three consecutive ineffective ratings, the commissioner shall appoint a hearing officer from the list.

### Pre-Hearing Conference

1. The pre-hearing conference shall be private.
2. The hearing officer shall hold a pre-hearing conference within 10-15 days of receipt of notice from the commissioner confirming his or her acceptance to serve in such position, in the case of a standard or expedited §3020-a hearing.
3. For expedited §3020-b hearings where the employee has received 2 consecutive ineffective APPR ratings, the hearing officer shall hold a pre-hearing conference within 7 days of receiving notice confirming the hearing officer's agreement to serve.
4. For expedited §3020-b hearings where the employee has received 3 consecutive ineffective APPR ratings, the hearing officer shall hold a pre-hearing conference within 5 days of receiving notice confirming the hearing officer's agreement to serve.
5. At the pre-hearing conference, the hearing officer has the power to: a.) issue subpoenas; b.) hear and decide motions and applications made by either party; c.) set a schedule for full and fair disclosure of witnesses and evidence for both parties; and d.) set the time and place for hearings to ensure that the hearing is conducted within the statutory timelines.
6. Generally, pre-hearing motions must be made on written notice to the hearing officer and adverse party at least 5 days before the pre-hearing conference. Any pre-hearing motions not made as provided for herein shall be deemed waived. However, for expedited hearings, written notice to the adverse party shall be made no later than 2 days before the pre-hearing conference.

### General Hearing Procedures

1. The hearing will be conducted by a single hearing officer.
2. The employee shall have a reasonable opportunity to defend his or herself, including making any additional motions and applications and an opportunity to testify on his or her own behalf, however, the employee shall not be required to testify.
3. Each party has the right to be represented by counsel, and may subpoena and cross-examine witnesses. All testimony shall be under oath.
4. An accurate record of the hearing shall be kept at the expense of the commissioner. Upon request, the employee is entitled to a copy of the record without charge.
5. If the hearing officer needs to be replaced and the parties fail to notify the commissioner of their mutually agreed upon replacement within 2 business days, the commissioner shall select the replacement.

## Rights of Tenured Employees *(cont.)*

6. At the conclusion of the testimony, the hearing officer may allow the parties to submit memoranda of law; however, such submission may not delay the date that the hearing officer is required to render a decision.

7. In general, hearings must be completed within 60 days of the pre-hearing conference. Please see below for the time periods applicable to particular expedited hearings.

8. In general, all evidence must be submitted within 125 days of the filing of charges and no additional evidence shall be accepted after such time, absent extraordinary circumstances beyond control of the parties.

### Expedited Hearing Based on Revocation of Certification

1. If the charges are based upon revocation of the employee's certification, an expedited hearing must be held.

2. The hearing shall commence within 7 days of the pre-hearing conference and is limited to one day. The hearing may not be adjourned except upon request of a party and only for good cause as determined by the hearing officer.

### Expedited Hearing Based on Charges Constituting Physical or Sexual Abuse of Student

1. If the charges are based upon allegations of physical or sexual abuse of a student, an expedited hearing must be held.

2. The hearing shall commence within seven days after the pre-hearing conference and shall be completed within sixty days after the pre-hearing conference. Adjournments may not be granted that would extend the hearing beyond 60 days, except where the hearing officer determines that the delay is both substantially beyond control of the requesting party and an injustice would result if the adjournment were not granted.

### Expedited Hearing Based on Two Consecutive Ineffective APPR Ratings

1. The Board may bring charges alleging incompetence based upon two consecutive ineffective APPR ratings, in which case an expedited hearing would be held, but the board is not required to bring charges.

2. The hearing must begin within 7 days of the pre-hearing conference and be completed within 90 days following the date that the employee requested the hearing. Adjournments may not be granted that would extend the hearing beyond 90 days, except where the hearing officer determines that the delay is both substantially beyond control of the requesting party and an injustice would result if the adjournment were not granted.

3. The charges must allege that the board has developed and substantially implemented a teacher or principal improvement plan for the employee following the first evaluation in which the employee was rated ineffective and the immediately preceding evaluation if the employee was rated developing.

### Expedited Hearing Based on Three Consecutive Ineffective APPR Ratings

1. The Board shall bring charges alleging incompetence where any teacher or principal receives three consecutive ineffective APPR ratings, in which case an expedited hearing must be held.

2. The hearing must commence within 5 days of the pre-hearing conference and be completed within 30 days following the date that the employee requested the hearing. Adjournments may not be granted that would extend the hearing beyond 30 days, except where the hearing officer determines that the delay is both substantially beyond control of the requesting party and an injustice would result if the adjournment were not granted.

### Decision

1. With the exception of expedited hearings, the hearing officer shall render a written decision within 30 days of the last hearing date.

2. For expedited hearings, the hearing officer shall render a written decision within 10 days of the last hearing date.

3. The commissioner must immediately forward copies of the decision to the parties.

4. The hearing officer shall render a written decision that includes findings of fact and conclusions, based upon the findings of fact, as to each charge and shall state the penalty, or other action, if any, against the employee on each charge.

## Rights of Tenured Employees *(cont.)*

5. In those cases where a penalty is imposed, such penalty may be a written reprimand, a fine, a suspension for a fixed time without pay, or dismissal.

6. In determining penalty, the hearing officer shall give serious consideration to the penalty recommended by the board, and if the hearing officer imposes a different penalty, then the hearing officer must indicate the reasons for the alternate penalty based upon the record.

7. Within 15 days of the receipt of the hearing officer's decision, the board shall implement the decision. If the employee is acquitted of the charges, he or she must be restored to his or her position with full pay for any period of suspension without pay and the charges expunged from the employment record.

8. The hearing officer shall indicate in the decision whether any of the charges brought by the board were frivolous as defined by the Civil Practice Law and Rules §8303-a. If the hearing officer finds that all of the charges were frivolous, the hearing officer shall order the board to reimburse both the employee and the department reasonable costs that were incurred. If the hearing officer finds that some, but not all of the charges were frivolous, the hearing officer shall order the board to reimburse a portion of the reasonable costs incurred to the department and the employee.

### Appeal

1. Not later than 10 days after receipt of the hearing officer's decision, either the employee or the board may make an application to the New York State Supreme Court to vacate or modify the hearing officer's decision pursuant to Civil Practice Law and Rules §7511.

2. The filing of the pendency of an appeal shall not delay the implementation of the hearing officer's decision.

### Restoration of Rights

If an employee who was convicted of a felony crime as specified in Education Law §3020-a(2)(b) has his or her conviction reversed, the employee, upon application, shall be entitled to have his or her pay and other emoluments restored, for the period of time extending from the date of suspension to the date of the decision.

*Pursuant to §§ 30-2.14 and 30-3.17 of the Rules of the Board of Regents, educators whose Annual Professional Performance Reviews (APPRs) include results from the State's growth model (i.e., teachers of grades 4-8 ELA and Mathematics; principals of buildings including those grade levels; and principals of buildings including all of grades 9-12) or any other measures based on the grades 3-8 ELA and Mathematics State assessments will receive both an "original" evaluation and a "transition" evaluation. This process will continue through the 2018-19 school year, during the time that the State transitions to new ELA and Mathematics learning standards and assessments and during that time the State will explore potential revisions to the evaluation framework. The "original" evaluation will include the results of the State's growth model and any other measures based on the grades 3-8 ELA and Mathematics State assessments. This evaluation is provided for advisory purposes only and cannot be used for employment related decisions. Affected educators will also receive a "transition" evaluation that excludes the above referenced measures. During the transition period, only this transition score and rating will be used for purposes of employment decisions, including tenure determinations and for purposes of proceedings under Education Law §§3020-a and 3020-b.

# EXHIBIT L



### SCHEINMAN
ARBITRATION & MEDIATION SERVICES

June 27, 2022

**Via E-Mail Only**
Liz Vladeck, Esq.
New York City Department of Education
Office of the General Counsel
52 Chambers Street, Room 308
New York, NY 10007

Alan M. Klinger, Esq.
Stroock & Stroock & Lavan, L.L.P.
180 Maiden Lane, 33rd Floor
New York, NY 10038

Michael Mulgrew, President
Beth Norton, Esq.
United Federation of Teachers
52 Broadway, 14th Floor
New York, NY 10004

**Re:** **Board of Education of the City School District of the City of New York**
**and**
**United Federation of Teachers, Local 2, AFT, AFL-CIO**
**(Proof of Vaccination)**

Dear Counsel:

Enclosed please find my Opinion and Award in the above referenced matter.

I have also enclosed my bill for services rendered.

Thank you.

Sincerely,

Martin F. Scheinman

MFS/sk
NYCDOE.UFT.proof of vaccination.trans

322 Main Street ◆ Port Washington, NY 11050 ◆ 516.944.1700 ◆ fax: 516.944.1771 ◆ www.ScheinmanNeutrals.com

```
----------------------------------- X
In the Matter of the Arbitration
                                    X
        between
                                    X        Re: Proof of
BOARD OF EDUCATION OF THE CITY                   Vaccination
SCHOOL DISTRICT OF THE CITY OF      X
NEW YORK
                                    X
            "Department"
                                    X
        -and-
                                    X
UNITED FEDERATION OF TEACHERS,
LOCAL 2, AFT, AFL-CIO               X

            "Union"                 X

----------------------------------- X
```

**APPEARANCES**

**For the Department**
   Liz Vladeck, General Counsel

**For the Union**
STROOCK & STROOCK & LAVAN, L.L.P.
   Alan M. Klinger, Esq.

   Beth Norton, Esq., UFT General Counsel
   Michael Mulgrew, UFT President

**BEFORE:**   Martin F. Scheinman, Esq., Arbitrator

Case 1:24-cv-06123-RPK-TAM   Document 35   Filed 01/16/26   Page 49 of 188 PageID #: 723

**BACKGROUND**

The Union protests the Department's decision to summarily place approximately eighty two (82) Department employees on leave without pay, with benefits, effective April 25, 2022. This action was based upon information the Department received from a separate investigative agency these employees' proof of COVID-19 vaccination was allegedly fraudulent. The Union contends the issue of whether the Department's action is proper and falls within the scope of my September 10, 2021, Award ("Award").

Most of the basic facts are not in dispute.

In July 2021, former Mayor de Blasio announced a "Vaccine-or-Test" mandate which required the City workforce, including the educators, to either be vaccinated or undergo weekly testing for the Covid-19 virus effective September 13, 2021. Thereafter, on August 23, 2021, Mayor de Blasio and the New York City Commissioner of Health and Mental Hygiene, David A. Chokshi, MD, announced a new policy for those workforces in Department buildings. Those employees would be subject to a "Vaccine Only" mandate. That is, such employees would need to show by September 27, 2021, they had at least started the vaccination protocol or would not be allowed onto Department premises, would not be paid for work and would be at risk of loss of job and benefits.

Case 1:24-cv-06123-RPK-TAM    Document 35    Filed 01/16/26    Page 50 of 188 PageID #: 724

This mandate was reflected in an Order of Commissioner Chokshi, dated August 24, 2021.  That Order, by its terms, did not expressly provide for exceptions or accommodations for those with medical contraindications to vaccination or sincerely-held religious objections to inoculation.  Nor did it address matters of due process with regard to job and benefits protection.

The Union promptly sought to bargain the impact and implementation of the Vaccine Only mandate.  The parties had a number of discussions, but important matters remained unresolved.

On September 1, 2021, the UFT filed a Declaration of Impasse with the Public Employment Relations Board ("PERB") as to material matters.  The Department did not challenge the statement of impasse and PERB appointed me to mediate the matters.  Mediation sessions were held immediately on September 2, 3, 4 and 5, 2021, with some days having multiple sessions.  Progress was made, and certain tentative understandings were reached, but significant matters remained unresolved.  By agreement of the parties, the process moved to arbitration.  They asked I serve as arbitrator.

Arbitration sessions were then held.  On September 10, 2021, I issued an Award which set forth a detailed procedure to be followed in the cases of employees who sought an exemption to the Vaccination Mandate based on a medical condition or religious reasons.

3

Case 1:24-cv-06123-RPK-TAM    Document 35    Filed 01/16/26    Page 51 of 188 PageID #: 725

In accordance with the procedure set forth in my Award, employee requests for an exemption were initially submitted to the Department along with any supporting documentation. An employee wishing to appeal an adverse determination by the Department was given the opportunity to appear at a hearing before an impartial arbitrator who was authorized to render a final and binding decision. Approximately five hundred (500) appeals were determined by the arbitration process. Pending the arbitrator's decision, the employee could not be removed from the payroll.

On April 19, 2022, the Department informed approximately eight two (82) employees they were being placed on leave without pay, with benefits, effective April 25, 2022, based on allegations their proof of COVID-19 vaccination was fraudulent. The employees were told they could contact the Department if they believed the allegation they submitted fraudulent proof of vaccination was wrong. On April 21, 2022, the Union wrote the Department and demanded it rescind its decision to remove these employees from the payroll without the benefit of a due process hearing.

By letter dated April 22, 2022, the Department set forth its position placement of these employees on a leave without pay status did not constitute discipline, and, therefore, did not implicate the disciplinary procedures set forth in the Education Law or the parties' Collective Bargaining Agreement ("Agreement").

4

Case 1:24-cv-06123-RPK-TAM    Document 35    Filed 01/16/26    Page 52 of 188 PageID #: 726

Thereafter, by letter dated May 3, 2022, the Union wrote to me requesting I take jurisdiction over this dispute. The Union cited to that portion of the Award which states "should either party have reason to believe the process set forth herein, is not being implemented in good faith, it may bring a claim directly to SAMS for expedited resolution".

By letter dated May 4, 2022, the Department wrote in opposition to the Union's May 3, 2022, letter. The Department stated it was in full compliance with my Award, as well as the Agreement and applicable law. The Department also insisted this matter was not properly before me.

On May 4, 2022, I conducted a conference call with the parties. At that time, each side was given the opportunity to argue their positions.

Thereafter, on May 6, 2022, the Union submitted further argument in support of its position. The Department responded in a letter dated May 10, 2022.

Upon my receipt of the parties' written submissions, I closed the record.

### DISCUSSION AND FINDINGS

**The Issues:**

The basic issues to be decided are as follows:

1. Is the Department's decision to place the approximately eighty two (82) employees on leave without pay, with benefits, subject to my jurisdiction pursuant to the September 10, 2021, Award?

2. If so, what shall be the remedy?

## Position of the Parties

The Department insists the facts of circumstances regarding its placement of the eighty two (82) employees on leave without pay, with benefits, is not within my jurisdiction pursuant to the Award. According to the Department, the Award sets forth an expedited process to review Department employees' requests for exemptions and accommodations from the August 21, 2021, mandate to submit proof of COVID-19 vaccination by September 29, 2021. The Department maintains the requests for an exemption or accommodation were limited to medical and religious grounds. It contends no other issue is covered by the Award.

The Department contends it placed the employees on a leave without pay status as a result of the Department's receipt of information from a law enforcement agency the employees in question submitted fraudulent proof of vaccination in order to comply with Commissioner Chokshi's order which required vaccination of all Department staff.

According to the Department, the Courts have held compliance with the Commissioner Chokshi's Order is a "condition of

Case 1:24-cv-06123-RPK-TAM Document 35 Filed 01/16/26 Page 54 of 188 PageID #: 728

employment". The Department maintains this situation is no different to the Department's unilateral action against an employee who is not certified. As such, the Department maintains placing employees on leave without pay for failing to comply with the Commissioner Chokshi's Order comports with applicable due process procedures as long as notice is given, and the employee has an opportunity to respond. In support of its position the Department cites Broecker v. N.Y. Dep't of Educ., 21-CV-6387, 2022 WL 426113 at *7-8 (E.D.N.Y. Feb. 11, 2022); and N.Y. City Mun. Labor Comm. V. City of New York, 151169/2022 (Sup. Ct. N.Y. County Apr. 21, 2022).

The Department argues employees who are identified in connection with a law enforcement investigation into the submission of fraudulent vaccination cards are outside the scope of the Award. Furthermore, the Department insists the Award's reference to a party's failure to implement the process does not apply to the facts and circumstances presented, here. According to the Department, the language relied upon by the Union refers specifically to the "administrative process for the review and determination of requests for religious and medical exemptions to the mandatory vaccination policy and accommodation requests where the requested accommodation is the employee not appear at school". The Department asserts since that process is not at issue, here, the Union's claim is misplaced.

7

Case 1:24-cv-06123-RPK-TAM    Document 35    Filed 01/16/26    Page 55 of 188 PageID #: 729

For the reasons set forth above, the Department contends the Union's request for relief pursuant to the Award must be denied.

The Union, on the other hand, argues the Department's decision to place these employees on leave without pay, with benefits, is predicated on the Award. It insists this matter is subject to my continued jurisdiction. The Union asserts the Agreement prohibits an employee from being removed from the payroll without establishing probable cause in a due process hearing. [1]

The Union maintains the Department's contention this situation is akin to the removal of an uncertified employee is misplaced. According to the Union, approval of certification is issued by the State. In addition, the Union insists an employee is either certified by the State or is not, there is no underlying question of fact to be determined. The Union asserts if an employee proves they have completed all of the necessary paperwork, but they are not yet certified, they will not be terminated.

The Union urges in this instance the Department made a unilateral decision to place the employees on leave, without pay, based solely on a communication from another agency the employees were not vaccinated. The Union contends the Department has no direct knowledge of whether that assertion is true or false.

---

[1] There are limited exceptions to this procedure which are inapposite.

8

According to the Union, the Department removed the employees from the payroll and subsequently allowed them to provide additional evidence they are vaccinated. The Union maintains as of May 6, 2022, employees who have contacted the Department asserting they have been placed on leave without pay in error have not received any response, yet they remain suspended without pay.

The Union asserts the only authority for the Department to place employees on leave without pay, with benefits, is the Award. It contends the Department is improperly invoking the Award, and the action cannot be taken until the dispute concerning their vaccination status is determined through the Award's stated process.

In short, the Union argues the Department's unilateral decision to place employees on leave without pay, with benefits, based on the communication from another agency the employees are not vaccinated falls within the jurisdiction of the Award.

**Opinion**

Certain preliminary comments are appropriate. As an arbitrator my role is a limited one. In order for me to determine whether I can assert jurisdiction over the Department's actions as alleged by the Union, I am limited by the language of the Award. If the Award is clear, I must enforce it according to its plain meaning.

9

Case 1:24-cv-06123-RPK-TAM Document 35 Filed 01/16/26 Page 57 of 188 PageID #: 731

With these principles in mind, I turn to the facts presented.

I find I have jurisdiction to consider this matter. While the Department claims its action is unconnected with the Award, it is the Award itself that created a new leave without pay. Absent the Award, the Department was without the authority to remove these employees from the payroll without providing a due process hearing.

Leave without pay is an unusual outcome. Yet, I decided it was appropriate for employees whose requests for a medical or religious exemption were denied. This is because such employees intentionally decided to disregard the mandate they be vaccinated by September 27, 2021, the date established by Commissioner Chokshi and Mayor de Blasio.

Implicit in such a designation of leave without pay is the individual failed to comply with the vaccine mandate. Here, there is a dispute whether the employees did or did not comply. Without that being assessed, or at least submitting evidence to show a high likelihood of non-compliance, the predicate for placing an employee on leave without pay does not exist.

The Department's decision to automatically place these employees on leave without pay is inconsistent with the language and underpinnings of my Award. Nothing in the Award grants the Department such use of leave without pay status.

10

Case 1:24-cv-06123-RPK-TAM    Document 35    Filed 01/16/26    Page 58 of 188 PageID #: 732

Based upon the above, I find the Department failed to properly implement the due process protections of my Award. The Union has the right to assert the Department's process "is not implemented in good faith." To be clear, nothing in my Award was intended to abrogate any due process rights the parties otherwise maintained with regard to employment status.

I also disagree with the Department's position the court decisions it cites support the removal of these employees from pay status without a hearing. Those court decisions confronted an entirely different factual scenario. Unlike this matter, in those cited cases, there was no claim the employees at issue were vaccinated.

In denying the request for a preliminary injunction, Justice Kim, in NYC Municipal Labor Committee, supra., specifically found the absence of that factual issue in her determination. Here, of course, the employees assert they are in fact vaccinated. This raises a factual issue that is ripe for adjudication pursuant to my Award.

Based on the reasons set forth above, I take jurisdiction over the Department's placement of the approximately eighty two (82) employees placed on leave without pay, with benefits. The parties shall meet within seven (7) calendar days of the date of this Award to attempt to agree on a procedure to review an

11

Case 1:24-cv-06123-RPK-TAM Document 35 Filed 01/16/26 Page 59 of 188 PageID #: 733

employee's claim they have submitted proof of vaccination. If the parties are unable to agree on such a procedure, I shall immediately schedule a hearing and issue an expedited Award establishing the proper protocol to provide the employees the appropriate due process procedure.

**AWARD**

1.    Pursuant to Section 1L of my Award dated September 10, 2021, I shall assume jurisdiction over the Department's decision to place eighty two (82) employees on leave without pay, with benefits, effective April 25, 2022.

2.    The parties shall meet within seven (7) calendar days of the date of this Award to attempt to agree on a procedure to review an employee's claim they have submitted proof of vaccination. If the parties are unable to agree on such a procedure, I shall immediately schedule a hearing and issue an expedited Award establishing the proper protocol to provide the employees the appropriate due process procedure.

June 27 , 2022.

_____
Martin F. Scheinman, Esq.
Arbitrator

STATE OF NEW YORK      )
                       ) ss.:
COUNTY OF NASSAU       )

I, MARTIN F. SCHEINMAN, ESQ., do hereby affirm upon my oath as Arbitrator that I am the individual described herein and who executed this instrument, which is my Award.

June 27 , 2022.

_____
Martin F. Scheinman, Esq.
Arbitrator

# EXHIBIT M

# EXHIBIT 1

UNITED SATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - x

LORRAINE MASCIARELLI,

                Plaintiff,

                          INDEX NO. 22-cv-7553

        -against-

NEW YORK CITY DEPARTMENT OF
EDUCATION,

                Defendant.
- - - - - - - - - - - - - - - - - - x
(Pages 83 through 87 have been designated
 confidential in separate booklet)

                      March 25, 2025
                      10:20 a.m.

    VIRTUAL DEPOSITION of KATHERINE G. RODI, on behalf

of the Defendant herein, pursuant to Notice, taken

before Ceita Lazar, a Stenographic Reporter and

Notary Public within and for the State of New York.

              SANDY SAUNDERS REPORTING
          254 South Main Street, Suite 216
           New City, New York 10956
             (845) 634-7561

2

A P P E A R A N C E S:


          THE SCHER LAW FIRM, LLP
                Attorneys for Plaintiff
                600 Old Country Road
                Garden City, New York 11530
          BY:  AUSTIN GRAFF, ESQ.

          NEW YORK CITY LAW DEPARTMENT
                Attorneys for Defendant
                100 Church Street, New York
                New York 10007
          BY:  KATHLEEN LINNANE, ESQ.
                    - and -
                ANDREA MARTIN, ESQ.









          ALSO PRESENT:

                LORRAINE MASCIARELLI

3

F E D E R A L   S T I P U L A T I O N S


IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that filing and sealing be and the same are hereby waived.


IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial.


IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed and sworn to before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court.

4

                    K. G. RODI

          THE REPORTER:  Ms. Linnane,

would you like to purchase a

copy?

          MS. LINNANE:  It's my

understanding that the attorney

taking the deposition shares a

courtesy copy.  That's how we

usually practice.

          MR. GRAFF:  That's fine.  I

will do.

          MS. LINNANE:  Thank you,

Mr. Graff.

          THE REPORTER:  My name is

Ceita Lazar, court reporter.  The

parties are present remotely to

take the deposition of Katherine

Rodi In the Matter of Lorraine

Masciarelli versus New York City

Department of Education.

          I ask that everyone please

stay close to the microphone so

that I can provide the best

transcript possible and also so

my interruptions will be minimal.

5

K. G. RODI

Will counsel please state

their name, who they represent,

and then I will swear in the

witness.

MR. GRAFF:  Austin Graff

from The Scher Law Firm,

representing the plaintiff.

MS. LINNANE:  Kathleen

Linnane, New York City Law

Department for the defendant in

this case.

MS. MARTIN:  Andrea Martin,

New York City Law Department for

defendant.

KATHERINE G. RODI,

having been first duly sworn by the

Notary Public (CEITA LAZAR), and stating

her address as 65 Court Street,

Brooklyn, New York, 11201, was examined

and testified as follows:

MS. LINNANE:  We would like

this to be marked confidential

for the record, please.

6

K. G. RODI

Actually, no, it's her work

address.


EXAMINATION

BY MR. GRAFF:

Q. Good morning, Ms. Rodi.  My name

is Austin Graff.  I'm the attorney for

Lorraine Masciarelli.  I'm going to ask

you a series of questions today.  If

there's something you don't understand

or can't -- do not have an answer, if

you need me to repeat or rephrase the

question, please let me know.  If you

respond, I'll take it under belief that

you understood the question.  Do you

understand that?

A. Yes.

Q. Please make all your responses

verbal, because the court reporter

cannot take head nods and hand

gestures.  Do you understand that?

A. Yes.

Q. If -- if you need to take a

break at any point, as long as there's

7

K. G. RODI

no pending question, I have no problem taking a break.  Do you understand that?

A. Yes.

Q. Where are you currently situated?

A. At my home.

Q. Is there anyone else in the house with you?

A. No.

Q. Do you have any documents in front of you related to this case?

A. No.

Q. Is your cell phone nearby?

A. Within reach but not in front of me.

Q. I just ask if you turn it over or put it further away so you can't see it, so no one can communicate with you.

A. Sure.

Q. How did you prepare for today's deposition?

A. I was prepared by the New York City Law Department.  We met and

8

                         K. G. RODI

reviewed matters that they believe

would be addressed today in this

deposition.

     Q. Okay.  I'm going to show you --

tell me when you can see the screen?

     A. I can see the screen.

     Q. Is this the Notice of Deposition

that I've served upon you regarding

this deposition?

     A. Yes.

     Q. Have you seen this document

before?

     A. Yes.

     Q. Are you prepared to answer

questions regarding some or all of the

topics identified on the Notice of

Deposition?

     A. Yes.

     Q. Okay.

          MR. GRAFF:  I'm going to

     mark that Exhibit A.

             (Plaintiff's Exhibit A,

             Notice of Deposition, was

     marked for identification.)

9

                    K. G. RODI

Q. Are you currently employed?

A. Yes.

Q. Who is your employer?

A. The New York City Department of Education in the City of New York.

Q. Are you employed by both entities or just one of the entities?

A. The Department of Education is under the City of New York.

Q. How long have you worked for the New York City Department of Education?

A. For 18 years.

Q. What is your current title?

A. My current title is executive director, Office of Employee Relations.

Q. And how long did you have that title?

A. Since 2012.

Q. What are your duties in that title?

A. In that title, I oversee several offices including the Office of Personnel Investigation, the Office of Safety and Health, the employee

10

K. G. RODI

relations, the Office of Disability Accommodations, the reassignments and arrest team, and manage other issues related to onboarding, offboarding, and employee relations matters.

Q. Since September 21 -- 2021, have you had that same title?

A. Yes.

Q. Were your job duties in September 2021 similar?

A. Yes.

Q. Have you ever been a classroom teacher?

A. Yes.

Q. What did you teach?

A. High school history and English.

Q. Where did you teach?

A. East Rockaway High School.

Q. When did you start teaching?

A. 1995.

Q. How long did you teach?

A. For three years.

Q. When did you stop teaching?

A. 1998.

11

                    K. G. RODI

Q. What made you leave teaching?

        MS. LINNANE:  Objection.

        You can answer.

A. Decided to try something different.

Q. After you stopped teaching, did you immediately begin working for the New York City Department of Education?

        MS. LINNANE:  Objection.

        You can answer.

A. No.

Q. After you ended your teaching, did you go back to school?

A. Within a few years, yes.

Q. Where did you go back to school?

A. I went to law school at American University.

Q. What -- where did you graduate high school?

A. Sacred Heart Academy in Hempstead, New York.

Q. What year did you graduate high school?

A. 1990.

12

K. G. RODI

Q. Where did you go to college?

A. Mount Holyoke College in South Hadley, Massachusetts.

Q. What year did you graduate?

A. 1994.

Q. What was your major?

A. American Studies.

Q. And you said you went to American University for law school?

A. Yes.

Q. What year did you graduate American University?

A. 2003.

Q. Are you a licensed attorney?

A. Yes.

Q. Are you licensed in New York?

A. Yes.

Q. In law school, did you take any classes in labor law?

MS. LINANNE:  Objection.

You can answer.

A. I believe so, yes.

Q. In law school, did you take any classes in employment law?

13

K. G. RODI

Ms. LINNANE:  Objection.

You can answer.

A. Yes.

Q. Do you have any training in human resources?

A. Yes.

Q. What type of training do you have in human resources?

A. I have worked with human resources for the past 18 years. I've attended numerous professional development courses, and I have attended -- and numerous trainings within the DOE.

Q. Have you trained employees in human resources?

A. Yes.

Q. What topics have you trained employees?

A. Let's see.  Discipline accommodations, hiring, onboarding, offboarding, all progressive discipline, elements of tenure, elements of -- of leaves, parts about

K. G. RODI

the FMLA laws and policies related to human resources, and a lot more.

Q. Did you have any training on Title VII issues?

A. Yes.

Q. Have you trained employees on Title VII issues?

A. Yes.

Q. Do you have any training regarding -- well, do you have any training regarding religious discrimination?

A. Yes.

Q. What type of training do you have on religious discrimination?

A. I went to law school. I took classes in the First Amendment; I took classes regarding discrimination. I've also taken numerous professional development courses regarding discrimination, accommodation. At one point, I oversaw the Office of Equal Opportunity within the DOE. So I actually have extensive training in --

15

K. G. RODI

related to religious discrimination.

Q. When did you oversee the Department of Education's Equal Employment Office?

A. From 2019 -- no, 2018 to 2020 -- 2020, about there.

Q. Were you the director -- were you in charge of the equal employment opportunity during the COVID vaccine mandate implementation?

A. No. If the vaccine mandate started in '21, I was no longer overseeing it.

Q. Overseeing the Equal Employment Office?

A. Correct.

Q. Okay.  What role did you play in the implementation of the vaccine mandate?

A. I was on the general committee.

Q. What does it mean, "the general committee"?

A. There was a group of people from HR, the chancellor's office, the health

16

K. G. RODI

office, the superintendent's office, the legal office that joined together when we made decisions to -- regarding the -- anything related to the vaccine.

Q. What type of decisions did the committee make?

A. The -- one of the decisions was the process of how employees would apply for exemptions. One was the determination that -- that providing exemptions would be an undue burden for the agency, the determination of how just elements of how the exemption process would take place.

Q. With respect to determining providing exemptions were undue burdens, was that a decision across the board, or was it an individualized decision made by the committee based upon a person's application?

A. It was both. First, the -- when we were making a decision on how to approach reviewing the applications, we already had thousands of applications.

17

K. G. RODI

So, from the start, we knew that we would have to review them or consider them on a whole. And we realized that having 2,000 or more, and eventually it was over three thousand applications, if we granted those exemptions, that that would be an undue burden.

However, we also believed that each applicant deserved the right to have an individual review to make sure that there was nothing that we hadn't considered, that they had appropriately applied to the right place, and that there was -- that there was nothing that we had overlooked. So while it was a decision overall based on the numbers that we already had, it was every person's application was looked at individually.

Q. When did the general committee determine that providing exemptions was an undue burden?

A. I don't remember exactly when, but it was -- we had -- if the

K. G. RODI

exemption applications were due in, I think, it was early September, it was sometime during that period where we already -- by the time we met and talked about how we were going to approach it, we already had several thousand applications.

Q. Did the general committee -- were there notes taken regarding the general committee meetings?

A. Not that I'm aware of.

Q. Was there -- were there minutes made of the general committee meeting?

A. Not that I'm aware of.

Q. Did you take notes regarding the general committee meeting?

A. No.

Q. So the determination regarding undue burdens was made September, October, would you say, of 2021?

MS. LINNANE:  Objection.

You can answer.

A. Probably -- probably sometime in September.

K. G. RODI

Q. Did you have a role to play in determining whether to grant or deny exemptions?

A. Yes.

Q. Did you review specific applications for exemptions?

A. Yes.

Q. And when I talk about exemptions, I'm talking about exemptions from the COVID-19 mandate. Do you understand that?

A. Yes.

Q. Okay. Were you able to unilaterally decide on whether to grant or deny an exemption?

MS. LINNANE: Objection.

You can answer.

A. No. Yes and no. Yes, if there was something that was for some reason, I had the ability to do it. I don't think I did it due to the nature of how we were discussing all of the -- all of the applications. But we -- and I physically denied them in terms of in

K. G. RODI

the SOLAS.  But in terms of making the decision that -- that all religious exemption applications would be an undue burden, that was a group of us.

Q. And that group was the general committee?

A. Yes.

Q. And that was a decision that all religious exemptions were an undue burden?

A. Yes.

Q. And you said you reviewed them at the time you were discussing applications.  And you said "we." Who's "we" that were discussing applications?

A. My deputy, Mallory Sullivan; my boss at the time, Vicki Bernstein; and occasionally the law department.

Q. And your deputy, Mallory Sullivan, she -- is she currently working for the New York City Department of Education?

A. Yes.

K. G. RODI

Q. And Vicki Bernstein, who you said was your supervisor, does she currently work for the Department of Education?

A. No.

Q. And you said she was your supervisor.  What title did she have?

A. The chief human resource officer.

Q. What role did Ms. Bernstein have in the determinations of whether to grant or deny exemptions?

A. Similar to mine.

Q. Did she have a final say on yes or no whether to grant an exemption?

A. No one really had a final say.

Q. If no one had a final say, how was someone either granted or denied an exemption?

A. Meaning, no one person had a final say.  It was that -- that there was the determination from the general committee that these were an undue burden.  So it wasn't that Vicki made

22

K. G. RODI

that decision, or I made that decision.
It was that the decision had been made.

Q. And did the general committee review applications of people who sought exemptions before they decided that providing an exemption was an undue burden?

A. No.

Q. So regardless of what religious belief the person had, it was going to be denied no matter what?

MS. LINNANE: Objection.

You can answer.

A. Yes.

Q. Was there any discussions when examining an application about Catholic applicants?

A. No.

Q. Was there any discussion regarding the pope's statements regarding the vaccine in -- used to determine whether Catholic applicants received an exemption?

A. No.

K. G. RODI

Q. Was there a financial incentive granted to you to deny vaccine mandate exemptions?

Ms. LINNANE: Objection.

You can answer.

A. No.

Q. What was the basis for the general committee's decision that determined that providing exemptions was an undue burden to all applicants?

A. Because we had a school system to run, and kids needed to be back in school. And kids were not vaccinated at the time, and we needed to protect those children that came back to school. And we -- particularly on the lower level grades -- we needed teachers to be in the classroom, and we needed people to do their jobs. And we received applications from every title. We received it from teachers, from custodians, from school food workers, from principals, from assistant principals, from, you know, name the

24

                    K. G. RODI

person, name the job.  And the fact is

that we needed to run a school system,

and we did not have the staffing

resources to have people not in school

buildings or not be able to go into

school buildings, because, at that

time, if you weren't vaccinated, you

weren't permitted into school

buildings.

        So we didn't have the ability to

put people in remote places, because we

had kids physically in buildings.  You

can't -- you can't do online learning

with little kids.  You can't do

plumbing remotely.  You can't do school

food remotely.  So it was absolutely

necessary for us to return kids to

school, to return to education, to have

people in person.  And to have three

thousand people or -- or that not

working would've been an undue burden

to the agency.

    Q. Did the general committee

consider testing and masking as an

K. G. RODI

accommodation for those who had

religious objections?

MS. LINNANE: Objection.

You can answer.

A. It wasn't an option, because they -- the -- there was a mandate from the Department of Health that if you were not vaccinated, you were not permitted in buildings. So it didn't matter if you masked and tested. You still weren't allowed in the buildings.

Q. Were employees of that three thousand or how many sought exemptions granted accommodations?

MS. LINNANE: Objection.

You can answer.

A. Of the three thousand religious?

Q. Religious.

A. Not by the DOE.

Q. Who granted them?

MS. LINNANE: Objection.

You can answer.

A. If any of them received an exemption, it was from the arbitrator.

26

K. G. RODI

Q. The arbitrator, meaning Scheinman Arbitration Mediation Service?

A. Yes, correct.

Q. Do you know what basis those employees received an accommodation from Scheinman Arbitration Mediation Service?

MS. LINNANE:  Objection.

You can answer.

A. I have no idea.

Q. Was there an opinion within the Department of Education regarding those people who did not take the vaccine?

MS. LINNANE:  Objection.

You can answer.

A. No.

Q. Did the Department of Education believe that people who did not take the vaccine should've been terminated?

MS. LINNANE:  Objection.

You can answer.

A. I don't understand the question.

Q. In your position, was it proper

27

K. G. RODI

for the employees who did not take the

vaccine to be terminated from their

employment?

MS. LINNANE:  Objection.

You can answer.

A. At that time, they couldn't

work, and they were suspended for a

period.  And then there was a point

where we couldn't do anything with

them, and the mandate was still in

place.  And the only option was had was

to resign them from the system without

any bias so that we could hire other

teachers.  Because, again, we had a

school to run.  We have schools to run,

agency to run.  But that was because we

could not bring them into the building.

And there's a point where you can't

keep them on a suspension forever.

A lot of people went and got

other jobs, to our understanding.  But

in terms of, you know -- it was the

option that we had at the time.

Q. When you say you resigned them

K. G. RODI

from the system, do you mean terminate them?

A. No. We -- it's treated as a resignation in that if they apply to come back, we don't treat them as though they've been terminated. We treat them as though they resigned.

Q. If there's an application to return to work from someone who was -- who was resigned from the system, do they have to start at the bottom level of employment, or can they start where they left off?

MS. LINANNE: Objection.

You can answer.

A. It wholly depends on what agreement they signed. Everybody left in a different way. Some people signed forms so that they could be reinstated. Other people just walked away. Some people resigned on their own before we did a group resignation. So it's very individual. If anyone is rehired, we have to, like, basically look for their

K. G. RODI

-- if there's an agreement on them and then act appropriately.

Q. What about those employees that were resigned from the system in September of 2022 after the one year period of receiving benefits and being suspended?

MS. LINANNE: Objection.

You can answer.

A. Again, it depends on what they signed. It's individual.

Q. Do you think the people who had sincere and genuine religious beliefs should've been fired from their employment from the New York City Department of Education?

MS. LINANNE: Objection.

You can answer.

A. I -- the best option at the time was for us to run an agency. We could not have unvaccinated employees come into our buildings. That was not permitted at the time. And we kept them on with benefits for as long as we

                    K. G. RODI

could.  And there was a certain point

where we had to hire new people,

because we needed teachers in the

classrooms and custodians and school

food and all of that.  And we had no

other choice.

     Q. At some point during the

process, the City changed its rules

regarding entertainers and athletes.

How did that affect the Department of

Education?

          MS. LINNANE:  Objection.

          You can answer.

     A. I don't recall any effect.

     Q. Were you provided any training

regarding whether to determine whether

to grant or deny an application for an

exemption?

     A. What do you mean?

     Q. Well, did anyone tell you --

strike that.

          When an application came for a

religious exemption, was it

automatically denied without review?

K. G. RODI

MS. LINNANE: Objection.

You can answer.

A. Sorry. No.

Q. Okay. So when you received an application for religious exemption, what did you review to make a determination whether to grant or deny?

A. We made sure that the person had appropriately applied in the right area. A number of people would check religious exemption, but they were really looking for a medical exemption.

We also made sure that they actually submitted something with their application, because some people included blank sheets of paper. And, then, if it was a medical -- if it was in the wrong place, we -- we immediately advised them so that they could reapply or reapply in the right place. If it was a blank piece of paper, we immediately advised them so that they could submit appropriate documentation.

32

K. G. RODI

And then, other than that, we then -- we reviewed to make sure they had submitted something to support, you know, that it was religious in nature. We didn't judge what it was. And even if it was just a piece of paper that they wrote out. And then we denied their request.

Q. So there was no examination of whether or not the person submitting the application had a bona fide religious belief?

Ms. LINANNE: Objection.

You can answer.

A. No.

Q. No, there was no consideration of whether someone had a bona fide religious belief?

MS. LINANNE: Objection.

You can answer.

A. No.

Q. What were you looking for -- strike that.

Was there any religious belief

33

K. G. RODI

that would've entitled someone to a religious exemption?

A. No.

Q. Was it different for a person who sought a medical exemption or a medical accommodation?

MS. LINNANE: Objection.

You can answer.

A. There were medical exemptions, and then there were medical accommodations. Which one are you asking about?

Q. Well, let's start with medical exemptions. Was it any different if anyone sought a medical exemption?

MS. LINNANE: Objection.

You can answer.

A. Yes. The medical exemption went to our medical team, which comprised of doctors, and the doctors reviewed those applications.

Q. Did the doctors have the right to grant or deny the exemption, or they just made recommendations to someone?

K. G. RODI

MS. LINNANE: Objection.

You can answer.

A. They had the right to approve on a medical level, and then those were reviewed by -- by my team.

Q. And, to your memory, were any medical exemptions that were approved by a medical doctor denied?

MS. LINNANE: Objection.

You can answer.

A. Yes.

Q. So even though the doctor recommended an exemption, they were still denied?

MS. LINNANE: Objection.

You can answer.

A. Yes.

Q. Now, with respect to medical accommodations, how was that handled?

MS. LINNANE: Objection.

You can answer.

A. Medical accommodations were handled like we do all accommodations. Medical -- that the person applied

35

K. G. RODI

through the SOLAS system.  They were given -- they were reviewed by medical to determine if they had a disability. They were given the interactive process to determine what accommodation they would need, and then that accommodation was subsequently implemented, if possible.

Q. Do you remember how many medical exemption applications were received?

MS. LINNANE:  Objection.

You can answer.

A. I do not.

Q. Do you remember how many medical exemption -- medical exemptions were approved?

MS. LINNANE:  Objection.

You can answer.

A. I do not.

Q. Were there any medical exemptions approved?

MS. LINNANE:  Objection.

You can answer.

A. Yes.

K. G. RODI

Q. Do you know how many accommodation requests -- medical accommodation requests were made?

MS. LINNANE:  Objection.

You can answer.

A. I don't recall.

Q. Do you remember how many were approved?

MS. LINNANE:  Objection.

You can answer.

A. I don't recall.

Q. Were any medical accommodations approved?

MS. LINNANE:  Objection.

You can answer.

A. Yes.

Q. Why was there no interactive process for a request for religious exemption?

MS. LINNANE:  Objection.

You can answer.

A. Because there was no requirement for an interactive process.  It was an exemption, not an accommodation.

K. G. RODI

Q. What's the difference between an exemption and an accommodation?

MS. LINNANE: Objection.

You can answer.

A. An accommodation is outlined under the ADA. It's also outlined under religious discrimination law, where a person is looking to get an accommodation for either medical or religious reasons in order to access their employment.

An exemption is when a person asks to be completely removed from something that is a requirement with no option -- with no other options.

Q. Those people who received religious exemptions through Scheinman Arbitration Service, did they receive an exemption or an accommodation?

MS. LINNANE: Objection.

You can answer.

A. They received an exemption.

Q. When they received an exemption, did they -- were they provided another

K. G. RODI

place to work or an accommodation during that school year?

MS. LINNANE: Objection.

You can answer.

A. They were then provided an alternate place to work.

Q. So it was -- so they didn't have to take the vaccine, but they were entitled to work?

MS. LINNANE: Objection.

You can answer.

A. That was the determination by the arbitrator.

Q. So -- so the person was both -- received an exemption and an accommodation for the exemption?

MS. LINNANE: Objection.

You can answer.

A. No, because the -- an accommodation would mean that because of the medical reason, that we had an interactive process. We worked with them to find out what would be best. But a medical accommodation would be a

39

K. G. RODI

person who was able to take the

vaccine, so they were vaccinated, but,

for whatever reason -- for example,

they were immunocompromised.  They

still needed some sort of accommodation

around the elements of COVID, that they

needed, maybe, a plastic wall around

them, or they needed to be masked even

though, you know -- and have a face

shield or something.

        The -- with the exemptions, it

wasn't about accommodating them.  We

literally were directed to find an

alternate site.  There was no, like --

we were able to treat the group

unmasked, which you don't do with an

accommodation.

    Q. What was that last thing, you

don't --

    A. You don't treat them unmasked

at that site --

    Q. Oh, unmasked.

    A. -- so we could -- we found, you

know, two or three large sites, and we

40

K. G. RODI

were able to place them in those large sites.

Q. And those are the people with the medical exemptions?

MS. LINNANE:  Objection.

You can answer.

A. With medical and religious, the ones that were granted by the arbitrator.

Q. Where were -- what locations were they placed?

MS. LINNANE:  Objection.

You can answer.

A. I'm not familiar with all the exact locations.  I just can't remember anymore.  But I know that DOE rented space, like, one in Brooklyn, one in Queens, one in Manhattan for people to be located.

Q. And it was rented specifically for exemptions?

A. It was rented specifically for the people who had been granted exemptions by the arbitrator.

K. G. RODI

(Reporter requested clarification.)

MS. LINNANE:  I said, objection.

You can answer.  Thank you.

Q. Were any of the medical exemptions teachers?

MS. LINNANE:  Objection.

You can answer.

A. Yes.

Q. Do you know how many were teachers?

MS. LINNANE:  Objection.

You can answer.

A. I don't know.

Q. How many people were involved in reviewing applications for exemptions?

A. For the DOE?

Q. For the DOE.

A. Three.

Q. And that was the three people -- you and the other two people you mentioned?

A. Yes.

Q. How much time did you spend

42

K. G. RODI

reviewing individual applications?

A. It would depend on the application.  Some people had half a sheet of paper, some people had pages. So it would just be reviewing -- we would review every document they attached just to make sure there was nothing in there that was in the wrong place, and then we would move on.

Q. Did each of you review each of the applications, or were you given a portion, and each one was given a portion?

A. Each of us had a portion.

Q. So out of the three thousand, you probably reviewed about a thousand applications?

A. No.  I probably did at least half.

Q. Did you do more than anyone else, do you think?

MS. LINNANE:  Objection.

You can answer.

A. Probably.

43

K. G. RODI

Q. Was -- from an application, was there a way of knowing who reviewed the application?  Were there notations made?

A. No.

Q. And just to confirm, masking and testing was never considered as an accommodation for those who sought religious exemptions?

MS. LINNANE:  Objection.

You can answer.

A. Again, anyone who was not vaccinated was not permitted in buildings.  Period.  So it didn't matter if they were masked and tested. They were not permitted in the buildings.  It was not an option.

Q. Okay.  Let me know when you see the screen.

MS. LINNANE:  Austin, can you make it a little bigger?

MR. GRAFF:  Yeah.  I just needed to know that it came on the screen first.

44

K. G. RODI

MS. LINNANE:  Yeah, I see it.

MR. GRAFF:  Okay.

BY MR. GRAFF:

Q. Ms. Rodi, do you recognize this document?

A. Not particularly.

MS. LINNANE:  I'm going to ask that we scroll through the whole thing, so we identify whether or not it's been recognized.

MR. GRAFF:  Sure.

BY MR. GRAFF:

Q. Do you recognize this document?

A. It looks like many of the documents that were submitted.

Q. Do you know if you reviewed Lorraine Masciarelli's application for vaccine mandate -- vaccine exemption?

A. I don't know.

Q. Is there any way of knowing who reviewed her application?

A. No.

45

K. G. RODI

Q. Once this document came into your office on or about September 10, 2021, what was the process?  Where did it go first?

A. It first came into the medical office.  Medical made sure that the employee didn't have duplicate applications or that -- and they didn't have a pending leave or anything else that would -- that would automatically disqualify them from submitting an application.  And then it was sent to our office.

We would open the application, and we would just make sure that all of the documents were related to the application.

Q. So the requests came in on or about September 10, 2021.  When was the meeting with the general committee?

MS. LINNANE:  Objection.

You can answer.

A. We had several meetings.

Q. So at the -- when was the

K. G. RODI

meeting where it was determined that all religious exemptions were going to be denied based upon an undue burden?

MS. LINNANE:  Objection.

You can answer.

A. I couldn't tell you.

Q. Before the meeting that was held with the general committee where it was determined that providing an exemption was an undue burden, were applications reviewed?

MS. LINNANE:  Objection.

You can answer.

A. No.  We did not review until we had a conversation with the law department and the general counsel's office as to how -- like, who was going to review them, how they were -- what the approach would be, et cetera.

Q. Was that separate or apart from the general committee?

MS. LINNANE:  I'm going to caution the witness not to disclose any information that

K. G. RODI

could be considered privileged,
the discussions of
attorney-client privilege,
please.

Thank you.

A. It was probably -- there were probably fewer people at some of the meetings.

BY MR. GRAFF:

Q. Which meetings?  The general counsel and law department, or the general committee?

MS. LINNANE:  Objection.

You can answer.

A. With the general counsel and the law department.

Q. Who from the law department was at those meetings?

MS. LINNANE:  Objection.

I'm going to caution the witness not to disclose any information that could be considered privileged under the attorney-client privilege.

48

K. G. RODI

A. It varied.  Various lawyers from the law department.

BY MR. GRAFF:

Q. Were any of the attorneys that are currently on this Zoom part of the law department meetings?

MS. LINNANE:  Objection. I'm going to caution the witness not to disclose any information that could be considered privileged due to attorney-client privilege.

A. No.

BY MR. GRAFF:

Q. When you say "general counsel," is there a separate legal department within the Department of Education?

A. Yes.

Q. And who is -- who was the general counsel then?

A. Howard Friedman?

Q. Is he currently general counsel?

A. No.

Q. Would you meet with the law

K. G. RODI

department and general counsel in one meeting?

MS. LINNANE:  I'm going to caution the witness not to disclose any information that could be considered privileged under the attorney-client privilege.

A. Yes.

BY MR. GRAFF:

Q. And the meetings with the law department and general counsel were different from the meetings of the general committee that you described?

MS. LINNANE:  I'm going to caution the witness not to disclose any information that could be considered privileged due to attorney-client privilege.

A. Yes.

BY MR. GRAFF:

Q. Did you participate in the negotiations with the UFT over the implementation of the vaccine mandate?

50

K. G. RODI

MS. LINNANE:  Objection.

You can answer.

A. No.

Q. Do you know who at the UFT --
sorry -- at the New York City
Department of Education represented the
Department of Education in the meetings
with the UFT over the implementation of
the vaccine mandate?

MS. LINNANE:  Objection.

You can answer if you're
able.

A. I could name maybe one or two,
but I couldn't confirm.

Q. Do you know -- what are those
one or two names that you know of?

MS. LINNANE:  Objection.

You can answer.

A. Vicki Bernstein, my former
supervisor, and the general counsel.

Q. Howard --

A. Howard Friedman, yeah.

MR. GRAFF:  I'm just -- this
document, dated September 10,

51

K. G. RODI

2021, I'm going to mark as

Exhibit B.

(Plaintiff's Exhibit B,

Document dated September 10,

2021, was marked for

identification.)

Q. Let me know when you see the next document?

A. I see it.

Q. Okay. Do you need me to make it larger?

A. No. I can see it.

MR. GRAFF: Okay. I'm going to mark this Exhibit C. It's a September 21, 2021, email.

(Plaintiff's Exhibit C,

Email dated September 21,

2021, was marked for

identification.)

Q. Do you recognize this document?

A. Yes.

Q. How do you recognize this document?

A. This was the document that was

K. G. RODI

sent to any person who applied for a

religious exemption.

Q. Who drafted this language?

A. Probably a group of lawyers.

Q. Did you participate in the

drafting?

          MS. LINNANE:  Objection.

     I'm going to direct the witness

     not to answer any questions with

     respect to work you did in your

     representation of the DOE as a

     DOE attorney.

BY MR. GRAFF:

     Q. Are you not answering because of

  the privilege?

     A. Correct.

          MS. LINNANE:  Yes.

          MR. GRAFF:  Okay.  I just

     want to clarify the record.

BY MR. GRAFF:

     Q. It says that the plaintiff

failed to meet the criteria for a

religious-based accommodation.  It's in

the second line of the document.

53

K. G. RODI

How did the plaintiff fail to meet the criteria for a religious-based accommodation?

MS. LINNANE:  Objection.

You can answer if you're able.

A. That was sent to all employees that all employees could not be able -- were not able to enter the building, and, as such, we could not provide them with a religious accommodation, and, therefore, we had to deny their entire application.

Q. It says that "to provide an accommodation would impose an undue hardship, ie, more than a minimal burden on the DOE and it's operations." Do you see that?

A. Yes.

Q. The recent Supreme Court decision in Groff, G-R-O-F-F, was there any analysis after that decision regarding the undue hardship placed on the DOE?

K. G. RODI

MS. LINNANE:  Objection.

You can answer if you're

able.

A. I don't recall.

Q. How was it determined that it would be an undue hardship to place this plaintiff at a different work site?

MS. LINNANE:  Objection.

You can answer.

A. It wasn't determined about this plaintiff or your client.  It was determined about all of the three thousand people who we would have to find an alternate site.  And if, you know, your client is a teacher, it would be even more difficult to find a site for them.  That their essential functions of their job would be to teach students and, particularly, if a person is an elementary schoolteacher or pre-k teacher or a gym teacher or someone where it's vitally important that they have to be with children,

55

K. G. RODI

it's really hard to say that they're meeting the essential functions of their job or that they're even doing their job if they're sitting in a building someplace else.

Q. Who performed the analysis regarding the undue hardship that would be placed on the Department of Education?

MS. LINNANE:  Objection.

You can answer.

A. That was a review with everyone involved, essentially, that looking at the -- the number of people who would need a placement, the roles in which those people -- the roles in which those people performed, the -- the cost at which it would be for the students and, you know, in terms of not getting their primary needs and education.  How much staff we would need to find to cover all of these roles.  And then how much space we would need to find for these people to work.  So that involved

56

K. G. RODI

doing an analysis from a lot of different people.  And we determined that it was the role of the agency was to provide education and that if these folks were not able to be in the building with -- around students, that it would then become an undue burden on the agency to provide those exemptions.

Q. So those -- do those employees of the Department of Education who decide not to take the vaccine and were placed on leave, there was staff found to fill those roles, correct?

MS. LINNANE:  Objection.

You can answer.

A. Not necessarily.

Q. So the teachers that went on leave pursuant to the arbitration award, their roles were not filled by people at the DOE?

MS. LINNANE:  Objection.

You can answer.

A. It depended on the role, depended on what teachers we could

57

K. G. RODI

find.  We may have been filled by a substitute, but that's not necessarily the same as a teacher.  And while they were on suspension, they still had a right to their jobs.  So we couldn't replace them with someone who would be qualified at that time.  So, unfortunately, students had, you know, like, random subs in there.  And, you know, we couldn't -- if -- at any point, if anybody who was suspended got the vaccination, they were entitled to come right back to their job.  So we kind of just filled in for a while and -- until someone either made the determination to leave.

Q. Did the students' education suffer as a result of that, not knowing whether a teacher was coming back or not?

MS. LINNANE:  Objection.

You can answer.

A. I would assume that there would be some sort of effect on students if

58

K. G. RODI

you're not clear as to, like, the status of your teacher.

Q. So the -- going back to the exhibit, the plaintiff's application, which is Exhibit B, was dated September 10, 2021, and the denial of the accommodation was dated September 21, 2021?

A. Uh-hum.

Q. In those 11 days, was that when the decision was made to -- by the general committee to deny all exemptions?

MS. LINNANE:  Objection.

You can answer.

A. Again, I don't recall the exact date, but that would -- I would assume it would be sometime in that period.

MR. GRAFF:  Exhibit D is --
I mean, Exhibit C would be the email?

Exhibit D is the Julie Torrey arbitration decision.

(Plaintiff's Exhibit D,

59

K. G. RODI

Julie Torrey Arbitration Decision, was marked for identification.)

Q. Do you recognize this document? Do you need me to make it bigger?

A. No, I can see it.

Q. Okay.

A. I mean, I've seen other arbitration decisions. I don't know that I've necessarily seen this one.

Q. Did you participate in the arbitration proceedings with the Scheinman Arbitration Mediation Service?

A. I did not.

Q. Who participated on behalf of the Department of Education in these arbitrations?

MS. LINNANE: Objection.

You can answer.

A. No one.

Q. So it was simply the application and the arbitrator?

MS. LINNANE: Objection.

60

K. G. RODI

You can answer.

A. Yes.

Q. Was there any communications between the department of education and the individual arbitrators regarding the general committee's decision to deny all exemptions?

MS. LINNANE:  Objection.

You can answer.

A. Not to my knowledge.

Q. Were they aware -- were the arbitrators aware of the decision by the general committee to deny all exemptions?

MS. LINNANE:  Objection.

You can answer.

A. I have no idea.

Q. Do you know how many applications for exemptions were granted through the arbitration process?

MS. LINNANE:  Objection.

You can answer.

A. I don't recall.

K. G. RODI

Q. Do you know what criteria the arbitrator used to determine whether to grant or deny an exemption?

MS. LINNANE: Objection.

You can answer.

A. I have no idea.

Q. I'll show you what's going to be marked as Exhibit E. Do you recognize this document?

(Plaintiff's Exhibit E, Renewed application, was marked for identification.)

A. No.

Q. Were you -- did you have any role in the City of New York reasonable accommodations appeals panel?

MS. LINNANE: Objection.

You can answer.

A. No.

Q. Are you aware of the appeals panel process?

MS. LINNANE: Objection.

You can answer.

A. I'm aware of the panel. I'm

62

K. G. RODI

aware that we supported the process by -- by, like, allowing people to submit part of it through SOLAS.  But that's where our involvement ended.  We had nothing else to do with it.

Q. Was there anyone from the Department of Education on the appeals panel?

MS. LINNANE:  Objection.

You can answer.

A. I have no idea.

Q. I show you what's marked Exhibit F.  Do you recognize this document?

(Plaintiff's Exhibit F,

Position Statement, was

marked for identification.)

A. I recognize that it's a position statement.  I don't, like, recognize it unique to your client.

Q. Do you know when this document was created?

A. No idea.

Q. Did you participate in the drafting of the document?

                    K. G. RODI

          MS. LINNANE:  Objection.

     I'm going to direct the witness

     not to answer with respect to any

     work that you did in your role as

     an attorney with the DOE due to

     attorney-client privilege.

BY MR. GRAFF:

     Q. And due to the attorney-client

privilege, you're not answering the

question, correct?

     A. Correct.

     Q. Do you know what the purpose of

this document was created for?

     A. I would assume that if a person

was appealing a determination by this

agency, that we had the right to submit

a position statement about our

position.  So that's what I would

conclude.

     Q. Do you know if this document was

submitted to the appeals panel?

          MS. LINNANE:  Objection.

          You can answer.

     A. I have no idea.

64

K. G. RODI

Q. Do you know if this is the same document that was submitted for anyone requesting a religious exemption except for the top four lines of the document?

MS. LINNANE: Objection.

You can answer.

A. I have no idea.

Q. So, in this document, it talks about "the DOE granting an exemption to this employee would create an undue hardship for the DOE for the following reasons." And that's the bottom of the first page, and it has three bullets on to -- the second page.

Were these the reasons why the general committee believed it was an undue burden --

MS. LINNANE: Objection --

Q. -- to grant the exemption?

MS. LINNANE: Apologies. I didn't -- I thought you were done.

Objection.

You can answer.

65

K. G. RODI

MR. GRAFF:  It's fine.  No problem.

A. Let's see.  "It would result in the inability of an employee to perform the essential functions of the job." Yeah.  I mean, that's one of the reasons. "State law --

(Reporter requested clarification.)

A. Sorry, I'm just reading these paragraphs.  So the first paragraph would be -- I'll speak in generalities, rather.

The first paragraph is consistent with our perspective.  The second is consistent with our limitations.  And the third is consistent with the concern that we have regarding the numbers, the ability to find space, the ability to hire appropriate staff, and the cost that it would have that would negatively impact schools.

MS. LINNANE:  Can we just mark for the record before you go

K. G. RODI

to the next question that this is the bullets on -- it's Bates stamped DEFS 000554.

MR. GRAFF:  There's no S in it, but it's DEF as in Frank.

MS. LINNANE:  DEF.  Sorry. DEF.

MR. GRAFF:  That's fine.

BY MR. GRAFF:

Q. So with respect to the first bullet, it says, "other mitigation measures provide insufficient protection particularly when transmission rates remain high."

Was there any analysis by the Department of Education regarding other mitigation measures regarding COVID-19?

MS. LINNANE:  Objection.

You can answer.

A. There was constant conversations with the Department of Health.  We would have consulted with the Department of Health and, again, they were not permitted in the building.  It

K. G. RODI

doesn't matter.  Even if you said that if they wore a cone on their head that that would stop, the policy said if you were not vaccinated, you could not enter a school building.  Period.  So it didn't matter if there were other mitigation measures.

Q. So it was the policy of the City and then the Department of Education that no matter what religion, religious objection, anything, a person was not going to be able to work in a school building?

MS. LINNANE:  Objection.

You can answer.

A. The policy of the Department of Health was that a person who was not vaccinated was not permitted in a building, whether they worked there or were a parent or were -- they cleaned the basement.  They were not permitted in a school building.  Period.

Q. And it didn't matter if they had a religious objection or not?

68

K. G. RODI

MS. LINNANE:  Objection.

You can answer.

A. Again, if they were not vaccinated.  Period.

Q. Were you involved in any conversations with the Department of Health regarding the mandate after -- strike that.

Were you involved in any conversations with the Department of Health regarding the vaccine mandate?

MS. LINNANE:  Objection. I'm going to caution the witness not to disclose any information that could be considered privileged due to attorney-client privilege in your role as an attorney with the DOE.

MR. GRAFF:

Q. Are you not answering?

A. Correct.

Q. Was there an analysis by the Department of Education regarding the science behind other mitigation

                   K. G. RODI

measures?

                MS. LINNANE:  Objection.

                You can answer.

    A. Again, we have a Department of
Health and health advisers that we were
in regular contact with.

    Q. The second bullet says that
"state law and applicable collective
bargaining agreements, including the
operation of seniority systems,
generally limit DOE's ability to
transfer staff between schools except
in limited circumstances not applicable
here."  Do you see that?

    A. In the second bullet or the
third bullet?

    Q. Second bullet.

    A. Oh, yeah.  Yeah, yeah.

    Q. Was there any effort by the DOE
to negotiate with the UFT to grant the
DOE flexibility to transfer staff?

                MS. LINNANE:  Objection.

                You can answer.

    A. I don't know.

K. G. RODI

Q. Do you know how many out of the approximately 3,300 applicants for religious exemption actually had a bona fide religious objection?

MS. LINNANE: Objection.

You can answer.

A. We didn't make that determination.

Q. Were some of the students learning remotely during the '21, '22 school year?

MS. LINNANE: Objection.

You can answer.

A. I believe there were students in special ed programs that remained working remotely -- I mean, studying remotely.

Q. And how was it determined who would teach those special ed students studying remotely?

MS. LINNANE: Objection.

You can answer.

A. They had their same teachers that -- just some of the teachers would

71

K. G. RODI

come into school and -- because the --
some of the kids -- it would depend on
the kid and if a kid was vulnerable
with their health.  But maybe, like,
the teacher had ten kids in their
class, and three had health
vulnerabilities.  The teacher was still
teaching the other seven kids and then
was working with the three kids who
could not come into the buildings.

Q. Were any teachers teaching
remotely during the '21, '22 school
year?

MS. LINNANE:  Objection.

You can answer.

A. Yes, a few.

Q. Were those because of
accommodations for health reasons?

MS. LINNANE:  Objection.

You can answer.

A. Yes.

Q. How was it decided who received
remote teaching positions?

A. Each person would apply for an

72

K. G. RODI

accommodation.  They would -- then we would do the interactive process, and if the school could manage them working remotely, that that was a reasonable accommodation for them, then the school would make a decision that they would work remotely.  It would depend on the school; it would depend on the level. It would depend on the job; it would depend on, you know -- in certain situations, the person might be teaching English and social studies in a middle school with a co-teacher.  So that might work.  But then you'd have somebody, say, like, first graders with special needs.  That wouldn't be possible.

So it was wholly dependent on the person's program and whether or not the school could figure out a remote accommodation.  And, of course, whether they were -- there was a medical reason that they couldn't come in, not -- that was already determined.

K. G. RODI

Q. Was that -- were those medical accommodation -- accommodations, were they made at the school level, or were they done in your office?

MS. LINNANE:  Objection.

You can answer.

A. They were done at the school level.

Q. The medical accommodation requests, both accommodations and exemptions, were there more of them than religious exemptions --

MS. LINNANE:  Objection.

You can answer.

A. No.

Q. -- requests to medical accomodation?

A. No.

(Reporter requested clarification.)

Q. Do you know how many medical accomodation or exemption requests were made?

MS. LINNANE:  Objection.

You can answer.

K. G. RODI

A. I don't know. I believe it was, like, half. In terms of requests, I don't know how many were granted.

Q. The second paragraph of page DEF 000554, at the bottom of the paragraph saying "allowing such employees to remain in school settings unvaccinated even with other safeguards like masking and testing were presented unacceptable risk to school children, staff, and others." What is the basis for that statement?

MS. LINNANE: Objection.

You can answer.

A. I don't know. I mean we had -- they -- they weren't permitted in the building. And, I mean, you could also say that they -- that, you know -- the argument then was that we had unvaccinated kids. And we didn't want anyone who wasn't vaccinated around the kids.

Q. But why address safeguards like masking and testing would present an

K. G. RODI

unacceptable risk when it didn't matter if they were masking and testing?

MS. LINNANE:  Objection.

You can answer.

A. Because they were vaccinated.

Q. The letter explains -- this letter explains why the plaintiff was denied an exemption.  And one of the reasons that is in this letter is that safeguards like masking and testing would present an unacceptable risk to school children, staff, and others. Did the Department of Education do any research regarding masking and testing and how it would affect school children, staff, and others?

MS. LINNANE:  Objection.

You can answer.

A. I can't speak to that.

Q. Are you aware of any studies done regarding masking and testing in schools?

MS. LINNANE:  Objection.

You can answer.

K. G. RODI

A. I'm not.

Q. Are you aware that all other school districts in New York State had masking and testing policies?

MS. LINNANE:  Objection.

You can answer.

A. I didn't -- I'm not familiar with other school policies.

Q. The first line on this last paragraph on 554 says, "Our experience in providing exemptions in accordance with the arbitration award has only confirmed that creating such alternative assignments poses an undue hardship."  Do you see that?

A. Yes.

Q. The Department of Education didn't provide any exemptions, correct?

MS. LINNANE:  Objection.

You can answer.

A. Correct.

  (Reporter requested clarification.)

Q. So you had no experience in providing exemptions, correct?

K. G. RODI

MS. LINNANE:  Objection.

You can answer.

A. No, not correct.  Because by the time it got to the central committee or the central appeals board or whatever it was, we had already had -- the arbitrator had already approved some that we had denied.  So we were already scrambling to find places for people to be.

Q. Was there one particular arbitrator who granted exemptions?

MS. LINNANE:  Objection.

You can answer.

A. No.  I saw several arbitrators sign off.

Q. Do you know the names of those arbitrators?

MS. LINNANE:  Objection.

You can answer.

A. I do not.

Q. The top of page DEF 000555 says, "There was simply limited work available for employees to support

78

K. G. RODI

their schools long term from outside the school building."  Do you see that?

A. Yes.

Q. There was work for these employees, though, correct?

MS. LINNANE:  Objection.

A. No.  No.

Q. It says "limited work," so there must have been some kind of work, correct?

MS. LINNANE:  Objection.

You can answer.

A. Again, as I referenced before, it wholly depended on what the person was doing.  So if a person was, like, say, a guidance counselor, and they were a guidance counselor on the high school level, and they had to write high school recommendations for college, yeah, they would have limited work to do outside.  But if you take someone who's, like, a kindergarten teacher, what are they doing outside of a school?  Nothing.  They have to be in

K. G. RODI

the school.

So, yeah, was there limited work for certain titles?  Sure.  But not -- it doesn't say each employee has limited work.  It's like there is simply limited work available for employees.

Q. So, for example, the guidance counselor that you cited --

A. Yeah.

Q. -- why wasn't a guidance counselor granted an exemption if there was limited work that they could do?

MS. LINNANE:  Objection.

You can answer.

A. Because on the whole, we needed as many staff as possible, because we had to run a school.  And a guidance counselor, while they may have limited work, that's not their job to just do that.  They have to be available for students.  They have to be available to meet students.  They have to be available to work with students.  They

80

K. G. RODI

have to be able to have confidential conversations with students. They have -- the essential functions of their job may -- some of their work may be able to be done remotely but not all of their work. That's the nature of their job.

Q. The second paragraph on page 555 at the bottom, it says, "Accordingly, additional resources have been diverted to train the exempted employees and assign supervisors to oversee their work." What type of training did exempted employees receive?

MS. LINNANE: Objection.

You can answer.

A. I know that we had a few employees that were exempted who had jobs that were not office-based jobs, so we would have to train them in, like -- like, let's say they -- we had a number of the exempted people supporting the -- I forget the name of it. There was this team of people that

K. G. RODI

were -- that were basically like a COVID hotline for principals.  And a bunch of exempted teachers -- I mean, employees were trained to answer those calls.  So I know that they set up a small phone bank to support that for the people that we had to find work for, because none of their work could be remote.

Q. Did -- when an employee was granted an exemption through the arbitration process, was there an explanation given to the DOE why this particular employee was granted an exemption?

MS. LINNANE:  Objection.

You can answer.

A. I never saw one.

MR. GRAFF:  All right.  I'm going to mark this part of the transcript "Confidential," because this particular exhibit is confidential.  So we're going to separate this part of the

K. G. RODI

transcript out when you produce it.  Please produce it separately and apart from the rest of the transcript.  Is that acceptable?

MS. LINNANE:  We're going to note our objection.  I don't think it's essential to produce it in any respect.  But I will -- I know what you're going to show on the screen given your discussions.  But we will note our objection, due to the confidential nature of this document, that it shouldn't be shown or produced.

MR. GRAFF:  And, Ms. Lazar, you've signed the confidentiality agreement?

THE REPORTER:  Yes.

(The following pages 82 through 87 have been designated confidential.)

K. G. RODI

CONFIDENTIAL IN SPARATE BOOKLE

K. G. RODI


CONFIDENTIAL IN SPARATE BOOKLE



K. G. RODI

K. G. RODI

CONFIDENTIAL IN SPARATE BOOKLE

K. G. RODI

86

K. G. RODI

CONFIDENTIAL IN SPARATE BOOKLE

K. G. RODI

K. G. RODI

CONFIDENTIAL IN SPARATE BOOKLE

(Conclusion of confidential portion)

MR. GRAFF:  Let's go to this exhibit.  I guess this is Exhibit H --

Q. Are you aware that SAMS' arbitrator granted 164 COVID exemptions based on religious reasons?

MS. LINNANE:  Objection.

You can answer.

A. I was not aware of the number.

Q. Are you aware that the Department of Education has disclosed that only 145 employees received a religious exemption?

MS. LINNANE:  Objection.

You can answer.

A. I would not know the numbers. To note that the -- the SAMS saying --

88

K. G. RODI

there were SAMS, and then there was the panel. So I don't know if anyone got them from the panel too.

Q. When SAMS granted an accommodation -- an exemption, excuse me -- who's role was it to place the person into a position?

MS. LINNANE: Objection.

You can answer.

A. When they received an exemption, their names would be sent to the central -- the team that was handling the placements. And they would then figure out where they lived, figure out what would be the right place for them to be. They would call their school and say, hey, this person has an exemption, so they're going to remain on your table of organization. And you're going to keep doing their attendance and all of that.

And then, at that point, if the school said, oh, we have work for them, they would -- they would arrange that.

K. G. RODI

But it was all -- there was a central group in the office that handled it.

Q. Were you involved in that process?

A. I was not.

Q. Do you know if any classroom teacher received a religious exemption?

MS. LINNANE:  Objection.

You can answer.

A. I believe so.

Q. And that was one of the either school-based or DOE office-based accommodations?

MS. LINNANE:  Objection.

You can answer.

A. Yes.

Q. Do you know if any DOE central office employees received a religious exemption?

MS. LINNANE:  Objection.

You can answer.

A. I -- I can't say for sure, because some titles are education titles, but they work in a central

90

K. G. RODI

office.  I will say that, at one point, I saw, like, a list of everybody who had gotten an accommodation, and it was all over the place.  It was teachers, guidance counselors, food service workers, like, custodians, central -- like, it was -- but it could be -- for example, it could be, like, a teacher assigned got an exemption.  But a teacher assigned works in a central office, so I couldn't -- I mean, it was -- I looked at the list briefly.

MR. GRAFF:  Okay.  I'm going to take a five- minute break.  I think I'm almost done.  But I'm going -- right now, it's 11:54. Let's come back at, like, 12:05.

MS. LINNANE:  That's fine. Ten minutes is great.

MR. GRAFF:  All right.  See you in a few minutes.

MS. LINNANE:  All right. Thanks.

(A recess was taken.)

91

K. G. RODI

MR. GRAFF:  I just have one other question.

BY MR. GRAFF:

Q. Ms. Rodi, do you know if any religious exemptions were granted by the appeal panel?

MS. LINNANE:  Objection.

You can answer.

A. I have no idea.

MR. GRAFF:  I don't have any other questions.

(Time noted: 12:06 p.m. )

92

K. G. RODI

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections.  You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you.  If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

93

K. G. RODI

A C K N O W L E D G E M E N T

STATE OF NEW YORK)

                          :SS

COUNTY OF _____)

  I, KATHERINE G. RODI, hereby certify

that I have read the transcript of my

testimony taken under oath on

March 25, 2025, that the transcript is a

true, complete and correct record of

what was asked, answered and said during

my testimony under oath, and that the

answers on the record as given by me are

true and correct, except for the

corrections or changes in form or

subsTtance, if any, noted in the

attached Errata Sheet.

                    _____

                          KATHERINE G. RODI


Signed and subscribed to

before me, this _____ day

of _____, _____.

_____

     Notary Public

94

K. G. RODI

I N D E X

EXAMINATION                                6

BY MR. GRAFF:

(Plaintiff's Exhibit A,          8

Notice of Deposition, was

marked for identification.)

(Plaintiff's Exhibit B,          51

Document dated September 10,

2021, was marked for

identification.)

(Plaintiff's Exhibit C,          51

Email dated September 21, 2021,

was marked for identification.)

(Plaintiff's Exhibit D,          58

Julie Torrey Arbitration

Decision, was marked for

identification.)

95

K. G. RODI

(Plaintiff's Exhibit E,          61

Renewed application, was marked

for identification.)

(Plaintiff's Exhibit F,          62

Position Statement, was marked

for identification.)

(Pages 82 through 87 have been

designated confidential)

96

C E R T I F I C A T E

I, CEITA LAZAR, a stenographic reporter and Notary Public within and for the State of New York, do hereby certify:

That the witness(es) whose testimony is hereinbefore set forth was duly sworn by me, and the foregoing transcript is a true record of the testimony given by such witness(es).

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

CEITA LAZAR
Dated:  April 9, 2025

97

Errata Sheet

NAME OF CASE: LORRAINE MASCIARELLI -against- NEW YORK CITY DEPARTMENT OF EDUCATION

DATE OF DEPOSITION: 03/25/2025

NAME OF WITNESS: KATHERINE G. RODI

Reason Codes:

    1. To clarify the record.

    2. To conform to the facts.

    3. To correct transcription errors.

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

    _____

**Exhibits**

**Ex A -**
**Katherine Rod**
**i deposition no**
**tice_marked**
8:22,23 94:9

**Ex B - Plainitff'**
**s Application_**
**marked** 51:3,4
58:6 94:13

**Ex C - 9-21-**
**21 Denial of Ac**
**commodation_**
**marked** 51:15,
17 58:21 94:18

**Ex D -**
**Torrey Arb aw**
**ard_marked**
58:20,23,25
94:22

**Ex E - 5 - 11-**
**19-2021 -**
**Renewed appli**
**cation_marked**
61:9,11 95:3

**Ex F -**
**NYC DOE Posi**
**tion Statement**
**-- 553-555_**
**marked** 62:13,
14,15 95:6

**Ex G -**
**Redact Confid**
**ential List (**
**just page 1)_**
**marked**

**0**

**000554** 66:4
74:6

**000555** 77:23

**1**

**10** 45:3,20 50:25
51:5 58:7

**11** 58:11

**11201** 5:21

**11:54** 90:17

**12:05** 90:18

**145** 87:20

**164** 87:13

**18** 9:13 13:11

**1990** 11:25

**1994** 12:6

**1995** 10:21

**1998** 10:25

**2**

**2,000** 17:5

**2003** 12:14

**2012** 9:19

**2018** 15:6

**2019** 15:6

**2020** 15:6,7

**2021** 10:7,11
18:21 45:4,20
51:2,6,16,19
58:7,9

**2022** 29:6

**21** 10:7 15:13
51:16,18 58:9
70:11 71:13

**22** 70:11 71:13

**3**

**3,300** 70:3

**5**

**554** 76:11

**555** 80:9

**6**

**65** 5:20

**8**

**82** 82:21

**87** 82:22

**A**

**A** 90:25

**ability** 19:21
24:11 65:19,20
69:12

**able** 19:14 24:6
39:2,16 40:2
50:13 53:7,9,10
54:4 56:6 67:13
80:2,6

**absolutely**
24:17

**Academy** 11:21

**acceptable**
82:5

**access** 37:11

**accommodatin**
**g** 39:13

**accommodatio**
**n** 14:22 25:2
26:7 33:7 35:6,7
36:3,4,25 37:3,
6,10,20 38:2,17,
21,25 39:6,18
43:9 52:24 53:4,
12,16 58:8 72:2,
6,22 73:3,10
88:6 90:4

**accommodatio**
**ns** 10:3 13:22
25:15 33:12
34:20,23,24
36:13 61:17
71:19 73:3,11
89:14

**accomodation**
73:18,22

**accordance**
76:12

**Accordingly**
80:10

**across** 16:18

**act** 29:3

**actually** 6:2
14:25 31:15
70:4

**ADA** 37:7

**additional**
80:11

**address** 5:20
6:3 74:24

**addressed** 8:3

**advised** 31:20,
23

**advisers** 69:6

**affect** 30:11
75:16

**after** 11:7,13
29:6 53:23 68:8

**again** 27:15
29:11 43:13
58:17 66:24
68:4 69:5 78:14

**agency** 16:13
24:23 27:17
29:21 56:4,9
63:17

**agreement**
28:18 29:2
82:19

**agreements**
69:10

**all** 6:19 8:16
13:23 19:23
20:3,9 23:11
30:6 34:24
40:15 45:16
46:3 53:8,9
54:14 55:23
58:13 60:8,14
76:3 80:6 81:20
88:22 89:2 90:5,
21,23

**allowed** 25:12

**allowing** 62:3
74:7

**almost** 90:16

**already** 16:25
17:18 18:5,7
72:25 77:7,8,9

**also** 4:24 14:20
17:9 31:14 37:7
74:18

**alternate** 38:7
39:15 54:16

**alternative**
76:15

**Amendment**
14:18

**American** 11:17
12:8,10,13

**an** 6:12 16:12,19
17:8,11,23
19:16 20:4,10
21:16,19,24
22:7,17,24
23:11 24:22,25
25:6,24 26:7,13
28:9 29:2,21
30:18,23 31:5
34:14 36:24,25
37:2,3,6,9,13,
20,23,24 38:2,6,
16,20,22 39:14,
17 43:2,8,18
45:12 46:4,10,
11 53:15,16
54:7,16,22 56:2,
8 61:4 63:6
64:10,11,17
65:5 68:19,23
71:25 74:25
75:9,12 76:15
79:13 81:11,12,
13,15 88:5,6,11,
18 90:4,10

**analysis** 53:23
55:7 56:2 66:16
68:23

**Andrea** 5:13

**another** 37:25

**answer** 6:12
8:15 11:4,11
12:22 13:3
18:23 19:18
22:14 23:6 25:5,
17,23 26:11,17,
23 27:6 28:16
29:10,19 30:14
31:3 32:15,21
33:9,18 34:3,11,
17,22 35:13,19,
24 36:6,11,16,

Case 1:22-cv-06173-PKC-AMS Document 35-76 Filed 06/06/24 Page 161 of 188 PageID #:351476

22 37:5,22 38:5, 12,19 40:7,14 41:5,9,14 42:24 43:12 45:23 46:6,14 47:15 50:3,12,19 52:10 53:6 54:3, 11 55:12 56:16, 23 57:23 58:16 59:21 60:2,10, 17,24 61:6,19, 24 62:11 63:4, 24 64:7,25 66:20 67:16 68:3 69:4,24 70:7,14,23 71:16,21 73:7, 15,25 74:15 75:5,19,25 76:7, 21 77:3,15,21 78:13 79:16 80:17 81:5,18 87:16,23 88:10 89:10,16,22

**answering** 52:15 63:10 68:21

**any** 6:25 7:12 12:19,24 13:5 14:4,10,11 22:16,20 25:24 27:14 30:15,16 32:25 33:15 34:7 35:21 36:13 41:6 44:23 46:25 47:22 48:5,10 49:6,18 52:2,10 53:23 57:11 60:4 61:15 63:4 66:16 68:6,10, 15 69:20 71:12 75:14,21 76:19 82:9 89:7,18

**anybody** 57:12

**anymore** 40:17

**anyone** 7:9 28:24 30:21 33:16 42:21 43:13 62:7 64:3 74:22 88:3

**anything** 16:5 27:10 45:10 67:12

**apart** 46:21 82:4

**Apologies** 64:21

**appealing** 63:16

**appeals** 61:17, 21 62:8 63:22 77:6

**applicable** 69:9,14

**applicant** 17:10

**applicants** 22:18,23 23:11 70:3

**application** 16:21 17:19 22:17 28:9 30:18,23 31:6, 16 32:12 42:4 43:2,4 44:20,24 45:13,15,18 53:14 58:5 59:23 61:12

**applications** 16:24,25 17:6 18:2,8 19:7,24 20:4,15,17 22:5 23:21 33:22 35:11 41:17 42:2,12,18 45:9 46:11 60:20

**applied** 17:14 31:10 34:25 52:2

**apply** 16:10 28:5 71:25

**approach** 16:24 18:7 46:20

**appropriate** 31:24 65:21

**appropriately** 17:13 29:3 31:10

**approve** 34:4

**approved** 34:8 35:17,22 36:9, 14 77:8

**approximately** 70:3

**arbitration** 26:3,8 37:19 56:19 58:24 59:2,10,13,14 60:21 76:13 81:13

**arbitrations** 59:19

**arbitrator** 25:25 26:2 38:14 40:10,25 59:24 61:3 77:8,13 87:13

**arbitrators** 60:6,13 77:16, 19

**area** 31:11

**argument** 74:20

**around** 39:7,8 56:7 74:22

**arrange** 88:25

**arrest** 10:4

**ask** 4:21 6:9 7:18 44:10

**asking** 33:13

**asks** 37:14

**assign** 80:13

**assigned** 90:10,11

**assignments** 76:15

**assistant** 23:24

**assume** 57:24 58:18 63:15

**at** 6:25 7:8 11:17 14:22 17:20 20:14,19 23:15 24:7 27:7,24 28:12 29:20,24 30:8 39:22 42:19 45:25 47:8,19 50:5,6 54:8 55:14,19 56:21 57:8,11 73:4,8 74:6 80:10 88:23 90:2,13,18

**athletes** 30:10

**attached** 42:8

**attendance** 88:22

**attended** 13:12, 14

**attorney** 4:6 6:8 12:15 52:13 63:6 68:19

**attorney-** 47:24 68:17

**attorney-client** 47:4 48:12 49:8, 20 63:7,9

**attorneys** 48:5

**Austin** 5:6 6:8 43:21

**automatically** 30:25 45:11

**available** 77:25 79:7,22,23,25

**award** 56:20 76:13

**aware** 18:12,15 60:12,13 61:21, 25 62:2 75:21 76:3 87:12,17, 18

**away** 7:19 28:21

---

**B**

**back** 11:14,16 23:13,16 28:6 57:14,20 58:4 90:18

**bank** 81:7

**bargaining** 69:10

**based** 16:20 17:17 46:4 53:4 87:14

**basement** 67:22

**basically** 28:25 81:2

**basis** 23:8 26:6 74:12

**Bates** 66:3

**because** 6:20 23:12 24:7,12 25:6 27:15,17 30:4 31:16 36:23 38:20,21 52:15 71:2,18 75:6 77:4 79:17, 18 81:9,23 89:24

**become** 56:8

**been** 5:18 10:13 22:3 24:22 26:21 28:7 29:15 40:24 44:12 57:2 78:10 80:11 82:22

**before** 8:13 22:6 28:22 46:8 65:25 78:14

**begin** 11:8

**behalf** 59:17

**behind** 68:25

**being** 29:7

**belief** 6:15 22:11 32:13,19, 25

**beliefs** 29:14

**believe** 8:2 12:23 26:20 70:15 74:2 89:11

**believed** 17:9 64:17

**benefits** 29:7, 25

**Bernstein** 20:19 21:2,11 50:20

**best** 4:23 29:20 38:24

**between** 37:2 60:5 69:13

**bias** 27:14

**bigger** 43:22 59:6

**blank** 31:17,22

**board** 16:19 77:6

**bona** 32:12,18 70:4

**BOOKLE** 83:5 84:5 85:5 86:5 87:5

**boss** 20:19

**both** 9:7 16:22 38:15 73:11

**bottom** 28:12 64:13 74:6 80:10

**break** 6:25 7:3 90:15

**briefly** 90:13

**bring** 27:18

**Brooklyn** 5:21 40:18

**building** 27:18 53:10 55:6 56:7 66:25 67:6,14, 20,23 74:18 78:3

**buildings** 24:6, 7,10,13 25:10, 12 29:23 43:15, 18 71:11

**bullet** 66:12 69:8,16,17,18

**bullets** 64:14 66:3

**bunch** 81:4

**burden** 16:12 17:8,23 20:5,11 21:25 22:8 23:11 24:22 46:4,11 53:18 56:8 64:18

**burdens** 16:18 18:20

**but** 7:16 17:25 19:24 20:2 27:17,22 31:12 38:9,25 39:3 40:17 50:15 57:3 58:18 62:4

66:6 71:5 72:15 74:24 78:22 79:4 80:6 82:9, 12 89:2,25 90:8, 10,16

**C**

**call** 88:17

**calls** 81:6

**came** 23:16 30:23 43:24 45:2,6,19

**can** 4:23 7:20 8:6,7 11:4,11 12:22 13:3 18:23 19:18 22:14 23:6 25:5, 17,23 26:11,17, 23 27:6 28:13, 16 29:10,19 30:14 31:3 32:15,21 33:9, 18 34:3,11,17, 22 35:13,19,24 36:6,11,16,22 37:5,22 38:5,12, 19 40:7,14 41:5, 9,14 42:24 43:12,21 45:23 46:6,14 47:15 50:3,12,19 51:13 53:6 54:3, 11 55:12 56:16, 23 57:23 58:16 59:7,21 60:2,10, 17,24 61:6,19, 24 62:11 63:24 64:7,25 65:24 66:20 67:16 68:3 69:4,24 70:7,14,23 71:16,21 73:7, 15,25 74:15 75:5,19,25 76:7, 21 77:3,15,21 78:13 79:16 80:17 81:18 87:16,23 88:10 89:10,16,22

**can't** 6:12 7:19 24:14,15,16 27:19 40:16 75:20 89:23

**cannot** 6:21

**case** 5:12 7:13

**Catholic** 22:17, 23

**caution** 46:24 47:21 48:9 49:5, 17 68:14

**ceita** 4:15 5:19

**cell** 7:15

**central** 77:5,6 88:13 89:2,18, 25 90:7,11

**certain** 30:2 72:11 79:4

**cetera** 46:20

**chancellor's** 15:25

**changed** 30:9

**charge** 15:9

**check** 31:11

**chief** 21:9

**children** 23:16 54:25 74:11 75:13,17

**choice** 30:7

**circumstances** 69:14

**cited** 79:10

**City** 4:19 5:10, 14 7:25 9:5,6, 10,12 11:9 20:23 29:16 30:9 50:6 61:16 67:9

**clarification** 41:2 65:9 73:20 76:23

**clarify** 52:20

**class** 71:7

**classes** 12:20, 25 14:18,19

**classroom** 10:13 23:19 89:7

**classrooms**

30:5

**cleaned** 67:21

**clear** 58:2

**client** 47:25 54:13,17 62:20 68:18

**close** 4:22

**co-teacher** 72:14

**collective** 69:9

**college** 12:2,3 78:21

**come** 28:6 29:22 57:14 71:2,11 72:24 90:18

**coming** 57:20

**committee** 15:21,23 16:7, 20 17:21 18:9, 11,14,17 20:7 21:24 22:4 24:24 45:21 46:9,22 47:13 49:15 58:13 60:14 64:17 77:5

**committee's** 23:9 60:7

**communicate** 7:20

**communications** 60:4

**completely** 37:14

**comprised** 33:20

**concern** 65:18

**conclude** 63:20

**conclusion** 87:8

**cone** 67:3

**confidential** 5:24 80:2 81:22, 24 82:14,23 83:5 84:5 85:5 86:5 87:5,8

**confidentiality** 82:18

**confirm** 43:7 50:15

**confirmed** 76:14

**consider** 17:3 24:25

**consideration** 32:17

**considered** 17:13 43:8 47:2, 23 48:11 49:7, 19 68:16

**consistent** 65:15,16,18

**constant** 66:21

**consulted** 66:23

**contact** 69:7

**conversation** 46:16

**conversations** 66:21 68:7,11 80:3

**copy** 4:4,8

**correct** 15:17 26:5 52:17 56:14 63:11,12 68:22 76:19,22, 25 77:4 78:6,11

**cost** 55:18 65:21

**could** 27:14,18 28:20 29:21 30:2 31:21,24 39:24 47:2,23 48:11 49:7,19 50:14 53:9,11 56:25 67:5 68:16 71:11 72:4,21 74:18 79:14 81:9 90:8, 9

**couldn't** 27:7, 10 46:7 50:15 57:6,11 72:24 90:12

**counsel** 5:2 47:12,16 48:16,

21,23 49:2,13 50:21

**counsel's** 46:17

**counselor** 78:17,18 79:10, 13,20

**counselors** 90:6

**course** 72:22

**courses** 13:13 14:21

**court** 4:15 5:20 6:20 53:21

**courtesy** 4:8

**cover** 55:23

**COVID** 15:10 39:7 81:3 87:13

**COVID-19** 19:11 66:18

**create** 64:11

**created** 62:22 63:14

**creating** 76:14

**criteria** 52:23 53:3 61:2

**current** 9:14,15

**currently** 7:6 9:2 20:22 21:4 48:6,23

**custodians** 23:23 30:5 90:7

**D**

**date** 58:18

**dated** 50:25 51:5,18 58:6,8

**days** 58:11

**decide** 19:15 56:12

**decided** 11:5 22:6 71:23

**decision** 16:18, 20,23 17:17 20:3,9 22:2,3

23:9 53:22,23 58:12,24 59:3 60:7,13 72:7

**decisions** 16:4, 6,8 59:10

**DEF** 66:6,7,8 74:5 77:23

**defendant** 5:11, 15

**DEFS** 66:4

**denial** 58:7

**denied** 19:25 21:19 22:12 30:25 32:8 34:9, 15 46:4 75:9 77:9

**deny** 19:3,16 21:13 23:3 30:18 31:8 33:24 53:13 58:13 60:8,14 61:4

**department** 4:20 5:11,14 7:25 9:5,9,12 11:9 15:4 20:20, 24 21:4 25:8 26:14,19 29:17 30:11 46:17 47:12,17,18 48:3,7,17,18 49:2,13 50:7,8 55:9 56:11 59:18 60:5 62:8 66:17,22,24 67:10,17 68:7, 11,24 69:5 75:14 76:18 87:19

**depend** 42:3 71:3 72:8,9,10, 11

**depended** 56:24,25 78:15

**dependent** 72:19

**depends** 28:17 29:11

**deposition** 4:7, 17 7:23 8:4,8, 10,18,24

**deputy** 20:18,21

**described** 49:15

**deserved** 17:10

**designated** 82:22

**determination** 16:11,13 18:19 21:23 31:8 38:13 57:17 63:16 70:9

**determinations** 21:12

**determine** 17:22 22:23 30:17 35:4,6 61:3

**determined** 23:10 46:2,10 54:6,12,14 56:3 70:19 72:25

**determining** 16:16 19:3

**development** 13:13 14:21

**didn't** 24:11 25:10 32:6 38:8 43:15 45:8,9 64:22 67:7,24 70:8 74:21 75:2 76:8,19

**difference** 37:2

**different** 11:6 28:19 33:5,15 49:14 54:8 56:3

**difficult** 54:18

**direct** 52:9 63:3

**directed** 39:14

**director** 9:16 15:8

**disability** 10:2 35:4

**discipline** 13:21,24

**disclose** 46:25 47:22 48:10 49:6,18 68:15

**disclosed** 87:19

**discrimination** 14:13,16,19,22 15:2 37:8

**discussing** 19:23 20:14,16

**discussion** 22:20

**discussions** 22:16 47:3 82:12

**disqualify** 45:12

**districts** 76:4

**diverted** 80:11

**doctor** 34:9,13

**doctors** 33:21, 23

**document** 8:12 42:7 44:7,16 45:2 50:25 51:5, 9,21,24,25 52:25 59:5 61:10 62:14,21, 25 63:14,21 64:3,5,9 82:15

**documentation** 31:25

**documents** 7:12 44:18 45:17

**DOE** 13:15 14:24 25:20 40:17 41:18,19 52:12,13 53:18, 25 56:21 63:6 64:10,12 68:19 69:20,22 81:14 89:13,18

**DOE's** 69:12

**does** 15:22 21:3

**doesn't** 67:2 79:5

**doing** 55:4 56:2 78:16,24 88:21

**don't** 6:11 17:24 19:21 26:24

**disclosed** 28:6 30:15 36:7, 12 39:17,20,21 41:15 44:22 54:5 58:17 59:10 60:25 62:19 69:25 74:2,4,16 82:7 88:3

**done** 64:23 73:5,8 75:22 80:6 90:16

**drafted** 52:4

**drafting** 52:7 62:25

**due** 18:2 19:22 48:12 49:20 63:6,9 68:17 82:13

**duly** 5:18

**duplicate** 45:8

**during** 15:10 18:4 30:8 38:3 70:11 71:13

**duties** 9:20 10:10

**E**

**each** 17:10 42:11,13,15 71:25 79:5

**early** 18:3

**East** 10:19

**ed** 70:16,20

**education** 4:20 9:6,9,12 11:9 20:24 21:5 24:19 26:14,19 29:17 30:12 48:18 50:7,8 55:10,21 56:5, 11 57:18 59:18 60:5 62:8 66:17 67:10 68:24 75:14 76:18 87:19 89:24

**Education's** 15:4

**effect** 30:15 57:25

Case 1:22-cv-01275-PKC-MMS Document 76 Filed 01/06/25 Page 164 of 188 PageID #: 1479

**effort** 69:20

**either** 21:19 37:10 57:16 89:12

**elementary** 54:22

**elements** 13:24,25 16:14 39:7

**else** 7:9 42:22 45:10 55:6 62:6

**email** 51:16,18 58:22

**employed** 9:2,7

**employee** 9:16, 25 10:6 45:8 64:11 65:5 79:5 81:11,15

**employees** 13:16,20 14:7 16:9 25:13 26:7 27:2 29:4,22 53:8,9 56:10 74:7 77:25 78:6 79:8 80:12,15, 19 81:5 87:20 89:19

**employer** 9:4

**employment** 12:25 15:5,9,15 27:4 28:13 29:16 37:12

**ended** 11:13 62:5

**English** 10:17 72:13

**enter** 53:10 67:6

**entertainers** 30:10

**entire** 53:13

**entities** 9:8

**entitled** 33:2 38:10 57:13

**equal** 14:23 15:4,9,15

**essential** 54:19 55:3 65:6 80:4 82:8

**essentially** 55:14

**et** 46:20

**even** 32:6 34:13 39:9 54:18 55:4 67:2 74:9

**eventually** 17:5

**ever** 10:13

**every** 17:19 23:21 42:7

**everybody** 28:18 90:3

**everyone** 4:21 55:13

**exact** 40:16 58:17

**exactly** 17:24

**examination** 6:5 32:10

**examined** 5:21

**examining** 22:17

**example** 39:4 79:9 90:9

**except** 64:4 69:13

**excuse** 88:6

**executive** 9:15

**exempted** 80:12,15,19,23 81:4

**exemption** 16:14 18:2 19:16 20:4 21:16,20 22:7, 24 25:25 30:19, 24 31:6,12,13 33:3,6,16,19,24 34:14 35:11,16 36:20,25 37:3, 13,20,23,24 38:16,17 44:21 46:10 52:3 61:4 64:4,10,20 70:4 73:22 75:9 79:13 81:12,16 87:21 88:6,11, 19 89:8,20

**90:10**

**exemptions** 16:10,12,17 17:7,22 19:4,7, 10,11 20:10 21:13 22:6 23:4, 10 25:14 33:10, 15 34:8 35:16, 22 37:18 39:12 40:5,22,25 41:7, 17 43:10 46:3 56:9 58:14 60:8, 15,20 73:12,13 76:12,19,25 77:13 87:13

**exhibit** 8:22,23 51:3,4,15,17 58:5,6,20,21,23, 25 61:9,11 62:13,15 81:23 87:10

**experience** 76:11,24

**explains** 75:7,8

**explanation** 81:14

**extensive** 14:25

---

**F**

**face** 39:10

**fact** 24:2

**fail** 53:2

**failed** 52:23

**familiar** 40:15 76:8

**few** 11:15 71:17 80:18 90:22

**fewer** 47:8

**fide** 32:12,18 70:5

**figure** 72:21 88:15

**fill** 56:14

**filled** 56:20 57:2,15

**final** 21:15,17, 18,22

**financial** 23:2

**find** 38:24 39:14 54:16,18 55:22, 24 57:2 65:20 77:10 81:8

**fine** 4:10 65:2 66:9 90:19

**fired** 29:15

**Firm** 5:7

**first** 5:18 14:18 16:22 43:25 45:5,6 64:14 65:11,14 66:11 72:16 76:10

**five-** 90:15

**flexibility** 69:22

**FMLA** 14:2

**folks** 56:6

**following** 64:12 82:21

**follows** 5:22

**food** 23:23 24:17 30:6 90:6

**forever** 27:20

**forget** 80:24

**former** 50:20

**forms** 28:20

**found** 39:24 56:13

**four** 64:5

**Frank** 66:6

**Friedman** 48:22 50:23

**from** 5:7 15:6,24 17:2 19:11 21:23 23:21,22, 23,24,25 25:7, 25 26:8 27:3,13 28:2,10,11 29:5, 15,16 37:14 43:2 45:12 46:21 47:18 48:2 49:14 56:2 62:7 78:2 82:4 88:4

**front** 7:13,16

**functions** 54:20 55:3 65:6 80:4

**further** 7:19

---

**G**

**G-R-O-F-F** 53:22

**general** 15:21, 23 17:21 18:9, 11,14,17 20:6 21:23 22:4 23:9 24:24 45:21 46:9,17,22 47:11,13,16 48:16,21,23 49:2,13,15 50:21 58:13 60:7,14 64:17

**generalities** 65:12

**generally** 69:12

**genuine** 29:14

**gestures** 6:22

**get** 37:9

**getting** 55:20

**given** 35:3,5 42:12,13 81:14 82:11

**go** 11:14,16 12:2 24:6 45:5 65:25 87:9

**going** 6:9 8:5,21 18:6 22:11 44:9 46:3,18,23 47:21 48:9 49:4, 16 51:2,14 52:9 58:4 61:8 63:3 67:13 68:14 81:21,24 82:6, 10 88:19,21 90:14,17

**Good** 6:7

**got** 27:21 57:12 77:5 88:3 90:10

**gotten** 90:4

**graders** 72:16

**grades** 23:18

**graduate** 11:19, 23 12:5,12

**Graff** 4:10,13 5:6 6:6,8 8:21 43:23 44:4,5,14, 15 47:10 48:4, 15 49:11,22 50:24 51:14 52:14,19,21 58:20 63:8 65:2 66:5,9,10 68:20 81:20 82:17 87:9 90:14,21

**grant** 19:3,15 21:13,16 30:18 31:8 33:24 61:4 64:20 69:21

**granted** 17:7 21:19 23:3 25:15,21 40:9, 24 60:21 74:4 77:13 79:13 81:12,15 87:13 88:5

**granting** 64:10

**great** 90:20

**Groff** 53:22

**group** 15:24 20:5,6 28:23 39:16 52:5 89:3

**guess** 87:10

**guidance** 78:17,18 79:9, 12,19 90:6

**gym** 54:23

**H**

**Hadley** 12:4

**hadn't** 17:12

**half** 42:4,20 74:3

**hand** 6:21

**handled** 34:20, 24 89:3

**handling** 88:13

**hard** 55:2

**hardship** 53:17, 24 54:7 55:8

64:12 76:16

**has** 64:14 76:13 79:5 87:19 88:18

**having** 5:18 17:5

**he** 48:23

**head** 6:21 67:3

**health** 9:25 15:25 25:8 66:22,24 67:18 68:8,12 69:6 71:5,7,19

**Heart** 11:21

**held** 46:8

**Hempstead** 11:22

**her** 5:20 6:2 44:24

**here** 69:15

**hey** 88:18

**high** 10:17,19 11:20,23 66:15 78:18,20

**hire** 27:14 30:3 65:20

**hiring** 13:22

**history** 10:17

**Holyoke** 12:3

**home** 7:8

**hotline** 81:3

**house** 7:10

**how** 4:8 7:22 9:11,17 10:22 16:9,13,14,23 18:6 19:22 21:18 25:14 30:11 34:20 35:10,15 36:2,8 41:11,16,25 46:18,19 51:23 53:2 54:6 55:21, 23 60:19 70:2, 19 71:23 73:21 74:4 75:16

**Howard** 48:22 50:22,23

**However** 17:9

**HR** 15:25

**human** 13:6,9, 10,17 14:3 21:9

**I**

**I'LL** 6:15 61:8 65:12

**I'VE** 8:9 13:12 14:19 59:9,11

**idea** 26:12 60:18 61:7 62:12,23 63:25 64:8

**identification** 8:25 51:7,20 59:4 61:13 62:17

**identified** 8:17

**identify** 44:11

**ie** 53:17

**immediately** 11:8 31:20,23

**immunocompromised** 39:5

**impact** 65:22

**implementation** 15:11,19 49:25 50:9

**implemented** 35:8

**important** 54:24

**impose** 53:16

**inability** 65:5

**incentive** 23:2

**included** 31:17

**including** 9:23 69:10

**individual** 17:11 28:24 29:12 42:2 60:6

**individualized** 16:19

**individually**

17:20

**information** 46:25 47:22 48:10 49:6,18 68:15

**insufficient** 66:13

**interactive** 35:5 36:18,24 38:23 72:3

**interruptions** 4:25

**into** 24:6,9 27:18 29:23 45:2,6 71:2,11 88:8

**Investigation** 9:24

**involved** 41:16 55:14,25 68:6, 10 89:4

**involvement** 62:5

**issues** 10:4 14:5,8

**its** 30:9

**J**

**job** 10:10 24:2 54:20 55:4,5 57:14 65:6 72:10 79:21 80:5,8

**jobs** 23:20 27:22 57:6 80:20

**joined** 16:3

**judge** 32:6

**Julie** 58:23 59:2

**just** 7:18 9:8 16:14 28:21 32:7 33:25 40:16 42:6,8 43:7,23 45:16 50:24 52:19 57:15 65:10,24 70:25 79:21

**K**

**Katherine** 4:17 5:17

**Kathleen** 5:9

**keep** 27:20 88:21

**kept** 29:24

**kid** 71:4

**kids** 23:13,14 24:13,15,18 71:3,6,9,10 74:21,23

**kind** 57:15 78:10

**kindergarten** 78:23

**knew** 17:2

**know** 6:14 23:25 26:6 27:23 32:5 36:2 39:10,25 40:17 41:11,15 43:19,24 44:19, 22 50:5,16,17 51:8 54:17 55:20 57:9,11 59:10 60:19 61:2 62:21 63:13,21 64:2 69:25 70:2 72:11 73:21 74:2,4,16,19 77:18 80:18 81:6 82:10 87:24 88:3 89:7, 18

**knowing** 43:3 44:23 57:19

**knowledge** 60:11

**L**

**labor** 12:20

**language** 52:4

**large** 39:25 40:2

**larger** 51:12

**last** 39:19 76:10

**law** 5:7,10,14 7:25 11:17 12:10,19,20,24, 25 14:17 20:20 37:8 46:16 47:12,17,18 48:3,7,25 49:12 65:8 69:9

**laws** 14:2

**lawyers** 48:2 52:5

**Lazar** 4:15 5:19 82:17

**learning** 24:14 70:11

**least** 42:19

**leave** 11:2 45:10 56:13,19 57:17

**leaves** 13:25

**left** 28:14,18

**legal** 16:3 48:17

**let** 6:14 43:19 51:8

**let's** 13:21 33:14 65:4 80:22 87:9 90:18

**letter** 75:7,8,10

**level** 23:18 28:12 34:5 72:9 73:4,9 78:19

**licensed** 12:15, 17

**like** 4:3 5:23 28:25 34:24 39:15 40:18 44:17 46:18 57:10 58:2 62:3, 19 71:5 72:16 74:3,9,24 75:11 78:16,23 79:6 80:21,22 81:2 90:3,7,8,9,18

**limit** 69:12

**limitations** 65:17

**limited** 69:14 77:24 78:9,21 79:3,6,7,14,20

**LINANNE** 12:21 28:15 29:9,18 32:14,20

**line** 52:25 76:10

**lines** 64:5

**Linnane** 4:2,5, 12 5:9,10,23 11:3,10 13:2 18:22 19:17 22:13 23:5 25:4, 16,22 26:10,16, 22 27:5 30:13 31:2 33:8,17 34:2,10,16,21 35:12,18,23 36:5,10,15,21 37:4,21 38:4,11, 18 40:6,13 41:3, 8,13 42:23 43:11,21 44:2,9 45:22 46:5,13, 23 47:14,20 48:8 49:4,16 50:2,11,18 52:8, 18 53:5 54:2,10 55:11 56:15,22 57:22 58:15 59:20,25 60:9, 16,23 61:5,18, 23 62:10 63:2, 23 64:6,19,21 65:24 66:7,19 67:15 68:2,13 69:3,23 70:6,13, 22 71:15,20 73:6,14,24 74:14 75:4,18, 24 76:6,20 77:2, 14,20 78:7,12 79:15 80:16 81:17 82:6 87:15,22 88:9 89:9,15,21 90:19,23

**list** 90:3,13

**literally** 39:14

**little** 24:15 43:22

**lived** 88:15

**located** 40:20

**locations** 40:11,16

**long** 6:25 9:11, 17 10:22 29:25

78:2

**longer** 15:13

**look** 28:25

**looked** 17:19 90:13

**looking** 31:13 32:23 37:9 55:14

**looks** 44:17

**Lorraine** 4:18 6:9 44:20

**lot** 14:3 27:21 56:2

**lower** 23:18

**M**

**made** 11:2 16:4, 20 18:14,20 21:25 22:2,3 31:9,14 33:25 36:4 43:5 45:7 57:16 58:12 73:4,23

**major** 12:7

**make** 6:19 16:7 17:11 31:7 32:3 42:8 43:22 45:16 51:11 59:6 70:8 72:7

**making** 16:23 20:2

**Mallory** 20:18, 21

**manage** 10:4 72:4

**mandate** 15:11, 12,20 19:11 23:3 25:7 27:11 44:21 49:25 50:10 68:8,12

**Manhattan** 40:19

**many** 25:14 35:10,15 36:2,8 41:11,16 44:17 60:19 70:2 73:21 74:4 79:18

**mark** 8:22 51:2, 15 65:25 81:21

**marked** 5:24 8:25 51:6,19 59:3 61:9,13 62:13,17

**Martin** 5:13

**Masciarelli** 4:19 6:9

**Masciarelli's** 44:20

**masked** 25:11 39:9 43:16

**masking** 24:25 43:7 74:9,25 75:3,11,15,22 76:5

**Massachusetts** 12:4

**matter** 4:18 22:12 25:11 43:16 67:2,7,11, 24 75:2

**matters** 8:2 10:6

**may** 57:2 79:20 80:5

**maybe** 39:8 50:14 71:5

**me** 6:13,14 7:17 8:6 43:19 51:8, 11 59:6 88:7

**mean** 15:22 28:2 30:20 38:21 58:21 59:9 65:7 70:17 74:16,18 81:4 90:12

**meaning** 21:21 26:2

**measures** 66:13,18 67:8 69:2

**Mediation** 26:3, 8 59:14

**medical** 31:13, 18 33:6,7,10,11, 14,16,19,20 34:5,8,9,19,23,

25 35:3,10,15, 16,21 36:3,13 37:10 38:22,25 40:5,8 41:6 45:6,7 72:23 73:2,10,17,21

**meet** 48:25 52:23 53:3 79:24

**meeting** 18:14, 17 45:21 46:2,8 49:3 55:3

**meetings** 18:11 45:24 47:9,11, 19 48:7 49:12, 14 50:8

**memory** 34:7

**mentioned** 41:23

**met** 7:25 18:5

**microphone** 4:22

**middle** 72:14

**might** 72:12,15

**mine** 21:14

**minimal** 4:25 53:17

**minute** 90:15

**minutes** 18:13 90:20,22

**mitigation** 66:12,18 67:8 68:25

**more** 14:3 17:5 42:21 53:17 54:18 73:12

**morning** 6:7

**Mount** 12:3

**move** 42:10

**Mr** 4:10,13 5:6 6:6 8:21 43:23 44:4,5,14,15 47:10 48:4,15 49:11,22 50:24 51:14 52:14,19, 21 58:20 63:8 65:2 66:5,9,10 68:20 81:20

Case 2:22-cv-06173-PK-AMMS Document 35-76 Filed 01/16/24 Page 167 of 188 PageID #: 11482

82:17 87:9 90:14,21

**Ms** 4:2,5,12 5:9, 13,23 6:7 11:3, 10 12:21 13:2 18:22 19:17 21:11 22:13 23:5 25:4,16,22 26:10,16,22 27:5 28:15 29:9, 18 30:13 31:2 32:14,20 33:8, 17 34:2,10,16, 21 35:12,18,23 36:5,10,15,21 37:4,21 38:4,11, 18 40:6,13 41:3, 8,13 42:23 43:11,21 44:2,6, 9 45:22 46:5,13, 23 47:14,20 48:8 49:4,16 50:2,11,18 52:8, 18 53:5 54:2,10 55:11 56:15,22 57:22 58:15 59:20,25 60:9, 16,23 61:5,18, 23 62:10 63:2, 23 64:6,19,21 65:24 66:7,19 67:15 68:2,13 69:3,23 70:6,13, 22 71:15,20 73:6,14,24 74:14 75:4,18, 24 76:6,20 77:2, 14,20 78:7,12 79:15 80:16 81:17 82:6,17 87:15,22 88:9 89:9,15,21 90:19,23

**much** 41:25 55:22,24

**must** 78:10

**my** 4:5,14,25 6:7 7:8 9:15 20:18 34:6 50:20 60:11

---

### N

**name** 4:14 5:3 6:7 23:25 24:2

50:14 80:24

**names** 50:17 77:18 88:12

**nature** 19:22 32:5 80:7 82:14

**nearby** 7:15

**necessarily** 56:17 57:3 59:11

**necessary** 24:18

**need** 6:13,24 35:7 51:11 55:16,22,24 59:6

**needed** 23:13, 15,18,20 24:3 30:4 39:6,8,9 43:24 79:17

**needs** 55:21 72:17

**negatively** 65:22

**negotiate** 69:21

**negotiations** 49:24

**never** 43:8 81:19

**new** 4:19 5:10, 14,21 7:24 9:5, 6,10,12 11:9,22 12:17 20:23 29:16 30:3 50:6 61:16 76:4

**next** 51:9 66:2

**no** 6:2 7:2,11,14, 20 11:12 15:6, 12,13 18:18 19:19 21:6,16, 17,18,21 22:9, 12,19,25 23:7 26:12,18 28:4 30:6 31:4 32:10, 16,17,22 33:4 36:18,23 37:15, 16 38:20 39:15 42:19 43:6 44:25 46:15 48:14,24 50:4 51:13 59:7,22

60:18 61:7,14, 20 62:12,23 63:25 64:8 65:2 66:5 67:11 73:16,19 76:24 77:4,16 78:8

**nods** 6:21

**none** 81:9

**not** 6:12 7:16 18:12,15 23:14 24:4,5,6,21 25:9,20 26:15, 20 27:2,18 29:22,23 32:11 35:14,20 36:25 40:15 43:13,14, 17,18 44:8,12 46:15,24 47:22 48:10 49:5,17 52:10,15 53:9, 10,11 55:20 56:6,12,17,20 57:3,19,21 58:2 59:16 60:11 63:4,10 66:25 67:5,12,18,19, 22,25 68:4,15, 21 69:14 71:11 72:20,24 76:2,8 77:4,22 79:4,21 80:6,20 87:17, 24 89:6

**Notary** 5:19

**notations** 43:4

**note** 82:7,12 87:25

**notes** 18:10,16

**nothing** 17:12, 15 42:9 62:6 78:25

**Notice** 8:8,17,24

**now** 34:19 90:17

**number** 31:11 55:15 80:23 87:17

**numbers** 17:18 65:19 87:24

**numerous** 13:12,14 14:20

---

### O

**objection** 11:3, 10 12:21 13:2 18:22 19:17 22:13 23:5 25:4, 16,22 26:10,16, 22 27:5 28:15 29:9,18 30:13 31:2 32:14,20 33:8,17 34:2,10, 16,21 35:12,18, 23 36:5,10,15, 21 37:4,21 38:4, 11,18 40:6,13 41:4,8,13 42:23 43:11 45:22 46:5,13 47:14, 20 48:8 50:2,11, 18 52:8 53:5 54:2,10 55:11 56:15,22 57:22 58:15 59:20,25 60:9,16,23 61:5, 18,23 62:10 63:2,23 64:6,19, 24 66:19 67:12, 15,25 68:2,13 69:3,23 70:5,6, 13,22 71:15,20 73:6,14,24 74:14 75:4,18, 24 76:6,20 77:2, 14,20 78:7,12 79:15 80:16 81:17 82:7,13 87:15,22 88:9 89:9,15,21

**objections** 25:3

**occasionally** 20:20

**October** 18:21

**off** 28:14 77:17

**offboarding** 10:5 13:23

**office** 9:16,23, 24 10:2 14:23 15:5,16,25 16:2, 3 45:3,7,14 46:18 73:5 89:3, 19 90:2,12

**office-based** 80:20 89:13

**officer** 21:10

**offices** 9:23

**oh** 39:23 69:19 88:24

**Okay** 8:5,20 15:18 19:14 31:5 43:19 44:4 51:11,14 52:19 59:8 90:14

**on** 8:17 14:4,7, 16 15:21 16:23 17:4,17 19:15 21:15 23:17 27:20 28:17,22 29:2,11,25 34:4 42:3,10 43:24 45:3,19 48:6 53:18,24 55:9 56:8,13,18,24, 25 57:5,25 59:17 62:8 64:14 66:3 67:3 71:3 72:8,9,10, 11,19 76:10,11 78:15,18 79:17 80:9 82:11 87:14 88:20

**onboarding** 10:5 13:22

**Once** 45:2

**one** 7:20 9:8 14:22 16:8,10 21:17,18,21 29:6 33:12 40:18,19 42:13 49:2 50:14,17 59:11,22 65:7 75:9 77:12 81:19 89:12 90:2

**ones** 40:9

**online** 24:14

**only** 27:12 76:13 87:20

**open** 45:15

**operation** 69:11

**operations** 53:18

**opinion** 26:13

**opportunity**

14:24 15:10

**option** 25:6
27:12,24 29:20
37:16 43:18

**options** 37:16

**order** 37:11

**organization**
88:20

**other** 10:4
27:14,22 28:21
30:7 32:2 37:16
41:22 59:9
66:12,17 67:7
68:25 71:9 74:9
76:3,9

**others** 74:12
75:13,17

**our** 27:22 29:23
33:20 45:14
62:5 63:18
65:15,16 76:11
82:7,13

**out** 32:8 38:24
42:16 70:2
72:21 82:2
88:15

**outlined** 37:6,7

**outside** 78:2,22,
24

**over** 7:18 17:6
49:24 50:9 90:5

**overall** 17:17

**overlooked**
17:16

**oversaw** 14:23

**oversee** 9:22
15:3 80:13

**overseeing**
15:14,15

**own** 28:22

**P**

**page** 64:14,15
74:5 77:23 80:9

**pages** 42:5
82:21

**panel** 61:17,22,
25 62:9 63:22
88:3,4

**paper** 31:17,23
32:7 42:5

**paragraph**
65:11,14 74:5,6
76:11 80:9

**paragraphs**
65:11

**parent** 67:21

**part** 48:6 62:4
81:21,25

**participate**
49:23 52:6
59:12 62:24

**participated**
59:17

**particular** 77:12
81:15,23

**particularly**
23:17 44:8
54:21 66:14

**parties** 4:16

**parts** 13:25

**past** 13:11

**pending** 7:2
45:10

**people** 15:24
22:5 23:20 24:5,
12,20,21 26:15,
20 27:21 28:19,
21,22 29:13
30:3 31:11,16
37:17 40:4,19,
24 41:16,21,22
42:4,5 47:8
54:15 55:15,17,
18,25 56:3,21
62:3 77:10
80:23,25 81:8

**perform** 65:5

**performed**
55:7,18

**period** 18:4 27:9
29:7 43:15
58:19 67:6,23
68:5

**permitted** 24:9
25:10 29:24
43:14,17 66:25
67:19,22 74:17

**person** 21:21
22:11 24:2,20
31:9 32:11 33:5
34:25 37:9,13
38:15 39:2 52:2
54:22 63:15
67:12,18 71:25
72:12 78:15,16
88:8,18

**person's** 16:21
17:19 72:20

**Personnel** 9:24

**perspective**
65:15

**phone** 7:15 81:7

**physically**
19:25 24:13

**piece** 31:22 32:7

**place** 16:15
17:14 27:12
31:19,22 38:2,7
40:2 42:10 54:7
88:7,16 90:5

**placed** 40:12
53:24 55:9
56:13

**placement**
55:16

**placements**
88:14

**places** 24:12
77:10

**plaintiff** 5:8
52:22 53:2 54:8,
13 75:8

**plaintiff's** 8:23
51:4,17 58:5,25
61:11 62:15

**plastic** 39:8

**play** 15:18 19:2

**please** 4:21 5:2,
25 6:14,19 47:5
82:3

**plumbing** 24:16

**point** 6:25 14:23
27:9,19 30:2,8
57:12 88:23
90:2

**policies** 14:2
76:5,9

**policy** 67:4,9,17

**pope's** 22:21

**portion** 42:13,
14,15 87:8

**poses** 76:15

**position** 26:25
62:16,18 63:18,
19 88:8

**positions** 71:24

**possible** 4:24
35:9 72:18
79:18

**practice** 4:9

**pre-k** 54:23

**prepare** 7:22

**prepared** 7:24
8:15

**present** 4:16
74:25 75:12

**presented**
74:10

**primary** 55:21

**principals**
23:24,25 81:3

**privilege** 47:4,
25 48:13 49:9,
20 52:16 63:7,
10 68:18

**privileged** 47:2,
24 48:12 49:7,
19 68:17

**probably** 18:24
42:17,19,25
47:7,8 52:5

**problem** 7:2
65:3

**proceedings**
59:13

**process** 16:9,
15 30:9 35:5

36:19,24 38:23
45:4 60:22
61:22 62:2 72:3
81:13 89:5

**produce** 82:2,3,
8

**produced** 82:16

**professional**
13:12 14:20

**program** 72:20

**programs**
70:16

**progressive**
13:23

**proper** 26:25

**protect** 23:15

**protection**
66:14

**provide** 4:23
53:11,15 56:5,9
66:13 76:19

**provided** 30:16
37:25 38:6

**providing**
16:11,17 17:22
22:7 23:10
46:10 76:12,25

**Public** 5:19

**purchase** 4:3

**purpose** 63:13

**pursuant** 56:19

**put** 7:19 24:12

**Q**

**qualified** 57:8

**Queens** 40:19

**question** 6:14,
16 7:2 26:24
63:11 66:2

**questions** 6:10
8:16 52:10

**R**

**random** 57:10

Case 2:22-cv-01753-PKC-AMMS Document 35-76 Filed 01/06/25 Page 169 of 188 PageID #: 1484

**rates** 66:15

**rather** 65:13

**reach** 7:16

**reading** 65:10

**realized** 17:4

**really** 21:17 31:13 55:2

**reapply** 31:21

**reason** 19:20 38:22 39:4 72:23

**reasonable** 61:16 72:5

**reasons** 37:11 64:13,16 65:8 71:19 75:10 87:14

**reassignments** 10:3

**recall** 30:15 36:7,12 54:5 58:17 60:25

**receive** 37:19 80:15

**received** 22:24 23:21,22 25:24 26:7 31:5 35:11 37:17,23,24 38:16 71:23 87:20 88:11 89:8,19

**receiving** 29:7

**recent** 53:21

**recess** 90:25

**recognize** 44:6, 16 51:21,23 59:5 61:9 62:14, 18,19

**recognized** 44:13

**recommendati ons** 33:25 78:20

**recommended** 34:14

**record** 5:25 52:20 65:25

**referenced** 78:14

**regarding** 8:9, 16 14:11,12,19, 21 16:4 18:10, 16,19 22:21,22 26:14 30:10,17 53:24 55:8 60:6 65:19 66:17,18 68:8,12,24 75:15,22

**regardless** 22:10

**regular** 69:7

**rehired** 28:24

**reinstated** 28:20

**related** 7:13 10:5 14:2 15:2 16:5 45:17

**relations** 9:16 10:2,6

**religion** 67:11

**religious** 14:12, 16 15:2 20:3,10 22:10 25:3,18, 19 29:14 30:24 31:6,12 32:5,13, 19,25 33:3 36:19 37:8,11, 18 40:8 43:10 46:3 52:3 53:12 64:4 67:11,25 70:4,5 73:13 87:14,21 89:8, 19

**religious-** 53:3

**religious- based** 52:24

**remain** 66:15 74:8 88:19

**remained** 70:16

**remember** 17:24 35:10,15 36:8 40:16

**remote** 24:12 71:24 72:21 81:10

**remotely** 4:16

24:16,17 70:11, 17,18,21 71:13 72:5,8 80:6

**removed** 37:14

**Renewed** 61:12

**rented** 40:17,21, 23

**repeat** 6:13

**rephrase** 6:13

**replace** 57:7

**reporter** 4:2,14, 15 6:20 41:2 65:9 73:20 76:23 82:20

**represent** 5:3

**representation** 52:12

**represented** 50:7

**representing** 5:8

**request** 32:9 36:19

**requested** 41:2 65:9 73:20 76:23

**requesting** 64:4

**requests** 36:3,4 45:19 73:11,17, 22 74:3

**requirement** 36:23 37:15

**research** 75:15

**resign** 27:13

**resignation** 28:5,23

**resigned** 27:25 28:8,11,22 29:5

**resource** 21:9

**resources** 13:6, 9,11,17 14:3 24:5 80:11

**respect** 16:16 34:19 52:11 63:4 66:11 82:9

**respond** 6:15

**responses** 6:19

**rest** 82:4

**result** 57:19 65:4

**return** 24:18,19 28:10

**review** 17:3,11 19:6 22:5 30:25 31:7 42:7,11 46:15,19 55:13

**reviewed** 8:2 20:13 32:3 33:21 34:6 35:3 42:17 43:3 44:19,24 46:12

**reviewing** 16:24 41:17 42:2,6

**right** 17:10,14 31:10,21 33:23 34:4 57:6,14 63:17 81:20 88:16 90:17,21, 23

**risk** 74:11 75:2, 12

**Rockaway** 10:19

**Rodi** 4:1,18 5:1, 17 6:1,7 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1,6 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1

72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1

**role** 15:18 19:2 21:11 56:4,24 61:16 63:5 68:18 88:7

**roles** 55:16,17, 23 56:14,20

**rules** 30:9

**run** 23:13 24:3 27:16,17 29:21 79:19

---

**S**

**Sacred** 11:21

**safeguards** 74:9,24 75:11

**Safety** 9:25

**said** 12:9 20:13, 15 21:3,7 41:3 67:2,4 88:24

**same** 10:8 57:4 64:2 70:24

**SAMS** 87:25 88:2,5

**SAMS'** 87:12

**saw** 77:16 81:19 90:3

**say** 18:21 21:15, 17,18,22 27:25 48:16 55:2 72:16 74:19 78:17 79:5 80:22 88:18 89:23 90:2

**saying** 74:7 87:25

**says** 52:22 53:15 66:12 69:8 76:11 77:23 78:9 80:10

**Scheinman**

CaseCase241:22-06-127553PKCBTAMMSDocDoctume35t 76FiledFiledO11e/d07/3614/25PagePage170oef 10f88fPageID Page#D844141485

26:3,8 37:18 59:14

**Scher** 5:7

**school** 10:17,19 11:14,16,17,20, 24 12:10,19,24 14:17 23:12,14, 17,23 24:3,5,7, 9,16,19 27:16 30:5 38:3 67:6, 13,23 70:12 71:2,13 72:4,6, 9,14,21 73:4,8 74:8,11 75:13, 16 76:4,9 78:3, 19,20,25 79:2, 19 88:17,24

**school-based** 89:13

**schools** 27:16 65:23 69:13 75:23 78:2

**schoolteacher** 54:22

**science** 68:25

**scrambling** 77:10

**screen** 8:6,7 43:20,25 82:11

**scroll** 44:10

**second** 52:25 64:15 65:16 69:8,16,18 74:5 80:9

**see** 7:19 8:6,7 13:21 43:19 44:2 51:8,10,13 53:19 59:7 65:4 69:15 76:16 78:3 90:21

**seen** 8:12 59:9, 11

**seniority** 69:11

**sent** 45:13 52:2 53:8 88:12

**separate** 46:21 48:17 81:25

**separately** 82:3

**September**

10:7,11 18:3,20, 25 29:6 45:3,20 50:25 51:5,16, 18 58:7,9

**series** 6:10

**served** 8:9

**service** 26:4,9 37:19 59:15 90:6

**set** 81:6

**settings** 74:8

**seven** 71:9

**several** 9:22 18:7 45:24 77:16

**shares** 4:7

**she** 20:22 21:3, 7,8,15

**sheet** 42:5

**sheets** 31:17

**shield** 39:11

**should've** 26:21 29:15

**shouldn't** 82:15

**show** 8:5 61:8 62:13 82:10

**shown** 82:16

**sign** 77:17

**signed** 28:18,19 29:12 82:18

**similar** 10:11 21:14

**simply** 59:23 77:24 79:7

**Since** 9:19 10:7

**sincere** 29:14

**site** 39:15,22 54:9,16,19

**sites** 39:25 40:3

**sitting** 55:5

**situated** 7:7

**situations** 72:12

**small** 81:7

**social** 72:13

**SOLAS** 20:2 35:2 62:4

**some** 8:16 19:20 28:19,21 30:8 31:16 39:6 42:4,5 47:8 57:25 70:10,25 71:3 77:8 78:10 80:5 89:24

**somebody** 72:16

**someone** 21:19 28:10 32:18 33:2,25 54:24 57:7,16 78:23

**someplace** 55:6

**something** 6:11 11:5 19:20 31:15 32:4 37:15 39:11

**sometime** 18:4, 24 58:19

**sorry** 31:4 50:6 65:10 66:7

**sort** 39:6 57:25

**sought** 22:6 25:14 33:6,16 43:9

**South** 12:3

**space** 40:18 55:24 65:20

**SPARATE** 83:5 84:5 85:5 86:5 87:5

**speak** 65:12 75:20

**special** 70:16, 20 72:17

**specific** 19:6

**specifically** 40:21,23

**spend** 41:25

**staff** 55:22 56:13 65:21

69:13,22 74:11 75:13,17 79:18

**staffing** 24:4

**stamped** 66:4

**start** 10:20 17:2 28:12,13 33:14

**started** 15:13

**state** 5:2 65:8 69:9 76:4

**statement** 62:16,19 63:18 74:13

**statements** 22:21

**stating** 5:19

**status** 58:3

**stay** 4:22

**still** 25:12 27:11 34:15 39:6 57:5 71:8

**stop** 10:24 67:4

**stopped** 11:7

**Street** 5:20

**strike** 30:22 32:24 68:9

**students** 54:21 55:19 56:7 57:9, 25 70:10,15,20 79:23,24,25 80:3

**students'** 57:18

**studies** 12:8 72:13 75:21

**studying** 70:17, 21

**submit** 31:24 62:4 63:17

**submitted** 31:15 32:4 44:18 63:22 64:3

**submitting** 32:11 45:12

**subs** 57:10

**subsequently**

35:8

**substitute** 57:3

**such** 53:11 74:7 76:14

**suffer** 57:19

**Sullivan** 20:18, 22

**superintendent 's** 16:2

**supervisor** 21:3,8 50:21

**supervisors** 80:13

**support** 32:4 77:25 81:7

**supported** 62:2

**supporting** 80:24

**Supreme** 53:21

**sure** 7:21 17:11 31:9,14 32:3 42:8 44:14 45:7, 16 79:4 89:23

**suspended** 27:8 29:8 57:12

**suspension** 27:20 57:5

**swear** 5:4

**sworn** 5:18

**system** 23:12 24:3 27:13 28:2, 11 29:5 35:2

**systems** 69:11

---

**T**

**table** 88:20

**take** 4:17 6:15, 21,24 12:19,24 16:15 18:16 26:15,20 27:2 38:9 39:2 56:12 78:22 90:15

**taken** 14:20 18:10 90:25

**taking** 4:7 7:3

**talk** 19:9

**talked** 18:6

**talking** 19:10

**talks** 64:9

**teach** 10:16,18, 22 54:21 70:20

**teacher** 10:14 54:17,23 57:4, 20 58:3 71:6,8 78:24 89:8 90:9, 11

**teachers** 23:19, 22 27:15 30:4 41:7,12 56:18, 25 70:24,25 71:12 81:4 90:5

**teaching** 10:20, 24 11:2,7,13 71:9,12,24 72:13

**team** 10:4 33:20 34:6 80:25 88:13

**tell** 8:6 30:21 46:7

**ten** 71:6 90:20

**tenure** 13:24

**term** 78:2

**terminate** 28:2

**terminated** 26:21 27:3 28:7

**terms** 19:25 20:2 27:23 55:20 74:3

**tested** 25:11 43:16

**testified** 5:22

**testing** 24:25 43:8 74:10,25 75:3,11,15,22 76:5

**than** 32:2 42:21 53:17 73:13

**Thank** 4:12 41:5 47:6

**Thanks** 90:24

**that's** 4:8,10 57:3 62:5 63:19 64:13 65:7 66:9 79:21 80:7 90:19

**their** 5:3 23:20 27:3 28:22,25 29:15 31:15 32:9 37:12 53:13 54:19,20 55:4,5,21 56:20 57:6,14 67:3 70:24 71:5,6 78:2 79:21 80:5, 7,8,13 81:9 88:12,17,21

**them** 17:3,4 19:25 20:13 25:21,24 27:11, 13,18,20,25 28:3,6,8 29:2,25 31:20,23 38:24 39:9,13,21 40:2 45:12 46:19 53:11 54:19 57:7 72:4,6 73:12 80:21 88:4,16,24

**then** 5:4 27:9 29:3 31:18 32:2, 3,8 33:11 34:5 35:7 38:6 42:10 45:13 48:21 55:23 56:8 67:10 71:9 72:2, 6,15 74:20 88:2, 14,23

**there** 7:9 15:7, 24 17:12,15 18:10,13 19:19 21:22 22:16,20 23:2 25:7 26:13 27:9 30:2 32:10, 17,25 33:10,11 35:21 36:18,23 39:15 42:8,9 43:3,4 44:23 47:7 48:17 53:22 56:13 57:10,24 60:4 62:7 66:16,21 67:7,20 68:23 69:20 70:15 72:23 73:12 77:12,24 78:5,9 79:3,6,13 80:25

**81:13 88:2 89:2**

**there's** 6:11,25 27:19 28:9 29:2 66:5

**therefore** 53:13

**these** 21:24 55:23,25 56:5 59:18 64:16 65:10 78:5

**they** 5:3 8:2 17:13 22:6 25:7 27:7,8 28:5,8, 12,13,14,18,20 29:11 31:12,14, 20,24 32:3,8 33:24 34:4,14 35:2,3,4,5,6 37:19,23,24,25 38:6,8,9 39:3,5, 7,9 40:12 42:7 43:16,17 45:9 46:19 54:25 57:4,5,13 60:12 66:24 67:3,20, 21,22,24 68:4 70:24 72:2,7,23, 24 73:4,5,8 74:17,19 75:3,6 78:17,19,21,24, 25 79:14,20,22, 23,24,25 80:3, 22 81:6 88:11, 14,15,17,25 89:25

**they're** 55:2,4,5 88:19

**they've** 28:7

**thing** 39:19 44:11

**think** 18:3 19:22 29:13 42:22 82:8 90:16

**third** 65:17 69:17

**those** 17:7 23:16 25:2 26:6, 14 29:4 33:21 34:5 37:17 40:2, 4 43:9 47:19 50:16 55:17,18 56:9,10,14 58:11 70:20 71:18 73:2

**77:18 81:5**

**though** 28:7,8 34:13 39:10 78:6

**thought** 64:22

**thousand** 17:6 18:8 24:21 25:14,18 42:16, 17 54:15

**thousands** 16:25

**three** 10:23 17:6 24:20 25:13,18 39:25 41:20,21 42:16 54:14 64:14 71:7,10

**through** 35:2 37:18 44:10 60:21 62:4 81:12 82:22

**time** 18:5 20:14, 19 23:15 24:8 27:7,24 29:20, 24 41:25 57:8 77:5

**title** 9:14,15,18, 21,22 10:8 14:5, 8 21:8 23:21

**titles** 79:4 89:24,25

**today** 6:10 8:3

**today's** 7:22

**together** 16:3

**too** 88:4

**took** 14:17,18

**top** 64:5 77:23

**topics** 8:17 13:19

**Torrey** 58:24 59:2

**train** 80:12,21

**trained** 13:16, 19 14:7 81:5

**training** 13:5,8 14:4,10,12,15, 25 30:16 80:14

**trainings** 13:14

**transcript** 4:24 81:22 82:2,5

**transfer** 69:13, 22

**transmission** 66:15

**treat** 28:6,8 39:16,21

**treated** 28:4

**try** 11:5

**turn** 7:18

**two** 39:25 41:22 50:14,17

**type** 13:8 14:15 16:6 80:14

---

**U**

**UFT** 49:24 50:5, 9 69:21

**Uh-hum** 58:10

**unacceptable** 74:10 75:2,12

**under** 6:15 9:10 37:7,8 47:24 49:8

**understand** 6:11,17,22 7:3 19:12 26:24

**understanding** 4:6 27:22

**understood** 6:16

**undue** 16:12,17 17:8,23 18:20 20:5,10 21:24 22:8 23:11 24:22 46:4,11 53:16,24 54:7 55:8 56:8 64:11, 18 76:15

**unfortunately** 57:9

**unilaterally** 19:15

**unique** 62:20

**University** 11:18 12:10,13

**unmasked** 39:17,21,23

**until** 46:15 57:16

**unvaccinated** 29:22 74:8,21

**up** 81:6

**upon** 8:9 16:21 46:4

**used** 22:22 61:3

**usually** 4:9

---

**V**

---

**vaccinated** 23:14 24:8 25:9 39:3 43:14 67:5, 19 68:5 74:22 75:6

**vaccination** 57:13

**vaccine** 15:10, 12,19 16:5 22:22 23:3 26:15,21 27:3 38:9 39:3 44:21 49:25 50:10 56:12 68:12

**varied** 48:2

**Various** 48:2

**verbal** 6:20

**versus** 4:19

**very** 28:23

**Vicki** 20:19 21:2,25 50:20

**VII** 14:5,8

**vitally** 54:24

**vulnerabilities** 71:8

**vulnerable** 71:4

---

**W**

---

**walked** 28:21

**wall** 39:8

**want** 52:20 74:21

**wasn't** 21:25 25:6 39:13 54:12 74:22 79:12

**way** 28:19 43:3 44:23

**we're** 81:24 82:6

**well** 14:11 30:21 33:14

**went** 11:17 12:9 14:17 27:21 33:19 56:18

**were** 10:10 15:8 16:17,23 18:2,6, 10,13 19:14,23 20:10,14,16 21:24 23:14 25:9,13 27:8 29:5 30:16 31:12 32:23 33:10,11 34:5,7, 8,14,23 35:2,3, 5,11,16,21 36:4, 8,13 37:25 38:6, 9 39:3,5,14,16 40:2,9,11,12 41:6,11,16 42:12 43:4,16, 17 44:18 45:17 46:3,11,19 47:7 48:5 49:13 53:10 56:6,12, 20 57:5,13 60:12,20 61:15 64:16,22 66:25 67:5,7,21,22 68:4,6,10 69:6 70:10,15 71:12, 18 72:23 73:2,3, 4,8,12,22 74:4, 10 75:3,6 77:9 78:18 80:19,20 81:2,5 88:2 89:4

**weren't** 24:8,9 25:12 74:17

**what** 9:14,20 10:16 11:2,19, 23 12:5,7,12 13:8,19 14:15 15:18,22 16:6

21:8,11 22:10, 12 23:8 26:6 28:17 29:4,11 30:20 31:7 32:6, 23 35:6 38:24 39:19 40:11 45:4 46:19 50:16 56:25 61:2 63:13,19 67:11 74:12 78:15,24 80:14 82:10 88:16

**what's** 37:2 61:8 62:13

**whatever** 39:4 77:6

**when** 8:6 10:20, 24 15:3 16:4,22 17:21,24 19:9 22:16 27:25 30:23 31:5 37:13,24 43:19 45:20,25 48:16 51:8 58:11 62:21 66:14 75:2 81:11 82:2 88:5,11

**where** 7:6 10:18 11:16,19 12:2 18:4 27:10,19 28:13 30:3 37:9 40:11 45:4 46:2, 9 54:24 62:5 88:15

**whether** 19:3, 15 21:12,16 22:23 30:17 31:8 32:11,18 44:12 57:20 61:3 67:20 72:20,22

**which** 33:12,20 39:17 47:11 55:16,17,19 58:6

**while** 17:16 57:4,15 79:20

**who** 5:3 9:4 21:2 22:5 25:2,21 26:15,20 27:2 28:10,11 29:13 33:6 37:17 39:2 40:24 43:3,9,13 44:23 46:18

47:18 48:20 50:5 52:2,4 54:15 55:7,15 56:11 57:7,12 59:17 67:18 70:19 71:10,23 74:22 77:13 80:19 90:3

**who's** 20:16 78:23 88:7

**whole** 17:4 44:11 79:17

**wholly** 28:17 72:19 78:15

**why** 36:18 64:16 74:24 75:8 79:12 81:14

**with** 7:10,20 13:10 16:16 24:15 27:10 29:25 31:15 33:14 34:19 37:15,16 38:23 39:12,17 40:4,8, 15 45:21 46:9, 16 47:16 48:25 49:12,24 50:9 52:10 53:12 54:25 55:13 56:7 57:7 59:13 62:6 63:4,6 65:15,16,18 66:11,22,23 68:7,11,19 69:7, 21 71:5,10 72:14,16 74:9 76:9,13 79:25 80:3

**within** 7:16 11:15 13:15 14:24 26:13 48:18

**without** 27:13 30:25

**witness** 5:5 46:24 47:21 48:9 49:5,17 52:9 63:3 68:14

**wore** 67:3

**work** 6:2 21:4 27:8 28:10 38:2, 7,10 52:11 54:8 55:25 63:5

67:13 72:8,15 77:24 78:5,9,10, 22 79:3,6,7,14, 21,25 80:5,7,14 81:8,9 88:24 89:25

**worked** 9:11 13:10 38:23 67:20

**workers** 23:23 90:7

**working** 11:8 20:23 24:22 70:17 71:10 72:4

**works** 90:11

**would** 4:3 5:23 8:3 16:9,12,15 17:3,8 18:21 20:4 31:11 35:7 38:21,24,25 42:3,6,7,10 45:11,15,16 46:20 48:25 53:16 54:7,15, 18,20 55:8,15, 19,22,24 56:8 57:7,24 58:18, 19,21 63:15,19 64:11 65:4,12, 22 66:23 67:4 70:20,25 71:3, 25 72:2,3,7,8,9, 10 74:25 75:12, 16 78:21 80:21 87:24 88:12,14, 16,17,25

**would've** 24:22 33:2

**wouldn't** 72:17

**write** 78:19

**wrong** 31:19 42:9

**wrote** 32:8

---

**Y**

---

**yeah** 43:23 44:2 50:23 65:7 69:19 78:21 79:3,11

Case 2:22-cv-06175-BRM-MMS Document 35 Filed 01/06/25 Page 173 of 188 PageID Page#ID 84:71488

**year** 11:23 12:5,
12 29:6 38:3
70:12 71:14

**years** 9:13
10:23 11:15
13:11

**yes** 6:18,23 7:5
8:11,14,19 9:3
10:9,12,15
11:15 12:11,16,
18,23 13:4,7,18
14:6,9,14 19:5,
8,13,19 20:8,12,
25 21:15 22:15
26:5 33:19
34:12,18 35:25
36:17 41:10,24
48:19 49:10,21
51:22 52:18
53:20 60:3
71:17,22 76:17
78:4 82:20
89:17

**York** 4:19 5:10,
14,21 7:24 9:5,
6,10,12 11:9,22
12:17 20:23
29:16 50:6
61:16 76:4

**you'd** 72:15

**you're** 50:12
53:6 54:3 58:2
63:10 82:10
88:21

**you've** 82:18

**your** 6:19 7:15
9:4,14,20 10:10
11:13 12:7
20:21 21:3,7
26:25 34:7 45:3
52:11 54:13,17
58:3 62:20 63:5
68:18 73:5
82:11 88:20

---

**Z**

---

**Zoom** 48:6

# EXHIBIT N



<table>
<tr><td><strong>MURIEL GOODE-TRUFANT</strong><br><em>Corporation Counsel</em></td><td align="center">THE CITY OF NEW YORK<br><strong>LAW DEPARTMENT</strong><br>100 CHURCH STREET<br>NEW YORK, NY 10007</td><td align="right"><strong>Andrea M. Martin</strong><br><em>Assistant Corporation Counsel</em><br>Telephone: (212) 356-3549<br>E-mail: andmarti@law.nyc.gov<br><em>Email not for service</em></td></tr>
</table>

November 18, 2025

**VIA ECF**

Magistrate Judge Vera Scanlon
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:   <u>Masciarelli v. New York City Department of Education</u>
           No. 22-Cv-7553

Dear Magistrate Judge Scanlon:

We represent Defendant New York City Department of Education ("DOE" or "Defendant") in the above-referenced action. In accordance with the Court's Order dated November 17, 2025 (ECF Dkt No. 75), Defendant respectfully submits this letter to provide additional context and address the points raised in the Court's October 15, 2025 Order prior to the November 20, 2025 oral argument concerning Plaintiff's motion to compel (ECF Dkt. No. 73). For the reasons set forth below, as well as in Defendant's opposition to Plaintiff's motion to compel (ECF Dkt. No. 75), the motion should be denied in its entirety.

The Court's October 15, 2025 Order directed the parties to be prepared to discuss the following: (1) whether any of the private arbitration decisions are within Defendant's custody and control; (2) the impact that any confidentiality provisions involved in the private arbitrations have on Plaintiff's request; and (3) whether the Citywide Appeals Panel decisions are subject to any confidentiality agreements and, if so, the impact of those agreements on Plaintiff's request. Those points are addressed herein.

**1. The Private Arbitration Decisions Are Not Within Defendant's Exclusive Custody and Control**

As a general matter, the private arbitration decisions Plaintiff seeks are not within Defendant's exclusive custody or control. These decisions were issued in confidential proceedings governed by independent arbitration agreements between the City of New York (the "City") and Scheinman Arbitrations and Mediation Services ("SAMS"), a non-party to this case. Defendant does not possess, maintain, or control the entirety of those records. SAMS occasionally, but not

consistently, provided Defendant with its decisions to notify Defendant of results in certain discrete arbitrations.  A party cannot be compelled to produce documents it neither controls nor has authority to access. See Shcherbakovskiy v. Da Capo Al Fine, Ltd., 490 F.3d 130 (2d Cir. 2007) ("[A] party is not obliged to produce . . . documents that it does not possess or cannot obtain.")

Applying that standard here, Defendant should not be compelled to produce the SAMS arbitration decisions not within its exclusive custody and control.

### 2. Judge Bulsara Already Determined That The Private Arbitration Decisions Must Remain Confidential

Even if the private arbitration decisions were in Defendant's custody and control, Plaintiff's motion must be rejected because well-established case law and strong public policy concerns dictate that those decisions must remain confidential. First, arbitrators are required to maintain the confidentiality of all arbitration proceedings.[1] The Alternative Dispute Resolution Act, 28 U.S.C. § 652, on its face, instructs federal district courts to adopt local rules to apply confidentiality in their dispute resolution programs. Importantly, courts have been instructed to "provide for the confidentiality of the alternative dispute resolution processes and prohibit disclosure of confidential dispute resolution communications." 28 U.S.C. § 652(d).

Second, Plaintif has already moved to compel non-party SAMS to produce the arbitration decisions, (ECF Dkt No. 53), and Judge Sanket J. Bulsara denied Plaintiff's motion in its entirety on August 6, 2024, ruling that the decisions are confidential and Plaintiff had not met her burden to compel their production. See ECF Minute Entry and Order dated August 6, 2024. Plaintiff's prior motion to compel sought the same confidential decisions Plaintiff seeks here, based on the same erroneous reasoning of an alleged numerical discrepancy. See ECF Dkt. No. 53. As such, the law of the case doctrine dictates that Plaintiff's renewed request should be denied. See United States v. Quintieri, 306 F.3d 1217, 1225 (2d Cir. 2002) (The law of the case doctrine commands that "when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case" unless "cogent and compelling reasons militate otherwise.").

Courts in the Eastern District of New York, including Judge Bulsara in this matter, have previously held that the type of material being sought here, namely private arbitration decisions from a third party conducted pursuant to a confidentiality agreement, are routinely recognized as confidential and sensitive. "A party seeking disclosure of confidential mediation communications must demonstrate (1) a special need for the confidential material, (2) resulting unfairness from a lack of discovery, and (3) that the need for the evidence outweighs the interest in maintaining confidentiality." Savage & Assocs. P.C. v. K&L Gates LLP (In re Teligent, Inc.), 640 F.3d 53, 58 (2d Cir. 2011). "All three factors are necessary to warrant disclosure of otherwise non-discoverable documents." Id. In Teligent, the Second Circuit made this point clear, explaining that "[c]onfidentiality is an important feature of the mediation and other alternative dispute resolution processes." In re Teligent, 640 F.3d at 57; see also Bernard v. Galen Group, Inc., 901 F. Supp. 778 at 57 (S.D.N.Y. 1995). Moreover, the Teligent court "vigorously enforce[d] the confidentiality

---

[1] Rule 23 of the American Arbitration Association (AAA) states "[t]he arbitrator and the AAA shall maintain the privacy of the hearings unless the law provides otherwise."

2

provisions of [their] own alternative dispute resolution . . . because [the court] believe[s] that confidentiality is essential." Id. at 58 (internal citation omitted). The court explained that "if participants cannot rely on the confidential treatment of everything that transpires during [mediations] then counsel of necessity will feel constrained to conduct themselves in a cautious, tight-lipped, non-committal manner more suitable to poker players in a high-stakes game than to adversaries attempting to arrive at a just resolution of a civil dispute." Bernard, 901 F. Supp. at 784 (citing Lake Utopia Paper Ltd. v. Connelly Containers, Inc., 608 F.2d 928, 930 (2d Cir. 1979)). The state and federal courts of this jurisdiction have held that New York's pervasive public policy of endorsing and enforcing the confidentiality of alternative dispute resolution procedures, and protecting the neutral from discovery can scarcely be debated. Id.

In light of this well-established law, Judge Bulsara previously denied Plaintiff's motion to compel SAMS to produce the private arbitration decisions of non-parties to this litigation because such material is confidential and Plaintiff failed to meet the standards outlined by the Second Circuit in In re Teligent. See ECF Dkt No. 60, Transcript of Proceedings held on August 6, 2024 Specifically, Judge Bulsara determined that, "when seeking documents that have been made confidential and you are a third party, there's a separate and more exacting standard in order to get discovery of those documents…. those standards aren't even articulated in the motion, let alone met, and that's an independent basis to deny the motion to compel". See ECF Dkt No. 60, at 8-9. Accordingly, the Court should not disturb Judge Bulsara's prior finding and should instead preserve the integrity of the ADR system by maintaining the confidentiality protections that have long governed these materials.

### 3. The Citywide Panel Decisions Must Remain Confidential Pursuant to Law, Policy, and Practice

Plaintiff also seeks confidential documents from the Citywide Appeals Panel, also a non-party to this action. See ECF Dkt. No. 73. However, the City of New York mandates that agencies keep records related to all accommodation requests – including those reviewed by the Citywide Appeals Panel - confidential. See City of New York Reasonable Accommodation Procedural Guidelines 2024, attached hereto as Exhibit A at 30 ("All information, including a statement of the person requesting a reasonable accommodation or any other related documentation, record, and the fact that the individual has requested or obtained a reasonable accommodation, must be maintained as confidential records by the agency to the extent required by applicable federal, state, or local law.") This requirement applies not only to the initial agency-level review, but also to all subsequent stages of the accommodations process, including the Citywide Appeals Panel. As such, this directly addresses Your Honor's Point II regarding whether the Citywide Appeals Panel decisions are subject to any confidentiality agreements and, if so, the impact of those agreements on Plaintiff's request.

As the City's Reasonable Accommodation policy makes explicit, access to such information is strictly restricted. See Exhibit A at 30. Consistent with this mandate, the vaccine appeals database was intentionally designed so that the ability to access or download any data submitted by employees was severely restricted, reflecting the City's understanding that the entirety of these requests must be kept confidential and handled with heightened sensitivity. See id. To publicly disclose information surrounding DOE employees' accommodation requests would violate the City's own legally mandated confidentiality procedures and undermine the integrity of

3

the entire accommodation process, which depends on employees being assured that sensitive medical and religious information will be protected.

In sum, both federal law, City policy and practice require that all reasonable accommodation requests submitted to City agencies be maintained as confidential. Thus, Defendant is not merely choosing to withhold private arbitration and Citywide Appeals Panel decisions, it is obligated to do so.

Accordingly, for the reasons set forth above, Plaintiff's motion to compel should be denied in its entirety.

Respectfully Submitted,
s/Andrea M. Martin
Assistant Corporation Counsel

cc:    Counsel of Record (via ECF)

# EXHIBIT O

## APPENDIX

# United States Court of Appeals
### FOR THE
### SECOND CIRCUIT

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 14th day of November, two thousand twenty-one.

Before:     Pierre N. Leval,
            José A. Cabranes,
            Denny Chin,
                 *Circuit Judges.*

---

Michael Kane, William Castro, Margaret Chu,
Heather Clark, Stephanie Di Capua, Robert Gladding,
Nwakaego Nwaifejokwu, Ingrid Romero, Trinidad
Smith, Amaryllis Ruiz-Toro,

                           *Plaintiffs-Appellants,*          **ORDER**

            v.                                                21-2678-cv

Bill de Blasio, in his official capacity as Mayor of
the City of New York, David Chokshi, in his
official capacity of Health Commissioner of the
City of New York, New York City Department of
Education,

                           *Defendants-Appellees.*

---

Matthew Keil, John De Luca, Sasha Delgado,
Dennis Strk, Sarah Buzaglo,

                           *Plaintiffs-Appellants,*

            v.                                                21-2711-cv

The City of New York, Board of Education of the
City School District of New York, David Chokshi, in
his Official Capacity of Health Commissioner of the
City of New York, Meisha Porter, in her Official

Capacity as Chancellor of the New York City
Department of Education,

*Defendants-Appellees.*

---

The motions of Plaintiffs-Appellants ("Plaintiffs") for an injunction pending appeal having been heard at oral argument on November 10, 2021, and Defendants-Appellees ("Defendants") having represented to this Court that "the City is working toward making an opportunity for reconsideration available more broadly to DOE employee[s] who unsuccessfully sought religious exemptions pursuant to the arbitration award's appeal process," it is hereby

**ORDERED** that this appeal is expedited and will be heard by a merits panel sitting on November 22, 2021 (the "merits panel"). Pending further order by the merits panel,

1. Plaintiffs shall receive fresh consideration of their requests for a religious accommodation by a central citywide panel consisting of representatives of the Department of Citywide Administrative Services, the City Commission on Human Rights, and the Office of the Corporation Counsel.

2. Such consideration shall adhere to the standards established by Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law, and the New York City Human Rights Law. Such consideration shall not be governed by the challenged criteria set forth in Section IC of the arbitration award for United Federation of Teachers members. Accommodations will be considered for all sincerely held religious observances, practices, and beliefs.

3. Plaintiffs shall submit to the citywide panel any materials or information they wish to be considered within two weeks of entry of this order. The citywide panel shall issue a determination on each request no later than two weeks after a plaintiff has submitted such information and materials. Within two business days of the entry of this order, Defendants shall inform plaintiffs' counsel how such information and materials should be transmitted to the citywide panel.

4. The deadline to opt-in to the extended leave program and execute any accompanying waiver shall be stayed for Plaintiffs, and no steps will be taken to terminate the plaintiff's employment for noncompliance with the vaccination requirement.

5. If a plaintiff's request is granted by the citywide panel, the plaintiff will receive backpay running from the date they were placed on leave without pay.

6. This order is intended only to provide for temporary interim relief until the matter is considered by the merits panel of this court, which panel may entirely supersede these provisions for interim relief, and the parties are at liberty to advocate to the merits panel for alteration of these provisions. Unless the merits panel has previously entered a superseding order, within two weeks of the conclusion of Plaintiffs' proceedings before the citywide panel, the parties shall inform the merits panel of the result of those proceedings and advise of any further relief being sought.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk

# EXHIBIT P

DIRECT/RODI

Your next witness, please.

MS. BILLER:  I would like to call Ms. Rodi, please.

JUDGE BLASSMAN:  Please approach and I will swear you in.

Do you swear or affirm to tell the truth and nothing but the truth in this proceeding?

THE WITNESS:  I do.

JUDGE BLASSMAN:  Thank you.

Can you please state your full name for the record.

THE WITNESS:  My full name is Katherine Rodi, R-O-D-I.

DIRECT EXAMINATION

BY MS. BILLER:

Q.    By whom are you employed by?

A.    I'm employed by the New York City Department of Education.

Q.    What capacity?

A.    I'm the director of the office of Employee Relations.

Q.    How long have you held that position?

DIRECT/RODI

A.      I held that position for two and a half years.

Q.      And prior to being the director of Employee Relations, what other job titles have you held within the Department of Education?

A.      I was an agency attorney, I was a senior counsel and I was the director of the Disciplinary Support Unit.

Q.      As director of Employee Relations, what are some of your job duties and responsibilities?

A.      I oversee several units.  I oversee the Office of Personnel Investigation, I oversee the Office of Employee Relations, I oversee the Office of Safety and Health, I oversee it, it is not really an office, but the Disciplinary Support Unit work.

Q.      Can you explain to us what the Disciplinary Support Unit is?

A.      It is a unit within my office that manages the on-line system that is the Disciplinary Support System.

DIRECT/RODI

And what we do, we check and track and eventually flag folks. We check older discipline, older substantiated reports, we review them, we track them and then if all the qualifications that we build together are met, then we may flag a person.

Q.    Can you give us the years that you were responsible for overseeing the disciplinary support unit?

A.    I was hired in June of 2012. I started in July, early July of 2012. Then I was promoted to the director of Employee Relations in January of 2013 and then I subsumed DSU into my current work.

JUDGE BLASSMAN:  DSU?

THE WITNESS:  The disciplinary support unit.

JUDGE BLASSMAN:  So, since when have you been overseeing disciplinary support.

A.    It has basically been under my portfolio since July of 2012.

Q.    Are you aware when the flagging was implemented, began to be implemented?

Page 71

DIRECT/RODI

A.      I was invited to a meeting about disciplinary support projects, I want to say it was like April of 2012 at that meeting there were all the senior counsel, I was in the role of senior counsel at the time.  So, all the senior counsel, there where I think there were superintendents, other random DOE staff and we got a presentation about the DSU.

By the time I started in July at least a couple of hundred people had been flagged.  So, I think it started in May or June of 2012.

Q.      Are you familiar with the Galaxy system?

A.      Yes.

Q.      What is the Galaxy system?

A.      The Galaxy system is actually a budgetary system that provides table of organization for all DOE offices and schools.

So, it is a budget driven system that basically tracks all current employees by the order by where they work.

Page 72

DIRECT/RODI

Q.       What, if any, involvement do you have with the Galaxy system?

A.       As being part of Human Resources, I use the Galaxy system a lot.  To check people's status and then the DSU, the Disciplinary Support project, it linked to Galaxy, but it is not like a part of Galaxy.

JUDGE BLASSMAN:  It is linked to Galaxy?

THE WITNESS:  It is linked to Galaxy.

Q.       Are you familiar with the Disciplinary Support Unit flag?

A.       Yes, I am.

Q.       I know we heard much talk about it.

Can you briefly define for us what the disciplinary support unit flag is?

A.       Sure.  The flag is a reflection of what we pulled into the DSU system.  The system is a web based system.

It is set up so that no one can be accidentally or easily flagged.  It is set up so that if I want to kind of open a folder

DIRECT/RODI

for a person, I have to put in their name or an identifier such as a Social Security number, an employee I.D. and then that person's name would be automatically populated from the Galaxy data.

Once I have the person's information up I can then attach documents to the person's name.

Just attaching a document to a person's name doesn't flag them. What it has to do it has to meet two qualifications.

Number one, there has to be a substantiated report of discipline issued from an investigatory body.

Then second there has to be a letter of discipline that has been -- that has evidenced that the person received the discipline.

Once both those two factors are met a person is then manually flagged.

So, even if the two documents were both there, unless someone went in there and looked at it, a person couldn't be flagged. It is not, the system doesn't read